UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF NEW YORK

------------------------------------------X

UNITED STATES OF AMERICA               11-CR-449 (SJ)


v.                                              MOTION


Cassandra Cean

------------------------------------------X



PRELIMINARY STATEMENT

Defendant Cassandra Cean ("Defendant"), pro se, respectfully submits this instant motion for a full resentencing for imposition of restitution, resentencing based on relevant conduct of co-conspirators pursuant to 1B1.3(a)(1)(B), loss pursuant to 2B1.1(b)(1), and forfeiture pursuant to 18 USC 984(a).


This motion is not intended as a motion pursuant to 28 U.S.C. Section 2255. The Supreme Court and the Court of Appeals for the Second Circuit have imposed some constraints upon the district court's ability to convert a pleading to a motion pursuant to 28 U.S.C. Section 2255 because of the potentially detrimental consequences to the petitioner. In construing a pro se pleading as a request for relief under 28 U.S.C. Section 2255 ("2255"), a district court is required to: Notify the pro se litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent 2255 motion will be subject to the

restrictions on "second or successive" motions, and provide
the litigant an opportunity to withdraw the motion or to amend
it so that it contains all the 2255 claims he believes he has.
Castro, 540 U.S. at 383; see also Adams, 155 F.3d at 584.
Additionally, a district court judge can revisit issues
decided on appeal [either by motion or sua sponte] where there
are subsequent factual discoveries. EEOC v. Sears, Roebuck &
Co. 417 F.3d 789, 796 (7th Cir.2005).


### THIS COURT'S RECENT RULING


On January 11, 2018, the Court affirmed Judge Reyes'
reasoning in his Report and Recommendation, recommending
restitution in the amount of $243,148.51 to Impac Secured
Asset Series 2007-2 Trust ("Impac") as a victim and no
restitution to Santander as a victim. This recent ruling, the
evidence presented post-remand during the MVRA hearings, and
the recent disclosure of the sealed lawsuit filed in United
States v. Impac Secured Assets Corp., Impac Funding Corp., and
Impac Mortgage Holdings, Inc. invites scrutiny and re-
application of not only the Mandatory Victim Restitution Act
of 1996 ("MVRA") which is codified in Title 18, United States
Code, Sections 3663A and 3664(e); but also for relevant
conduct of co-conspirators; and specific offense
characteristics sentence enhancements which are respectively
codified in United States Sentencing Manual, Sections
1B1.3(a)(1)(B);and Section 2B1.1(b).

ARGUMENT

POINT I

NEW EVIDENCE POST-REMAND MANDATES
A FULL RESENTENCING OF DEFENDANT

A. The Defendant Should Be Resentenced Pursuant To
1B1.3(a)(1)(B)

Defendant's conduct and the conduct of her co-
conspirators did not fall within the scope of conduct
allowable under 1B1.3(a)(1)(B), and Defendant asserts that any
enhancement of her sentence based on 1B1.3(a)(1)(B) was a
procedural error. A district court may sentence a defendant
based on the reasonably foreseeable acts and omissions of his
co-conspirators that were taken in relation to a conspiracy.
U.S. Sentencing Guidelines Manual section 1B1.3(a)(1)(B).
United States v. Getto, 729 F.3d 221 (2d Cir. 2013). However,
the scope of conduct for which a defendant can be held
accountable under the sentencing guidelines is significantly
narrower than the conduct embraced by the law of conspiracy.
Id. Defendant asserts that her sentence was inappropriately
enhanced by conduct of her co-conspirators, despite the
guidance offered in United States v. Studley, 47 F.3d at 574
(2d Cir. 1995).

Under Studley, the court is directed to determine the
defendant's accountability for the conduct of others under

3

subsection (a)(1)(B) using a two prong test. First, the court must determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement). This determination, goes to prong one of the test, must be made before the issue of the second (foreseeability) prong is reached. See Studley, 47 F.3d at 575. In the PSR there was no mention or determination of the specific conduct undertaken by Defendant or the objectives embraced. The PSR explained that, "Cean was involved in every transaction which comprises the instant offense, with the exception of the two 641 East 82nd Street transactions. She is nevertheless accountable for the losses associated with these two properties, they were both part of the overall conspiracy of which she was found guilty. Further, the activity which comprises the instant offense was jointly undertaken by Cean and the losses associated with each property were reasonably foreseeable. Consequently, on [count] 1,2,3,5, & 6, Cean is accountable for the total loss."

Contrary to the determination of the PSR, the testimony of Mr. Nicholas Schwegel, the Government's witness at the MVRA hearing, concerning 641 East 87th Street, Bklyn, NY, support that any sentence enhancement to the Defendant's sentence concerning this property was impermissible. Specifically, Mr. Schwegel testified that Defendant's name did not appear on any of the documents relating to the mortgage and that she was not the settlement agent with respect to this mortgage. (HT: 99-100).

Next, Mr. Jeremy Calva, Defendant's expert witness,
testified that he saw no documents mentioning Defendant or
Defendant's firm and that it was his opinion that since there
was no proof of specific conduct or objectives embraced by the
Defendant's agreement, Defendant could not be at fault. (HT:
261). In response to the Government's further inquiry of the
expert witness on this matter, Magistrate Judge Reyes advised,
"You don't need to go into this. This is a legal matter that
I'll deal with." However, this legal matter has not yet been
addressed through the Magistrate's Report and Recommendation
(R&R) or the Court's adoption of the R&R. Moreover, during
Defendant's sentencing and in the Government's sentencing
memorandum, the Government incorrectly applied the wrong law
for co-conspirator liability, by quoting case law in United
States v. Peter Rosa, 17 F. 3d 1531 (2d Cir. 1993) and United
States v. Juan Manuel Huezo, 546 F.3d 174 (2d Cir. 2008),
whose case law is limited to the elements necessary to prove
conspiracy, not elements needed "to prove a defendant's
liability as a co-conspirator. See Government's Sentencing
Memorandum, ECF DE 198 p.6).

At sentencing, the Government inappropriately argued for
sentence enhancements based on relevant conduct of co-
conspirators, pursuant to 1B1.3(a)(1)(B), by invoking
irrelevant conspiracy law stating that,"the case law on this
issue states that a participant in a conspiracy need not know
every act that other participants in the conspiracy are
committing during the course of the conspiracy." See ECF DE

193-5 p. 9. In providing credence to the misapplied conspiracy case law, the Government futilely stated, "[W]ith regard to that, the government presented evidence at trial that multiple closing agents were used during the course of the conspiracy, that Cassandra Cean had involvement with other closing agents... . So, the mere fact that she wasn't the closing agent doesn't take away her accountability for the actions of her other co-conspirators." Studley, the controlling case regarding relevant conduct of co-conspirators does not support the Government's proposition. United States v. Khandrius, 613 Fed. Appx. 4 (2d Cir. 2015)(quoting) United States v. Studley, 47 F.3d 569, 574 (2d Cir.1995)(even important participation in one aspect of a conspiracy with awareness of others does not necessarily establish responsibility for the whole of the conspiracy's activities). Moreover, the Second Circuit vacated the sentence of defendant-appellant Khandrius and remanded the case for resentencing consistent with its ruling that, "[T]he district court erred in attributing the entire loss amount from fraudulent Medicare billing to defendant under U.S. Sentencing Guidelines Manual Section 1B1.3(a)(1)(B) where it gave undue weight to his posing as a doctor, awareness that a suspiciously high volume of patients passed through the clinic, and status as a paid clinic employee in finding that the entire scope of the scheme orchestrated by his employers fell within his agreement to the conspiracy." Id.

B. The Defendant Should Be Resentenced Pursuant to
2B1.1(b)(1)

It should be noted that, even if the Court were to determine that the Defendant was responsible for loss associated with 641 East 87th Street, Brooklyn, NY under co-conspirator liability, defendant still should be resentenced based on the amount loss calculated regarding 641 East 87th Street, because demonstrably post-remand the tax assessment value of all the collateral used as "credit against loss" was materially incorrect.

Under the Guidelines, the "General Rule" is that "loss is the greater of actual loss or intended loss." U.S.S.G. Section 2B1.1 cmt.n.3(A). The loss amount shall be reduced by certain "credits against loss," defined, "in a case involving collateral pledged or otherwise provided by the defendant," as "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of at that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. Section 2B1.1 cmt.n.3(E)(ii). United States v. Raz Nawaz, 555 Fed.Appx.19(2d 2014). The definition of "fair market value" under U.S.S.G. Section 2B1.1 Application 3(E) Credits Against Loss provides that:

> in the case of a fraud involving a mortgage
> loan, if the collateral has not been disposed
> of by the time of sentencing, use the fair
> market value of the collateral as of the date
> on which the guilt of the defendant has been
> established, ... by ... trial... . In such a

case, there shall be a rebuttable presumption
that the most recent tax assessment value
of the collateral is a reasonable estimate of
the fair market value.

At sentencing, Defendant's counsel argued the tax
assessment value of the subject collateral was not a
reasonable estimate, "the probation report does not properly
calculate the loss amounts ...a tax assessment may not be up
to date, it may not be accurate, it may be much lower than the
actual fair market value of the property and by using a tax
assessment, my client is prejudiced." Indeed, the testimony at
the MVRA hearings clearly demonstrated that the PSR
incorrectly relied upon the tax assessment and use of the tax
assessment value of collateral prejudiced the Defendant.

1. 55 Stillwell Place, Brooklyn, NY

Specifically, Mr. Musick testified, on November 16,
2015, "[M]y understanding is that there was a BPO done and I
think it was in the past two or three months," and that it
fairly and accurately reflect the broker's price opinion of
$380,000. (HT: 128), See also ECF DE 236 p. 2. Therefore, on
May 9, 2014, the tax assessment used at Defendant's
sentencing, per the PSR, valuing the property at 55 Stillwell
Place for $241,000, represents a difference in the amount of
$139,000. Importantly, the tax assessment value for 55
Stillwell Place shows that the tax assessment remained the
same for three years, during the tax period of 2013/2014 -

2015/2016 reporting the value of the property at $241,000,
(See Cean PSR, See also Exhibit A - Property Shark Printout
for 55 Stillwell, Bklyn, NY) starkly paling in comparisons to
the Broker's Price Opinion of $380,000 reported during the
MVRA testimony. (ECF DE 262 p. 128)(HT: 127). Additionally,
the Government's witness testified that he did not know why
there was such a difference between the original valuation of
the property from when the loan originated and the most
current broker's price opinion. (ECF DE 262 p. 128)(HT: 127).

2. 641 East 87th Street, Brooklyn, NY

     Further, at the MVRA hearing, Mr. Schwegel testified
that the Broker's Price Opinion ("BPO") valued the property
located at 641 East 87th Street, Brooklyn, NY at $583,000 (HT:
96). The tax assessment used at Defendant's sentencing, per
the PSR, valued the property at $463,000, (See Cean PSR; See
also Exhibit B - Property Shark Printout for 641 East 87th
Street, Bklyn, NY) representing a difference of $120,000.
Therefore, this Court's January 11, 2018 ruling and
Defendant's May 9, 2014 sentencing, shockingly demonstrates
the depth of the prejudice of Defendant's calculated
restitution amount and intended loss amount being predicated
on two different amounts for fair market values (or credit
against loss) for the same property. Although, the Government
is correct in its general assertion that "Given the varied
scope of loss and restitution determinations, then, a
disparity between them does not, in and of itself, constitute
proof of sentencing error" (GOM at 16), here we have not only

a varied scope of loss, we have inter alia, a varied scope of
the fair market value (and calculation of loss) used for the
same property to determine restitution and intended loss.

The total of the difference of the fair market values
used for calculating restitution and intended loss for the
above-referenced properties represents only two of the four
properties resulting in the total restitution and intended
loss amount. Yet, the difference in these two property values,
alone, represent a combined difference of $259,000 [$139,000
(Stillwell Place) + $120,000 (641 East 87th Street)], easily
crediting Defendant's contention of procedural errors in the
calculation of both restitution and the intended loss
pursuant to the MVRA and 2B1.1 Application Note 3(E)(ii),
since the difference of $259,000 would have placed Defendant
in a lower guideline range of 63-78 months (14-level
enhancement for a loss amount less than 1,000,000 and greater
than $400,000) as opposed to 70-87 months (16-level
enhancement for a loss amount greater than $1,000,000). A
district court commits procedural error where it fails to
calculate (or improperly calculates) the Sentencing Guidelines
range..." United States v. Robinson, 702 F. 3d 22, 38 (2d Cir.
2012). In United States v. Davis, the court of appeals vacated
the defendant's sentence and remanded the case for full
resentencing stating that, "the restitution order is riddled
with the same problems as the loss figures. 863 F.3d 894 (DC
Cir 2017).

3. 113 Chauncey Street Brooklyn, NY

The Second Circuit in United States v. Lacey, opined that the difference between the short-sale price and the mortgage amount constitutes objective evidence of the amount that a reasonable defendant might expect a bank would lose in the transaction; and that, it is hardly clear error for a sentencing judge to conclude that a price negotiated by a willing buyer and a willing seller is better evidence of the property's value than an appraisal by a purported expert. 699 F.3d 710 (2d. Cir 2012). However, short-sale prices may be accepted as a reasonable estimates of loss where they were negotiated, not fraudulent, and where the "evidence showed that the appraisals at the time of the fraudulent mortgage may not have been reliable." Id.

The short-sale price used here as a reasonable estimate of loss has, more than ever, been called into question by the recent disclosure of a complaint filed under seal pursuant to 31 U.S.C. Section 3730(b)(2) against Impac Secured Assets Corp., Impac Funding Corp., and Impac Mortgage Holdings, Inc., under 31 U.S.C. Section 3729. The complaint reveals specific conduct by the above-referenced Impac defendant's detailing misconduct that is both nefarious and actionable. Exhibit C - False Claim Act Complaint. Poignantly, the lawsuit details active and ongoing fraud by the Impac Defendant's perpetrated against governmental entities and governmental programs involving ten different Trusts, including of specific relevance Impac Secured Asset Trust 2007-2. See Ex.C at 2.

The lawsuit sets out the machinations by which Impac orchestrated multiple civil and potentially criminal violations including:

a) failing to disclose its conflict of interest as the originator;

b) implementing a separate scheme to under-report monthly delinquencies to cover up the original contractual breaches with the Trust; and

c) committing wire fraud when knowingly issuing certificates to investors with untrue statements included within the offering documents.

See Ex.C at 9.


In retrospect, the reasonableness of the use of the short-sale price is called into question because although it is common for short sales to occur for less than fair market values making the loss foreseeable, what happened with the short-sale of 113 Chauncey Street, Brooklyn, NY was not legally acceptable. United States v. Lacey (in reviewing a district court's calculation, an appellate court must determine whether the trial court's method of calculating the amount of loss was legally acceptable). The 2010 short-sale price of $225,000 was substantially 250% below the (already low) 2010 tax assessment value of $563,000. Exhibit D - Property Shark Printout for 113 Chauncey Street, Bklyn, NY. At the time of Defendant's sentencing, on May 9, 2014, the tax assessment value for the property was $649,000, over 288% of the short-sale price. Currently, the tax assessment value of

the property is $1,328,000, over 590% of the short sale price.
Indeed, it is extremely typical for the short sale price to be
below the fair market value. However, a short sale price less
than 240% of the tax assessment value, for a brownstone in
Brooklyn, is egregiously atypical and highly suspect, as is
the misconduct referenced in the complaint against the Impac
defendants for violation of the False Claims Act. This again,
illustrates that the intended loss calculation pursuant to
2B1.1(b)(1) to be riddled with the same problems as the
restitution order. Therefore, the Defendant's request for a
full resentencing should be granted.

D. The Defendant Should Be Resentenced Pursuant To
   18 United States Code, Sections 3663A and 3664(e).

The plain language of 18 U.S.C. Sections 3663A (a)(1);
(c)(1)(B); 18 U.S.C. Section 3664(e) requires a court to order
restitution as part of sentencing where a defendant is
convicted of a crime of fraud or deceit involving "an offense
against property," "in which an identifiable victim or victims
has suffered a...pecuniary loss." United States v. Zangari,
677 F.3d 86, 91 (2d. Cir. 2012). The Court's January 11, 2018
ruling, sets forth that ABC, WMC, and Impac Funding
Corporation are no longer identified as victims and that the
Restitution owed is no longer $1,205,355 in accordance with
the above-referenced statutes; and that Impac Secured Asset
2007-2 Trust is entitled to $243,148.51 in restitution.

In the event that the Government's position remain

unchanged - that the Defendant's request for a full resentencing should not be granted because Defendant's argument that disparity between loss amounts adopted at sentencing and restitution ordered on remand elucidates procedural errors in sentencing is unavailing (GOM at 15); nonetheless, the Government has agreed that the Defendant should and will be resentenced for the imposition of a revised restitution order. Exhibit E - Govenment's opposition motion filed on March 16, 2018. On April 26, 2017, the Government stated, "...[O]nce we hear from Your Honor that a report [and] a recommendation has either been adopted or amended or some other order has been put into place, it is definitely our intention to make sure that you are here and present for any imposition of restitution." Exhibit F - Transcript of Status Conference on April 26, 2017.

### E. The Defendant Should be Resentenced Pursuant To
### 18 U.S.C. Section 982(a)(2)

The United States Court of Appeals for the Eleventh Circuit, ruled that it is plain error to order forfeiture proceeds from wire fraud not affecting a financial institution. "Federal law requires that in sentencing defendants "convicted of a violation of, or conspiracy to violate... [18 U.S.C. section 1343] affecting a financial institution, 'courts' shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." 18 U.S.C. Section 982(a)(2). United

States v. Mayer, 679 Fed. Appx. 895 (11th Cir. 2017). The
Eleventh Circuit, therefore, concluded that the district court
plainly erred in ordering Mayer to forfeit proceeds of wire
fraud not affecting a financial institution, pursuant to
Section 982(a)(2). Here, as in Mayer, the inclusion of non-
FDIC insured entities in a forfeiture amount "is both plain
and prejudicial, the error seriously affects the fairness,
integrity or public reputation of judicial proceedings.
Specifically, the Eleventh Circuit named the inclusion of
losses from ABC (one of the same entities listed in
Petitioners forfeiture order), as one of the non-FDIC
entities, that caused the plain error and prejudicial effect
resulting in its decision to vacate defendant's sentence. Id.


THIS COURT HAS THE POWER TO VISIT THE
PRESENTED ISSUES ON REMAND

Upon remand, the court has the authority to
resentence a defendant, even if the issue was not considered
by the remanding court. In giving guidance to district courts
on typical scope of a mandate, the First Circuit has
acknowledged that "On remand, courts are often confronted with
issues that were never considered by the remanding court, and
that, [b]roadly speaking, mandates require respect for what
the higher court decide, not what it did not decide." Biggins
v. Hazen Paper Co., 111 f.3d 205, 209 (1st Cir. 1997). Here,
on appeal, the Second Circuit did not decide whether this
Court erred in: its calculation of intended loss; the
inclusion of relevant co-conspirator conduct; or awarding

15

forfeiture. In fact, one of the grounds on which the
Government sought to have Defendant's request for a recall to
mandate denied was premised on that, "while Defendant did
challenge her sentence as procedurally and substantively
unreasonable on appeal, she did not specifically argue that
the district court erred in its calculation of loss." (GOM at
14).

More importantly, even where an appellate court's
mandate does not contemplate resurrecting an issue on remand,
the trial court may still possess some limited discretion to
reopen the issue in very special situations. United States of
America v. Richard Harmon Bell, 988 F.2d 247 (1st Cir. 1993).
Thus, if this Court determines that the issue of intended
loss; relevant conduct of co-conspirators pursuant to Section
1B1.3; and forfeiture has already been decided, it may still
be reopened, due to the change in the law of the case and
significant new evidence.

Reopening an already decided matter, however, requires a
showing of exceptional circumstances, a threshold which, in
turn, demands that the proponent accomplish one of three
things; show that controlling legal authority has changed
dramatically, proffer significant new evidence, not earlier
obtainable in the exercise of due diligence; or convince the
court that a blatant error in the prior decision will, if
uncorrected, result in a serious injustice. Id. This Court
should accept the opportunity to render a determination in the
issues presented herein, because the Court has by the adoption

of the Magistrate's Report and Recommendation changed the
controlling fair market value of the collateral at issue,
thereby affecting the "credit against loss," pursuant to
Application Note 3(E)(ii) and resulting loss amount. In
addition, during the MVRA hearings, for the first time,
evidence was illicited from witnesses about the value of the
properties from broker's price opinions. The tax assessment
values used to calculate the intended loss has now been
determined by the Government and its witnesses not to be a
fair estimation of the property values for the determination
of loss. Notably, the Government recently noted that, "While
the Government did ask the district court to adopt the loss
calculations set forth in the PSR, it did not argue that it
was the amount of loss intended, but rather a fair estimation
of the actual losses incurred by the named lenders given the
information available at that time." See Ex. D.

Additionally, the Eleventh Circuit in Mayer, ruled that
it is plain (blatant) error to order forfeiture of proceeds
from wire fraud not affecting a financial institution. Indeed,
at sentencing the Government conceded that there was no
financial institution involved, "We also noted that paragraphs
93, 101 and page three [in the PSR] needed to be corrected to
note that the application maximum term of imprisonment is
actually 20 years and not 30 years and that the maximum fine
is actually $250,000, not $1,000,000 because financial
institutions were not involved." ST: 21. Lastly, during the
MVRA hearings, the first available opportunity to the
Defendant to cross examine a witness regarding 641 East 87th

17

Street, Brooklyn, NY, Mr. Schwegel's testimony clearly supported that an enhancement based on relevant co-conspirator conduct was not appropriate. The above-referenced issues each attributed to enhancements in Defendant's senetence, resulting in serious injustice, which will become increasingly prejudicial if uncorrected.

CONCLUSION

Accordingly, this Court should based on its authority and the merits of Defendant's arguments, grant Defendant's request for a full resentencing.

---

Footnotes:

Numerical references preceded by the letters "ST" are to the sentencing transcript pages of Defendant's sentencing on May 9, 2014. Numerical references preceded by the letters "HT" are to the transcript pages of the mandatory victim restitution hearings conducted on November 16, 2015 and on December 8, 2015. Numerical references preceded by the letters "GOM" are to the Government's opposition motion brief filed in the second circuit on March 16, 2018.

Date: Danbury, CT
      May 18, 2018

Respectfully submitted,

Cassandra Cean

REG. NO. 79210-053

DANBURY FPC

33 1/2 PEMBROKE

DANBURY, CT 06811

Appearing Pro Se

"Exhibit A"

https://www.propertyshark.com/mason/Reports2/printall.html?propke...



Property Report by PropertyShark.com

Property Report for:

# 8055 Stillwell Pl, Brooklyn, NY 11204

## B. Overview

## B1. Overview

## Address

| | |
|---|---|
| Primary address | 8055 Stillwell Pl |
| Alternate address(es) | 55 Stillwells Pl |
| | 8909 Stillwells Pl |
| Zip code | 11204 |
| Borough | Brooklyn |
| Block & lot | 08055-0055 |
| Sanborn map | 317 063 |
| Tax map | 32403 |

## Owner

| | |
|---|---|
| Name | Santander Bank, N.A. |
| Address | 1130 BERKSHIRE BOULEVARD MAIL CODE 11-900-TX Reading, PA 19610 |
| Purchase date | 01/18/2017 |
| Purchase price | $1 |

## Property Taxes

| | |
|---|---|
| Tax class | 1 |
| Tax assessor's market value | $439,000 |
| Projected tax assessor's market value | $464,000 |
| Current tax bill | $3,311 |
| Projected tax bill | $3,510 |

## Neighborhood

| | |
|---|---|
| Neighborhood | Canarsie |
| Community district | 18 |
| Closest Police station | 0.84 Miles |
| Closest Fire station | 0.72 Miles |
| School district number | 18 |
| Census tract | 992 |

## Hazards & Environment

| | |
|---|---|
| Toxic site on this property | No |
| Neighboring toxic sites | No |

## Building

| | |
|---|---|
| Building class | One Story - Permanent Living Quarter (A2) |
| Building sqft | 860 |
| Unfinished sqft | 430 |
| Building dimensions | 20 ft x 16 ft |
| Roof height | 19 ft |
| Ground elevation | 12 ft |
| Year built | 1935 (estimated) |
| Stories | 2 |
| Has extension | Yes |
| Style | Old style |
| Construction type | Frame |
| Exterior wall | Wood |
| Exterior condition | High average |

## Use

| | |
|---|---|
| Residential units | 1 |
| Residential sqft | 860 |
| Average residential unit size | 860 |
| Certificate(s) of occupancy | Click here |

## Lot

| | |
|---|---|
| Lot sqft | 3,250 |
| Lot shape | Regular |
| Lot dimensions | 25 ft x 130 ft |
| Corner lot | No |
| Buildings on lot | 1 |

## Zoning

| | |
|---|---|
| Zoning districts | R4A |
| Zoning map | 23c |

## Floor Area Ratio (FAR)

| | |
|---|---|
| Residential FAR | 0.9 |
| Facility FAR | 2 |
| FAR as built | 0.26 |
| Allowed usable floor area | 2,925 |
| Usable floor area as built | 845 |
| Unused FAR | 2,080 |

## Violations

| | |
|---|---|
| ECB violations | 2 |

# B2. NEW Real Owners & Mortgages

Our dedicated team of 30 full-time employees has been manually researching owner names, phone numbers, and email addresses for

LLC-owned properties in NYC. They dig through documents, scour multiple resources and verify phone numbers, to save you time whenever you need to reach the right person. So far, we have researched over 240,000 properties and we are monitoring deeds every day in order to find the new owners and display the updates immediately.

| Name | Address | Phone | Email |
|------|---------|-------|-------|

**Mortgages**

| Mortgage date | Mortgage amount | Bank | Public Notes |
|---------------|-----------------|------|--------------|

The researched contact info is now included in our new subscription plan - Platinum.

As an existing subscriber, you can upgrade your current plan to Platinum in order to quickly get the contact info you need. Call our Customer Support Team at 718-715-1758 for your special upgrade price.

## B5. For Sale

No active listing found for this property.
Have your listing displayed on a high-traffic website by visiting Point2 Homes.

# C. Ownership

## C1. Registered Owner

**Santander Bank, N.A.**
1130 BERKSHIRE BOULEVARD MAIL CODE 11-900-TX
Reading, PA 19610
Source: Assessment Roll
Last recorded: 12/15/2017

👤 Add to Address Book

Ownership data is aggregated from governmental sources like deeds and the assessment roll. If the registered owner is a LLC or other form of company, use our Real Owners service to find the person behind the company.

# F. Sales & Value

## F1. Neighborhood Price History

| | |
|---|---|
| Median price/sqft | $453 |
| Neighboring properties | 15 |

**Recent sales of similar properties**

| Address | Sale price | Sale date | Sqft | Price/sqft |
|---|---|---|---|---|
| 951 E 88th St | $507,500 | 12/22/2017 | 812 | $625 |
| 1365 E 96th St | $458,860 | 11/27/2017 | 740 | $620 |
| 938 E 88th St | $505,000 | 2/7/2018 | 871 | $579 |
| 1365 E 93rd St | $418,000 | 5/12/2017 | 800 | $522 |
| 1370 E 96th St | $469,000 | 1/26/2017 | 920 | $509 |
| 1575 Canarsie Rd | $400,000 | 7/13/2017 | 805 | $496 |
| 9805 Avenue L | $390,000 | 6/5/2017 | 820 | $475 |
| 665 E 83rd St | $399,000 | 3/13/2018 | 880 | $453 |
| 731 E 85th St | $377,000 | 9/27/2017 | 860 | $438 |
| 1332 E 98th St | $349,000 | 10/27/2017 | 870 | $401 |

Use our Comparable Sales Tool to select your own list of recent sales, or read our Market Reports for an analysis of sale prices across a neighborhood.

# G. Property Tax

## G7. Assessment History

| Year | Building class | Market value | Assessed value | Taxable | Tax rate% | Base tax | Property tax |
|---|---|---|---|---|---|---|---|
| 2017/18 | A2 | $439,000 | $16,246 | $16,246 | 20.385% | $3,312 | $3,312 |
| 2016/17 | A2 | $325,000 | $15,327 | $15,327 | 19.991% | $3,064 | $3,064 |
| 2015/16 | A2 | $241,000 | $14,460 | $14,460 | 19.554% | $2,828 | $2,828 |
| 2014/15 | A2 | $241,000 | $14,460 | $14,460 | 19.157% | $2,770 | $2,770 |
| 2013/14 | A2 | $241,000 | $14,460 | $14,460 | 19.191% | $2,775 | $2,775 |
| 2012/13 | A2 | $270,000 | $16,200 | $16,200 | 18.569% | $3,008 | $3,008 |
| 2011/12 | A2 | $306,000 | $17,391 | $17,391 | 18.205% | $3,166 | $3,166 |
| 2010/11 | A2 | $383,000 | $17,376 | $17,376 | 17.364% | $3,017 | $3,017 |
| 2009/10 | A2 | $397,000 | $16,420 | $16,420 | 17.088% | $2,806 | $2,806 |
| 2008/09 | A2 | $413,000 | $16,255 | $16,255 | 16.196% | $2,633 | $2,633 |
| 2007/08 | A2 | $422,000 | $15,344 | $15,344 | 15.434% | $2,368 | $2,368 |
| 2006/07 | A2 | $358,000 | $14,493 | $14,493 | 16.118% | $2,336 | $2,336 |
| 2005/06 | A2 | $359,000 | $14,480 | $14,480 | 15.746% | $2,280 | $2,280 |
| 2004/05 | A2 | $320,000 | $13,684 | $13,684 | 15.094% | $2,065 | $2,065 |
| 2003/04 | A2 | $238,000 | $13,546 | $13,546 | 14.55% | $1,971 | $1,971 |

Disclaimer

"Exhibit B"



Property Report by PropertyShark.com

Property Report for:

# 641 E 87th St, Brooklyn, NY 11236

## B. Overview

## B1. Overview

| Mortgage date | Mortgage amount | Bank | Public Notes |
|---|---|---|---|

The researched contact info is now included in our new subscription plan - Platinum.

As an existing subscriber, you can upgrade your current plan to Platinum in order to quickly get the contact info you need. Call our Customer Support Team at 718-715-1758 for your special upgrade price.

## B3. Photos

**Open Google Street View**

**Upload photos for this property**







Uploaded in June, 2016 by Joe Strini

## B6. Sale & Property History

| Date | Event | Amount | Details |
|---|---|---|---|
| 1/6/2017 | Lis pendens filed | $455,000 | |
| 1/14/2014 | Deed transfer recorded | $11,000 | |
| 10/1/2012 | Lis pendens filed | | |
| 12/22/2008 | Lis pendens filed | $650,000 | |
| 6/27/2007 | Lis pendens filed | $650,000 | |
| 8/31/2006 | Deed transfer recorded | $650,000 | |

| Date | Event | Amount | Details |
|------|-------|--------|---------|
| 8/16/2006 | Lis pendens filed | | |
| 5/10/2006 | Lis pendens filed | $530,000 | |
| 10/27/2005 | Deed transfer recorded | $530,000 | |
| 4/14/2005 | Deed transfer recorded | $445,000 | |
| 1/13/2004 | Lis pendens filed | | |
| 2/21/2002 | Lis pendens filed | | |

# C. Ownership

## C1. Registered Owner

**Royal Gardens East 87 Corp.**
320 Roebling St #412
Brooklyn, NY 11211
Source: Assessment Roll
Last recorded: 12/15/2017

 Phone Lookup

Add to Address Book

Ownership data is aggregated from governmental sources like deeds and the assessment roll. If the registered owner is a LLC or other form of company, use our Real Owners service to find the person behind the company.

# F. Sales & Value

## F1. Neighborhood Price History

| Median price/sqft | $245 |
|-------------------|------|
| Neighboring properties | 6 |

**Recent sales of similar properties**

| Address | Sale price | Sale date | Sqft | Price/sqft |
|---------|-----------|-----------|------|-----------|
| 1029 Remsen Ave | $690,000 | 2/22/2018 | 2,048 | $336 |
| 563 E 86th St | $550,000 | 11/21/2016 | 1,800 | $305 |
| 751 E 87th St | $499,000 | 11/15/2017 | 1,656 | $301 |
| 1027 Remsen Ave | $390,390 | 6/9/2017 | 2,048 | $190 |
| 8916 Flatlands Ave | $367,317 | 9/27/2017 | 2,000 | $183 |
| 660 E 84th St | $230,000 | 12/21/2017 | 1,800 | $127 |

Use our Comparable Sales Tool to select your own list of recent sales, or read our Market Reports for an analysis of sale prices across a neighborhood.

https://www.propertyshark.com/mason/Reports2/print.html?propke...

# G. Property Tax

## G7. Assessment History

| Year | Building class | Market value | Assessed value | Taxable | Tax rate% | Base tax | Property tax |
|------|----------------|--------------|----------------|---------|-----------|----------|--------------|
| 2017/18 | B2 | $589,000 | $19,108 | $19,108 | 20.385% | $3,895 | $3,895 |
| 2016/17 | B2 | $507,000 | $18,032 | $18,032 | 19.991% | $3,605 | $3,605 |
| 2015/16 | B2 | $539,000 | $18,014 | $18,014 | 19.554% | $3,522 | $3,522 |
| 2014/15 | B2 | $515,000 | $17,017 | $17,017 | 19.157% | $3,260 | $3,260 |
| 2013/14 | B2 | $463,000 | $16,123 | $16,123 | 19.191% | $3,094 | $3,094 |
| 2012/13 | B2 | $468,000 | $15,924 | $15,924 | 18.569% | $2,957 | $2,957 |
| 2011/12 | B2 | $550,000 | $15,027 | $15,027 | 18.205% | $2,736 | $2,736 |
| 2010/11 | B2 | $518,000 | $15,012 | $15,012 | 17.364% | $2,607 | $2,607 |
| 2009/10 | B2 | $591,000 | $14,181 | $14,181 | 17.088% | $2,423 | $2,423 |
| 2008/09 | B2 | $613,000 | $13,436 | $13,436 | 16.196% | $2,176 | $2,176 |
| 2007/08 | B2 | $556,900 | $13,270 | $13,270 | 15.434% | $2,048 | $2,048 |
| 2006/07 | B2 | $463,900 | $12,523 | $12,523 | 16.118% | $2,018 | $2,018 |
| 2005/06 | B2 | $398,900 | $12,510 | $11,080 | 15.746% | $1,970 | $1,745 |
| 2004/05 | B2 | $363,000 | $11,818 | $10,318 | 15.094% | $1,784 | $1,557 |
| 2003/04 | B2 | $318,000 | $11,197 | $9,627 | 14.55% | $1,629 | $1,401 |

## Disclaimer

Copyright 2003-2018 by Property Research Partners LLC

All data comes from government sources. No attempt has been made to validate it.
No attempt has been made to validate the accuracy of the programming of this web
site. Do not rely on this report to support investment decisions. The only authoritative
source for the information in this report is the government agencies from which the
data was acquired.

5/7/18 8:55 PM

## Address

| | |
|---|---|
| Primary address | 641 E 87th St |
| Zip code | 11236 |
| Borough | Brooklyn |
| Block & lot | 07992-0021 |
| Sanborn map | 317 045 |
| Tax map | 32402 |

## Owner

| | |
|---|---|
| Name | Royal Gardens East 87 Corp. |
| Address | 320 Roebling St #412 Brooklyn, NY 11211 |
| Purchase date | 01/14/2014 |
| Purchase price | $11,000 |

## Property Taxes

| | |
|---|---|
| Tax class | 1 |
| Tax assessor's market value | $589,000 |
| Projected tax assessor's market value | $613,000 |
| Current tax bill | $3,895 |
| Projected tax bill | $3,943 |

## Neighborhood

| | |
|---|---|
| Neighborhood | Canarsie |
| Community district | 18 |
| Closest Police station | 0.55 Miles |
| Closest Fire station | 0.50 Miles |
| School district number | 18 |
| Census tract | 958 |

## Hazards & Environment

| | |
|---|---|
| Toxic site on this property | No |
| Neighboring toxic sites | No |

## Building

| | |
|---|---|
| Building class | Two Family Frame (B2) |
| Building sqft | 1,802 |
| Building dimensions | 17 ft x 37 ft |
| Roof height | 26 ft |
| Ground elevation | 18 ft |
| Year built | 1930 (estimated) |
| Stories | 2 |

## Use

| | |
|---|---|
| Residential units | 2 |
| Residential sqft | 1,802 |
| Average residential unit size | 901 |
| Certificate(s) of occupancy | Click here |

## Lot

| | |
|---|---|
| Lot sqft | 2,000 |
| Lot dimensions | 20 ft x 100 ft |
| Corner lot | No |
| Buildings on lot | 1 |

## Zoning

| | |
|---|---|
| Zoning districts | R4-1 |
| Zoning map | 23c |

## Floor Area Ratio (FAR)

| | |
|---|---|
| Residential FAR | 0.9 |
| Facility FAR | 2 |
| FAR as built | 0.90 |
| Allowed usable floor area | 1,800 |
| Usable floor area as built | 1,800 |

## Violations

| | |
|---|---|
| DOB violations | 1 |
| Marshals evictions in building | Yes |

# B2. NEW Real Owners & Mortgages

Our dedicated team of 30 full-time employees has been manually researching owner names, phone numbers, and email addresses for LLC-owned properties in NYC. They dig through documents, scour multiple resources and verify phone numbers, to save you time whenever you need to reach the right person. So far, we have researched over 240,000 properties and we are monitoring deeds every day in order to find the new owners and display the updates immediately.

| Name | Address | Phone | Email |
|---|---|---|---|

## Mortgages

"Exhibit C"

1   Christopher Hellmich (SBN 224169)
    chellmich@hellmichlaw.com
2   **HELLMICH LAW GROUP, PC**
    5753-G E. Santa Ana Canyon Rd, #512
3   Anaheim Hills, CA 92807
    Tel: 949.287.5708
4   Fax: 714.974.7733

5   Talcott J. Franklin (pro hac vice motion to be filed)
    tal@talcottfranklin.com
6   **TALCOTT FRANKLIN PC**
    1521 North Cooper Street, Suite 340
7   Arlington, TX 76011
    Tel: 214.736.8730
8   Fax: 800.727.0659

9   *Attorneys for Relator*

10

11                    UNITED STATES DISTRICT COURT

12                  CENTRAL DISTRICT OF CALIFORNIA

13                        SOUTHERN DIVISION

14   PLAINTIFF UNDER SEAL          CASE NO.   **SACV 16·01983** JVS (JCGx)

15                                 COMPLAINT FOR FALSE CLAIMS ACT
                                   VIOLATIONS UNDER 31 U.S.C. § 3729 ET SEQ.
16        v.                       AND STATE AND MUNICIPAL EQUIVALENTS

17                                 FILED BY HAND

18   DEFENDANTS UNDER SEAL         FILED UNDER SEAL PURSUANT TO 31 U.S.C.
                                   § 3730(b)(2)
19
                                   JURY TRIAL DEMANDED
20

21

22

23

24

25

26

27

28

1

1 | Christopher Hellmich (SBN 224169)
chellmich@hellmichlaw.com
2 | **HELLMICH LAW GROUP, PC**
5753-G E. Santa Ana Canyon Rd, #512
3 | Anaheim Hills, CA 92807
Tel: 949.287.5708
4 | Fax: 714.974.7733

5 | Talcott J. Franklin (*pro hac vice* motion to be filed)
tal@talcottfranklin.com
6 | **TALCOTT FRANKLIN PC**
1521 North Cooper Street, Suite 340
7 | Arlington, TX 76011
Tel: 214.736.8730
8 | Fax: 800.727.0659

9 | *Attorneys for Relator*

10

UNITED STATES DISTRICT COURT

11

CENTRAL DISTRICT OF CALIFORNIA

12

SOUTHERN DIVISION

| 13 | UNITED STATES OF AMERICA, *ex rel.* JEREMY CALVA, and on behalf of the STATE OF NEW YORK, the STATE OF CALIFORNIA, the STATE OF DELAWARE, the DISTRICT OF COLUMBIA, the STATE OF FLORIDA, the STATE OF HAWAII, the STATE OF ILLINOIS, the STATE OF INDIANA, the STATE OF IOWA, the STATE OF MINNESOTA, the STATE OF MONTANA, the STATE OF NEVADA, the STATE OF NEW JERSEY, the STATE OF NEW MEXICO, the STATE OF NORTH CAROLINA, the STATE OF RHODE ISLAND, the COMMONWEALTH OF VIRGINIA, the CITY of CHICAGO, the CITY of MIAMI, the CITY of NEW YORK, and the CITY of SAN FRANCISCO, | Case No. |
|---|---|---|
| | | COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729 ET SEQ. AND STATE AND MUNICIPAL EQUIVALENTS |
| | | FILED BY HAND |
| | | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| | | JURY TRIAL DEMANDED |

Plaintiff,

v.

IMPAC SECURED ASSETS CORP., IMPAC FUNDING CORP., and IMPAC MORTGAGE HOLDINGS, INC.,

Defendants.

## Table of Contents

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. | Nature Of The Action | 1 |
| | B. | Brief Description Of *What* The Impac Defendants Did | 2 |
| | C. | Brief Description Of *How* The Impac Defendants Executed The Scheme | 4 |
| | D. | The Impac Defendants' Misconduct Was Not Publicly Disclosed | 5 |
| | E. | The Impac Defendants' Misconduct Is Actionable Under The FCA. | 8 |
| II. | JURISDICTION AND VENUE | 10 |
| III. | PARTIES | 11 |
| | A. | Plaintiff/Relator | 11 |
| | B. | Impac Defendants | 12 |
| IV. | THE FALSE CLAIMS ACT | 13 |
| | A. | The Action Is Permitted Under The False Claims Act | 13 |
| | B. | The Fraud Enforcement And Recovery Act Of 2009 ("FERA") Amendments To The False Claims Act | 13 |
| V. | BACKGROUND | 17 |
| | A. | Introduction To Residential Mortgage-Backed Securities | 17 |
| | | 1. | *Asset-Backed Securities (ABS)* | 17 |
| | | 2. | *Residential Mortgage-Backed Securities (RMBS)* | 18 |
| | B. | Delinquency Reporting Requirements For RMBS Securitization | 19 |
| | C. | Ongoing Distribution Remittance Reporting For RMBS Trusts | 25 |
| | D. | The Impac Defendants' Motive And Opportunity To Engage In The Alleged Scheme | 26 |
| | | 1. | *2005-2007: Late Payments Begin To Imperil Residential Mortgage Pool Securitization* | 26 |
| | | 2. | *The Impac Defendants Continue To Represent And Warrant That "No Untrue Statements" Were Or Are Being Made.* | 29 |
| VI. | THE IMPAC DEFENDANTS ENGAGED IN SYSTEMATIC FRAUD TO DECEIVE INVESTORS, INCLUDING THE GOVERNMENT PROGRAMS | 34 |
| | A. | The Impac Defendants' Fraudulent Cut-Off Date Delinquency Disclosures | 35 |

    B.    The Impac Defendants' Fraudulent Inclusion of Breaching Loans Were Never Removed From The Trusts ................................................................... 36

    C.    The Impac Defendants' Fraudulent Inclusion Of Breaching Loans In Default ................ 44

    D.    The Impac Defendants' Ongoing False Delinquency Disclosures In Monthly Remittance Reports Perpetuated And Concealed The Initial Fraud. ................... 47

    E.    Detailed Example From Impac 2006-4 Trust ................................................. 49

VII.    FURTHER EVIDENCE OF THE IMPAC DEFENDANTS CONCEALMENT OF THE SCHEME ................................................................................................... 53

    A.    Transactional Concealment Methods – Failure To Publish Loan-Level Data ................ 53

    B.    Technological Concealment Methods – Presentation Of Mortgage Loan Schedules In Indecipherable Format ...................................................... 54

    C.    Impac Defendants' Wire Fraud .............................................................. 55

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)) ............ 55

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)) ........... 56

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ........................................ 56

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ....................................... 57

COUNT V (Violation of California False Claims Act) ......................................................... 57

COUNT VI (Violation of Delaware False Claims and Reporting Act) ......................................... 58

COUNT VII (Violation of District of Columbia False Claims Act) ............................................ 60

COUNT VIII (Violation of Florida False Claims Act) .......................................................... 61

COUNT IX (Violation of Hawaii False Claims Act) ............................................................ 62

COUNT X (Violation of Illinois False Claims Act) ............................................................. 63

COUNT XI (Violation of Indiana False Claims and Whistleblower Protection Act) ........................... 65

COUNT XII (Violation of Iowa False Claims Act) .............................................................. 66

COUNT XIII (Violation of Minnesota False Claims Act) ....................................................... 67

COUNT XIV (Violation of Montana False Claims Act) ......................................................... 68

COUNT XV (Violation of Nevada False Claims Act) ........................................................... 69

COUNT XVI (Violation of New Jersey False Claims Act) ...................................................... 71

COUNT XVII (Violation of New Mexico Fraud Against Taxpayers Act) ...................................... 72

COUNT XVIII (Violation of New York False Claims Act) ...................................................... 73

COUNT XIX (Violation of North Carolina False Claims Act) .................................................................74

COUNT XX (Violation of Rhode Island False Claims Act) ...................................................................76

COUNT XXI (Violation of Virginia Fraud Against Taxpayers Act) .......................................................77

COUNT XXII (Violation of Chicago Fraud Against Taxpayers Act) ......................................................78

COUNT XXIII (Violation of Miami-Dade County Fraud Against Taxpayers Act) .................................79

COUNT XXIV (Violation of the New York City False Claims Act) .......................................................81

COUNT XXV (Violation of the San Francisco City False Claims Act) ..................................................82

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

### A.   Nature Of The Action

1.      Relator, Jeremy Calva CPA CTP CFF Cr.FA, brings this *qui tam* action pursuant to the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and analogous State and Municipal FCAs,[1] to recover damages and civil penalties from Impac Secured Assets Corp., Impac Funding Corp., and Impac Mortgage Holdings Inc. (hereinafter "Impac Defendants" or "Impac"), on behalf of the United States of America, the States, and the Municipalities (hereinafter "Government Plaintiffs") arising from the Impac Defendants' fraud, misrepresentation, gross misreporting and breach of contractual and fiduciary duties from 2005 through the present. The Impac Defendants knowingly placed defective mortgages into ten residential mortgage-backed securitization ("RMBS") trusts issued in 2005, 2006 and 2007 (collectively, the "Trusts"), The Impac Defendants then issued and underwrote certificates offered, sold, or otherwise conveyed to the Government Plaintiffs and oversaw servicing of the loans within the Trusts in the role of master servicer.

2.      The Government Plaintiffs identified above also include certain federal government programs known as Fannie Mae and Freddie Mac, as well as federal government insurance organizations the Federal Deposit Insurance Corporation ("FDIC"), National Credit Union

---

[1]     The California False Claims Act, Cal. Gov't Code § 12650 *et seq.* (Deering 2000); the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.* (2000); the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.* (2000); the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* (2000); the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); the Iowa False Claims Act, Iowa Code § 685.1 *et seq.* (2010); the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.* (2007); the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.* (2011); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.* (1999); the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* (West 2007); the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.* (2007); the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* (2010; the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011) (collectively "State *qui tam* statutes" or "*Qui Tam* States"); the City of Chicago False Claims Act, Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7); the New York City False Claims Act, NYC Admin. Code §§ 7-803 (a) (1)-(a)(4), 7-803 (a)(7); Miami False Claims Act, Miami-Dade County False Claims Ordinance Section 21-255 *et seq.*; and the City of San Francisco False Claims Act, San Francisco Admin. Code §§ 7-803 *et seq.* (collectively "Municipal *qui tam* laws").

1  Administration ("NCUA") and the State and Municipal pension funds across the country that purchased

2  the securities (the "Government Programs").

3      3.    The Trusts at issue are:

4          a.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2005-1

5  ("Impac 2005-1 Trust");

6          b.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2005-2

7  ("Impac 2005-2 Trust");

8          c.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2006-1

9  ("Impac 2006-1 Trust");

10          d.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2006-2

11  ("Impac 2006-2 Trust");

12          e.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2006-3

13  ("Impac 2006-3 Trust");

14          f.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2006-4

15  ("Impac 2006-4 Trust");

16          g.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2006-5

17  ("Impac 2006-5 Trust");

18          h.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2007-1

19  ("Impac 2007-1 Trust");

20          i.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2007-2

21  ("Impac 2007-2 Trust"); and

22          j.    Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2007-3

23  ("Impac 2007-3 Trust").

24  **B.**    **Brief Description Of _What_ The Impac Defendants Did**

25      4.    At the time of their creation in 2005, 2006 and 2007, the Trusts held thousands of

26  mortgage loans totaling $12.5 billion in assets. Multiple civil and potentially criminal violations

27  occurred during the formation and administration of the Trusts, including:

28

Case 8:16-cv-01983-JVS-JCG   Document 1   Filed 11/01/16   Page 8 of 50   Page ID #:8

a.     Four of ten Trusts[2] reported false and misleading mortgage loan schedules filed with the Securities and Exchange Commission ("SEC") with more favorable "paid-to" dates than disclosed in the first available loan-level remittance data files;

b.     At least eight of ten Trusts[3] contained delinquent loans in monetary default as of the Closing Date. The Impac Defendants had firsthand knowledge of these monetary defaults, but failed to provide notice to the Trustee, which would have required Impac to repurchase the defective loans from the Trusts. Impac's failure to provide this notice is based on the conflicted roles in the administration of the Trusts, as Impac served as both the master servicer and the seller, sponsor, depositor, issuer, and in some cases the originator of almost all loans in the ten Trusts;

c.     Impac failed to disclose its conflict of interest as the originator for most loans as well as the sponsor, depositor, issuer and master servicer for all Trusts;

d.     Impac's failure to provide notice of even one instance of default or other representation and warranty violations breached its contractual duty to notice breaches where the giving of notice would have required Impac to repurchase the defective loans from the Trust's loan pool, thereby maximizing the recovery for the Trust's certificateholders;

e.     Impac perpetuated its misrepresentations regarding loan delinquencies as of the Closing Date of each Trust by failing to publish the loan-level remittance data for five of the ten Trusts until the fourth or greater month of reporting;[4]

f.     Impac implemented a separate scheme to under-report monthly delinquencies to cover up the original contract breaches by calculating loan delinquency rates in a manner not in compliance with the stated methodology contained in the Trusts' governing documents nor regulations promulgated by the SEC and falsified Cut-Off Dates in mortgage loan schedules.

---

[2] Impac 2006-3 Trust, Impac 2006-4 Trust, Impac 2006-5 Trust, and Impac 2007-1 Trust.

[3] The two Trusts, Impac 2006-1 and Impac 2007-3, which were not evaluated failed to provide their first loan level remittance file until years after the Closing Date.

[4] A particularly egregious example is found in the Impac 2007-3 Trust, where the first available loan-level data file was provided in July 2011, more than four years after the April 30, 2007 Closing Date.

1    This scheme systematically underreported loan delinquencies within the Trusts and continues to

2    the present day;

3          g.     Impac failed to declare an event of default caused by their failure to perform their

4    duties to provide notice of breaching loans for repurchase;

5          h.     Impac committed wire fraud when knowingly issuing certificates to investors with

6    untrue statements included within the offering documents.

7         5.     After the Closing Date and during the administration of the Trusts up to and including the

8    present day, the Impac Defendants knowingly failed and continue to fail to take reasonable actions to

9    protect the assets of the Trusts in their roles as the master servicer, seller, sponsor, depositor and issuer.

10        6.     By failing to disclose the truth regarding the quality of the mortgage loans in the Trusts,

11   Impac knowingly led investors including the Government Plaintiffs to overpay for securities issued

12   under false pretenses, with both misrepresentations made in the offering documents and contractual

13   breaches left uncured by Impac. Impac's actions also enabled the Trusts to obtain more favorable credit

14   ratings from ratings agencies (and thus better price points for the certificates). Impac thereby wrongfully

15   extracted billions of dollars in revenue from private and public investors, including Government

16   Programs.

17   **C.    Brief Description Of *How* The Impac Defendants Executed The Scheme**

18        7.     The Certificates sold in 2005-07 were securitized pursuant to shelf registration statements

19   (the "Registration Statements") that had been filed with the SEC for each of the Trusts and subsequently

20   sold to investors, including Government Programs. As part of the Registration Statement for each

21   securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement"), Free

22   Writing Prospectus ("FWP"), and Pooling and Servicing Agreement ("PSA") were filed with the SEC.

23   The same documents were used to market the securities to investors, including to the Government

24   Programs.

25        8.     The Registration Statements contained disclosures concerning, among other things, the

26   paid-to date of the loans in the Trusts and the lack of any delinquent loans as of each Trust's Cut-Off

27   Date, the creditworthiness of the borrowers, and the origination and underwriting standards used to

28   make and approve the loans. All are key metrics in determining the credit quality of the mortgage loans.

9.     The Impac Defendants made false and misleading statements in offering documents; developed a scheme to under-report and hide delinquencies, defaults, and breaching loans; and failed to provide notice of breach for a single loan in these Trusts.

10.    Had the Impac Defendants disclosed the true nature of the mortgage loans and correctly performed their duties as master servicer, then:

      a.     At least eight of the Trusts would have included repurchased loans for loans in default on the Closing Date;

      b.     At least four of the Trusts would have had to disclose paid-to dates in their Cut-Off Date mortgage loan schedule, painting a less favorable picture for investors; and

      c.     Closing Date default breaches, and any potential Cut-Off Date delinquency misrepresentations, would have been detected by investors, including the Government Plaintiffs, simply by reviewing the first remittance report.

11.    Impac continues to make misrepresentations of loan delinquency rates in monthly distribution remittance reports that are still being issued to the present day. Impac's delinquency reporting methodology is not in conformance with Regulation AB, nor does it comply with the delinquency reporting methodology it represented it uses in the Trusts' PSAs.[5] As a result, delinquency data underlying the monthly remittance reports was improperly enhanced by capturing approximately two weeks of late payments and backdating them.

**D.     The Impac Defendants' Misconduct Was Not Publicly Disclosed**

12.    As illustrated in the following paragraphs, nothing on the face of the publicly available narratives, summary tables, or loan-level data within the mortgage loan schedule files revealed the true state of facts from which an inference of fraud could be reached, let alone revealed the conclusion of fraud.

13.    Six Trusts failed to publish a mortgage loan schedule as of their Cut-Off Date that included a paid-to or next due date.

---

[5] Impac has represented that it uses the Office of Thrift Supervision's delinquency reporting methodology (the "OTS Method"), which is allowable under Regulation AB. *See* Impac 2007-3 Trust Prospectus Supplement. Impac purports to use this method for all of the Trusts.

14.     Four Trusts included false paid-to dates within their Cut-Off Date mortgage loan schedules filed with the SEC, thereby covering up the original fraud. The certainty of misrepresentation was determined by:

      a.     Extracting the mortgage loan schedules from public filings;

      b.     Counting the total loans with each paid-to date; and

      c.     Comparing the count for each paid-to date against the first available loan-level remittance file, post Cut-Off and closing date.

15.     Numerous loans had paid-to dates in the first available loan-level remittance report prior to the published Cut-Off Date mortgage loan schedule, indicating in each case that the mortgage loan schedule provided on the Cut-Off Date was altered and falsified, thereby misrepresenting the quality of the mortgage loans to investors.

16.     All four mortgage loan schedules filed with the SEC failed to provide a delinquency indicator on the loan record.

17.     An investor would have had to wait until the first available loan-level remittance report data set was available and then look for loans which were still in breach of the monetary default provision and/or had paid-to dates which were prior to those included in the Cut-Off Date mortgage loan schedule to detect the fraud and misrepresentation.

18.     Only five of the ten Trusts published a loan-level schedule along with the first remittance report. Most egregiously, the Impac 2006-1 Trust and the Impac 2007-3 Trust waited to publish their first loan-level remittance reports until January 2009 and July 2011 respectively.

19.     The Prospectus Supplements for each Trust either fail to disclose delinquency information as of the Cut-Off Date or disclosed that none of the loans were 30 days or more delinquent as of the Cut-Off Date. These disclosures are required by Regulation AB. The Impac Defendants, however, employed a delinquency reporting methodology of their own making and not in compliance with Regulation AB standards in order to under-report loan delinquencies.

20.     The Impac monthly remittance reports are not public disclosures. Within approximately one year after each Trust was formed, and not later than 2008, Deutsche Bank National Trust Co., the

1   Trustee for eight of the Trusts, notified the SEC that it would no longer file monthly remittance reports.[6]

2   That is, the Trustee was no longer obligated to file, and did not file, with the SEC the monthly

3   remittance reports after filing a 15-15D with the SEC. Instead, these were available only through private

4   websites maintained by the Trustee.

5        21.    Even if the remittance reports were publicly available, they did not contain the loan-level

6   data necessary to perform the analysis uncovering the full magnitude of the fraud in all Trusts.

7        22.    Further, the first loan-level remittance file was only available for five of the ten Trusts.

8        23.    As such, it was impossible to determine the true nature of delinquencies within the Trusts

9   without conducting an independent investigation into the performance of individual loans that included

10   gathering raw information from multiple independent sources and undertaking rigorous analysis to

11   identify the misrepresentations and fraud committed by Impac. This process included:

12        a.    Extracting out the mortgage loan schedule as of Cut-Off Date, if available;

13        b.    Summarizing the data by balances and grouping them into buckets for each

14   associated "next due" or "paid through" date;

15        c.    Understanding the differences between these fields for appropriate delinquency

16   measurement against a Cut-Off Date;

17        d.    Understanding the effective date of the mortgage loan schedule as it applies to the

18   specific Trust;

19        e.    Confirming the mortgage loan schedule Cut-Off Date was the same as the Trust's

20   Cut-Off Date;

21        f.    Applying the Office of Thrift Supervision ("OTS") Method of delinquency

22   determination appropriately; and

23        g.    Comparing the paid-to dates of loans in the mortgage loan schedule as of Cut-Off

24   Date to the paid-to dates of loans in the first available loan-level remittance to detect falsely

25   reported Cut-Off Date paid-to-dates in public filings with the SEC and/or for the mortgage loan

26   schedules attached to the PSAs.

27

28        [6] Wells Fargo Bank was the trustee for the Impac 2005-1 Trust and the Impac 2005-2 Trust and
filed similar 15-15D filings within similar time frames.

24.     As the foregoing illustrates, neither the conclusion of fraud nor the inference of fraud was presented by the publicly available documents. The process of developing, learning, and uncovering the nature and full magnitude of the fraud based on trial-and-error analysis of documents for which no roadmaps previously existed took Relator approximately twelve months of analyzing data and Trust documents and applying specialized knowledge and expertise.

25.     The Trustee has been provided with information regarding the false statements and comparison of paid-to dates between the Cut-Off data in the mortgage loan schedules and the first available loan-level remittance reports. The Trustee has nonetheless failed to provide currently unavailable first loan-level remittance reports to show the full extent of the breaches and false statements in SEC filings.

26.     In short, the raw data in the Impac Cut-Off Date mortgage loan schedules provided no actual loan-level disclosures regarding delinquency (there is no "delinquency" field), no indication as to whether any particular "next due" or "paid through" date would make a loan "delinquent" under the Prospectus Supplement on the date the mortgage loan schedule was generated, and no indication of fraud or misrepresentation regarding the delinquency percentage that should have been determined based on the mortgage loan schedule data. In fact, the mortgage loan schedules on their own provide false paid-to dates and data that is meaningless without the kind of sophisticated analysis conducted by the Relator. Utilizing the mortgage loan schedules as of the Cut-Off Date provided within the public filings on their own, it would appear the Trusts are comprised of loans that have all made their payments due as of and prior to the Cut-Off Date. But that is not the case.

**E.     The Impac Defendants' Misconduct Is Actionable Under The FCA.**

27.     The Impac Defendants' knowing misrepresentations of paid-to dates and delinquencies, and the ongoing and continuous covering up these delinquencies by publishing false monthly remittance reports were actions material to the investors' (including the Government Programs') decisions to purchase the certificates issued by the Trusts, the price they were willing to pay, and their ongoing decisions to hold them.

28. The Impac Defendants knew this, as evidenced by the securities' issuance documents, under which the Impac Defendants were obligated at the very least to replace or buy back any loans that were materially misrepresented in the securitization.[7]

29. Investors (including the Government Plaintiffs) would not have purchased and held these certificates but for the Impac Defendants' material misrepresentations and omissions concerning the initial mortgage loan default rates, delinquencies, and underwriting breaches within the underlying mortgage pool.

30. In addition, investors (including the Government Plaintiffs) would not have continued holding the Certificates, and/or would have enforced their rights to have the breaching loans repurchased or replaced, but for the Impac Defendants' ongoing material misrepresentations and omissions concerning the current delinquency rates made in monthly remittance reports for each Trust.

31. As a direct and proximate result of the Impac Defendants' misconduct, the ten Trusts contained loans that have actual and projected losses, based on bankruptcies, short sales, real estate owned properties ("REOs"), and foreclosures, in excess of $282 million as of December 2015, just for the positions held in custody by one Government Program, the National Credit Union Administration ("NCUA").

32. The Impac Defendants are liable for the misstatements and omissions of material fact contained in the Registration Statements and other offering materials because they prepared, signed, filed, and/or used these documents to market and sell certificates to the investors or because they directed and controlled the entities that did so.

33. The Impac Defendants continue to be liable for the misstatements and omissions of material fact contained in the monthly remittance reports up to and including the current period wherein they have continued the material under-reporting of delinquencies in the Trusts.

34. The Impac Defendants' conduct constitutes violations of the Federal, State and Municipal False Claims Acts, including without limitation:

---

[7] This is not to say that the issues in these Trusts can be reduced to mere "put-back" status. The fraudulent securitization and intentional misrepresentation in the inducement of investors to purchase otherwise invalid securities have ramifications far beyond a mere contractual obligation.

a.      Presenting or causing to present "false or fraudulent claims" to numerous federal government agencies and insurers, including but not limited to Fannie Mae, Freddie Mac, the Home Affordable Modification Program ("HAMP"), the NCUA, the FDIC, and to hundreds of State and Municipal agencies and State employee pension programs.

b.      Making or causing to be made false records or statements about the loan delinquencies and default status of loans on the closing date, along with other known contractual breaches underlying the securities, and therefore the risk and value of the securities, which were material to the decisions of investors (including the Government Plaintiffs) to purchase and hold the securities;

c.      Impeding the SEC from carrying out its mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation, including by concealing the initial and ongoing fraud upon which the Impac Defendants would otherwise be required to disgorge to the SEC all losses they avoided, including not only the losses the Impac Defendants avoided and passed on to the Government Programs, but also over $11 billion in losses they passed on generally to all investors of these fraudulent securities.

d.      Committing wire fraud and causing others to commit wire fraud for the electronic payment and settlement of sold Impac RMBS Trusts issued between 2005 and 2007; and

e.      Conspiring to engage in the actionable misconduct above.

## II.      JURISDICTION AND VENUE

35.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345 because, among other things, the Impac Defendants transact business in this District, and the Impac Defendants engaged in wrongdoing in this District. The Court has original jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and it arises from the same transactions or occurrences brought on behalf of the United States under 31 U.S.C. § 3730.

36.      This Court has personal jurisdiction over the Impac Defendants and venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). The Impac Defendants

1  transact business within this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this

2  District.

3      37.    This Court has jurisdiction over all State and Municipal law claims alleged herein

4  pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

5      38.    The causes of action alleged herein are timely brought because, among other things, of

6  efforts by the Impac Defendants to conceal from the United States, and the States and Municipalities,

7  their wrongdoing in connection with the allegations made herein.

8  **III.    PARTIES**

9      **A.    Plaintiff/Relator**

10     39.    Relator Jeremy Calva brings this action on behalf of itself and the United States of

11  America.

12     40.    Relator has direct knowledge of the conduct alleged in this Complaint and conducted an

13  independent investigation to uncover false claims submitted to the United States of America.

14  Accordingly, Relator is an "original source" of the non-public information alleged in this Complaint

15  within the meaning of 31 U.S.C. §§ 3730(e)(4)(A) and (B), and these allegations are not based upon

16  publicly disclosed allegations of the fraud alleged herein.

17     41.    Relator uncovered the false and fraudulent claims that are at issue in this case by virtue of

18  its extensive experience working in RMBS securitization reviews, servicing reviews, Regulation AB

19  disclosures, obtaining non-public information provided by Impac Defendants, loan-level data analysis,

20  and loan-level delinquency reporting.

21     42.    Based on its knowledge of and experience with RMBS offerings and monthly distribution

22  remittance reporting and reviewing non-public information provided by Impac, Relator found that the

23  Impac Defendants had formed these ten Trusts based on materially false information provided to the

24  SEC and all investors, including the Government Programs. Relator also uncovered evidence that the

25  Impac Defendants have continued to provide materially false information to investors up to the present

26  and are continuing to generate new false information on an ongoing monthly basis within the monthly

27  remittance reporting.

28

43. Prior to filing of the Complaint, Relator provided the Government with written disclosure of substantially all material evidence and information that Relator possessed, in accordance with 31 U.S.C. § 3730(b)(2). Included in the materials provided to the Government were its proprietary analysis and the results of its investigation into the Impac Defendants' fraudulent conduct.

44. Relator brings this action on its own behalf and on behalf of the United States of America pursuant to 31 U.S.C. §3730(b)(1) of the federal False Claims Act, for: a) false and fraudulent conduct that caused significant losses to the Federally-chartered and backed programs known as Fannie Mae and Freddie Mac, which were bailed-out by the U.S. Treasury from and after September 2008, in an amount in excess of $187 billion, due to substantial losses resulting, in part, from the fraud alleged herein; b) for false claims, records or statements made to Fannie Mae, Freddie Mac, the United States Treasury, the NCUA, the FDIC, and federal programs including, without limitation, HAMP; c) avoidance of their obligations to replace or repurchase the delinquent loans; d) avoidance of their obligation to disgorge to the SEC their ill-gotten gains from the securities fraud alleged herein; and d) concealment of all of the foregoing.

45. Relator also brings this action on its own behalf and on behalf of State and Municipal Governments pursuant to analogous provisions of their respective false claims acts for false and fraudulent conduct that caused significant losses to State and Municipal pension and other funds.

**B.    Impac Defendants**

46. Defendant Impac Secured Assets Corp. is a California corporation with its principal place of business in Irvine, California. Impac Secured Assets Corp. is the depositor and issuer for all ten (10) trusts.

47. Defendant Impac Funding Corp. is a California corporation with its principal place of business in Irvine, California. Impac Funding Corp. is the primary originator of most loans, and sponsor and master servicer for all ten (10) trusts.

48. Defendant Impac Mortgage Holdings, Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland. Impac Mortgage Holdings, Inc. oversaw and coordinated the efforts of its business units to carry out the scheme alleged herein and as the disclosed party that would complete a repurchase in the event the Sponsor is unable to do so.

49.     All unlawful practices alleged in this Complaint were established and/or ratified at the highest corporate levels of the Impac Defendants (or their successors) and subsidiaries and affiliates owned, operated, dominated and controlled by the Impac Defendants.

## IV.    THE FALSE CLAIMS ACT

### A.    The Action Is Permitted Under The False Claims Act

50.     To the extent certain information concerning these transactions was in the public domain, Relator asserts there was no "public disclosure" of the allegations of fraud set forth herein that would trigger the bar to certain actions set forth in 31 U.S.C. § 3730(e)(4). In pertinent part, the information used by Relator was virtually inaccessible publicly and, even once accessed, was presented in a format indecipherable to the general public, and therefore was insufficient to constitute a public disclosure of the fraud alleged herein.

51.     Even if any of the information in the public domain is found to be a public disclosure of the fraud alleged herein, Relator nonetheless qualifies as "an original source" of the allegations of fraud alleged herein because Relator obtained, and developed through original analysis, knowledge and information independent of any public disclosure and which materially adds thereto, and/or obtained direct and independent knowledge of the allegations of fraud alleged herein. In addition, prior to filing this action, Relator disclosed to the Government Plaintiffs all material evidence supporting the allegations of fraud herein.

### B.    The Fraud Enforcement And Recovery Act Of 2009 ("FERA") Amendments To The False Claims Act

52.     The trillion-dollar Congressional stimulus package has magnified the risk of fraud against taxpayer funds and led to calls for better oversight of government contractors.[8] Congress responded by

---

[8] See S. Rep. No. 111-10, at 10 (2009), reprinted in 2009 U.S.C.C.A.N. 430, 437-38 ("In response to the economic crisis, the Federal Government has obligated and expended more than $1 trillion in an effort to stabilize our banking system and rebuild our economy. These funds are often dispensed through contracts with non-governmental entities, going to general contractors and subcontractors working for the Government. Protecting these funds from fraud and abuse must be among our highest priorities as we move forward with these necessary actions."); see also Michael Cooper, Few Cases of Fraud Involving Stimulus Money Have Been Detected, Officials Say, N.Y. Times, Sept. 18, 2009, at A13 (reporting on fears among government officials that stimulus money will be targeted for fraud); Grant McCool & Martha Graybrow, FBI Targets Fraud in TARP, Stimulus Fund, Reuters, June 2, 2009, available at http://www.reuters.com/article/idUSTRE5515MF20090602 ("The FBI has been bracing for a wave of fraud and corruption cases stemming from the government's multitrillion-dollar effort to stimulate the economy and help ailing banks.").

1　enacting the Fraud Enforcement and Recovery Act of 2009 ("FERA").[9] On May 20, 2009, President

2　Obama signed FERA, putting into law Congress' "clarifying amendments" to the False Claims Act

3　("FCA"). The amendments, *inter alia*, expanded liability to requests for funds by a "contractor, grantee,

4　or other recipient, if the money or property is to be spent or used on the Government's behalf or to

5　advance a Government program or interest[.]"[10] The Senate Report accompanying the bill provides

6　support for use of the revised FCA to police the extraordinary economic support the Government has

7　provided to the banking system under TARP as established by the Emergency Economic Stabilization

8　Act of 2008. The Senate Report states that the FERA's amendments to the FCA were passed in order to

9　"protect from fraud the Federal assistance and relief funds expended in response to our current economic

10　crisis."[11]

11　　　53.　Congress enacted section 4 of FERA, titled "Clarifications to the False Claims Act to

12　Reflect the Original Intent of the Law" to, *inter alia*, close loopholes opened by courts.[12]　In particular,

13　courts had held that the FCA requires direct presentation of a false claim to the government, not just to

14　an entity using or administering government funds, and had held that false statements by a subcontractor

15　to a prime contractor must be made with the intent that the government would receive the information.[13]

16　　　54.　Congress achieved this clarification in part by revising the technical definition of

17　"claims" to clarify that the FCA was designed to capture all fraud against government funds, whether or

18　not the government has title to the money.[14] FERA amended the FCA to, in relevant part, clarify that

19

---

20　　　[9] Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009).

21　　　[10] *Id.* at sec. 4(a).

　　　[11] S. Rep. No. 110-10, at 4 (Mar. 23, 2009).

22　　　[12] *See Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662 (2008); *United States ex
rel. Totten v. Bombardier Corp.,* 380 F.3d 488 (D.C. Cir. 2004); S. Rep. No. 111-10, at 10 (2009),
23　*reprinted in* 2009 U.S.C.C.A.N. 430, 438 ("The effectiveness of the FCA has recently been undermined
by court decisions limiting the scope of the law and allowing subcontractors and non-governmental
24　entities to escape responsibility for proven frauds. In order to respond to these decisions, certain
provisions of the FCA must be corrected and clarified in order to protect the Federal assistance and
25　relief funds expended in response to our current economic crisis."); *see also id.* at 10-12 (discussing the
impact of *Allison Engine, Totten,* and *United States ex rel. DRC, Inc. v. Custer Battles, LLC,* 376 F.
26　Supp. 2d 617 (E.D. Va. 2006), on FCA liability for subcontractors and grantees).

27　　　[13] S. Rep. No. 111-10, at 10-12 (explaining that the FERA amendments were intended to
overrule *Totten* and *Allison Engine*).

28　　　[14] *See, e.g., id.* at 11 ("[T]his bill includes a clarification to the definition of the term 'claim' in
new Section 3729(b)(2)(A) and attaches FCA liability to knowingly false requests or demands for

1  an actionable "claim" under the FCA includes "any request or demand ... for  money ... that is made to a

2  contractor, grantee, or other recipient, if the money ... is to be spent or used on the Government's behalf

3  or to advance a Government program or interest, and if the United States Government provides or has

4  provided any portion of the money ... requested or demanded, or will reimburse ... any portion of the

5  money." 31 U.S.C. § 3729(b)(2)(A)(ii)(I)-(II).

6    55.    FERA expressly made the FCA applicable to Fannie Mae and Freddie Mac,

7  notwithstanding their status in recent decades as federally-chartered Government Sponsored Entities

8  ("GSE") because they also relied on significant federal funding to carry out their mission of purchasing

9  mortgages as a means of ensuring liquidity, stability, and affordability in the U.S. housing and mortgage

10  loan markets. Moreover, the amendments were made against the backdrop that, from and after

11  September 2008, the United States Treasury has placed both entities in conservatorship and infused over

12  $187 billion to cover losses such as the billions of dollars caused by the misconduct alleged herein.

13    56.    The FERA amendments were intended to be retroactive. Representative Howard Berman

14  directly addressed the retroactivity of the FERA amendments, stating: "We intend for the definition of

15  ['claim'] also to apply to all False Claims Act claims pending on or after June 7, 2008, as that definition

16  is an intrinsic part of amended Section 3729(a)(1)(B). The purpose of this amendment is to avoid the

17  extensive litigation over whether the amendments apply retroactively, as occurred following the

18  1986 False Claims Act amendments."[15]

19    57.    To plead a cause of action under the amended 31 U.S.C. § 3729(a)(1)(A), a complaint

20  must allege that the defendant (1) made, or caused to be made, a claim, (2) that was false or fraudulent,

21  (3) knowing of its falsity. *See* 31 U.S.C. § 3729(a)(1)(A). A cause of action under the new 31 U.S.C.

22  § 3729(a)(1)(B) requires that the defendant (1) made, used, or caused to be made or used, a statement,

23  (2) that was knowingly false or fraudulent, and (3) that was material to a false or fraudulent claim.[16]

24

25  money and property from the U.S. Government, without regard to whether the United States holds title

26  to the funds under its administration.").

27    [15] 155 Cong. Rec. E1300 (daily ed. June 3, 2009) (statement of Rep. Berman); *see also* Matthew
Titolo, *Retroactivity and the Fraud Enforcement and Recovery Act of 2009*, 86 Ind. L.J. 257 (2011).

28    [16] *See* 31 U.S.C. § 3729(a)(1)(B); *United States ex rel. Feldman v. City of New York*, 808 F.
Supp. 2d 641, 655-56 (S.D.N.Y. 2011).

58. The "knowledge" element of the FCA is defined as (1) "deliberate ignorance of the truth or falsity of the information" provided, or (2) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1).

59. This Complaint alleges that the federal government provides, or has provided, or will reimburse a portion of the money claimed for the Trust securities sold to the Government Programs. 31 U.S.C. § 3729(b)(2)(A). Specifically, with regard to the 2006-07 sales of the RMBS certificates, both Fannie Mae and Freddie Mac purchased the Securities while fulfilling their charters as GSEs to provide liquidity to the residential mortgage market. Fannie Mae and Freddie Mac have been under the conservatorship of the FHFA since September 2008, and have received quarterly capital contributions from the Treasury totaling more than $187 billion, which covered the losses caused to Fannie Mae and Freddie Mac from the Impac Defendants' misrepresentations of delinquency rates at the time the Trust Certificates were issued.

60. Each GSE has thus been a "recipient" of Government money. 31 U.S.C. § 3729(b)(2)(A)(ii). The Treasury also has provided these GSEs billions of dollars "to advance a Government program or interest," – namely, to provide liquidity, stability and affordability to the United States housing and mortgage markets, and to prevent disruptions in the availability of mortgage finance. In advancing this interest, the GSEs used federal money to, among other things, cover the massive losses incurred as a result of the failed Impac Trusts. *Id.* The Government thus has provided, or reimbursed the GSEs for, at least a portion of the money associated with Trust losses. *See id.* 3729(b)(2)(A)(ii)(I).

61. The FERA amendments were intended to combat the very kind of fraud perpetrated by Impac as alleged herein. FERA extended FCA liability to, among other things, claims made to recipients of federal funds for the purpose of "improv[ing] enforcement of mortgage fraud, securities fraud, financial institution fraud, and other frauds related to federal assistance and relief programs, [and] for the recovery of funds lost to these frauds."[17] As the Senate Report stated, the purpose of FERA was,

---

[17] *See* S. Rep. No. 111-10, 111th Cong. 1st Sess. 10, 2009 U.S.C.C.A.N. 430, 433 (March 23, 2009) (the "Senate Report") ("The False Claims Act must be corrected and clarified in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis.").

1  among other things, to "reinvigorate [] anti-fraud measures and give law enforcement agencies the
2  tools and resources they need to root out fraud so that it can never again place our financial system
3  at risk."[18]

4      62.    Additionally the NCUA as the insurer and regulator took over and covered the losses of
5  four corporate credit unions that purchased these defective securities. Losses to the NCUA share
6  insurance fund for the ten Impac Trusts have exceeded $282 million.

7      63.    As to the States and Municipalities, the Complaint alleges that State and Municipal
8  pension funds purchased the securities using State and Municipal funds.

9  **V.    BACKGROUND**

10     **A.    Introduction To Residential Mortgage-Backed Securities**

11         1.    *Asset-Backed Securities (ABS)*

12     64.    Asset-backed securitization is a financing technique in which financial assets, in many
13  cases themselves less liquid, are gathered into discrete pools and converted into instruments that may be
14  offered and sold in the capital markets. These instruments are commonly called "asset-backed
15  securities," or "ABS."

16     65.    In a basic ABS securitization structure, an entity—often a financial institution and
17  commonly known as a "sponsor"—originates or otherwise acquires a pool of financial assets, such as
18  mortgage loans, either directly or through an affiliate. It then sells the financial assets, again either
19  directly or through an affiliate, to a specially created investment vehicle that issues securities "backed"
20  or supported by those financial assets. The structure of asset-backed securities is intended, among other
21  things, to insulate ABS investors from the corporate credit risk of the sponsor that originated or acquired
22  the financial assets.

23     66.    Payments on an asset-backed security depend primarily on the cash flows generated by
24  the assets in the underlying pool and other rights designed to assure timely payment, such as liquidity
25  facilities, guarantees or other features generally known as credit enhancements.

26

27

28  _____
    [18]  *Id.* at 431.

## 2.   *Residential Mortgage-Backed Securities (RMBS)*

67.     One type of ABS involves residential mortgages. The certificates issued pursuant to the pooling of such mortgages are called RMBS.   A pool of residential mortgages can only be securitized into an RMBS according to strict laws designed to ensure the integrity of the markets for such financial products. Before detailing the RMBS disclosure requirements, however, it is essential to understand the various players and documents involved in an RMBS securitization.

68.     The RMBS securitization process begins when an investment bank or similar entity—usually called a "seller" or "sponsor" ("Sponsor")—aggregates and takes title to a number of mortgage loans, either because it originated the loans or because it purchased them from various other originators or sellers. The Sponsor then sells a pool of these mortgage loans to a "purchaser" or "depositor" ( "Depositor") pursuant to an agreement that is commonly called an Assignment and Assumption Agreement ("AAA") or a Mortgage Loan Purchase Agreement ("MLPA"). In the AAA or MLPA, the Sponsor makes certain representations and warranties. After the sale, the Sponsor remains in the picture as the Sponsor of the Trust which is detailed below.

69.     After having taken title to the pool of mortgages, the Depositor conveys the pool of loans to a newly created and separately named RMBS trust. This transfer is achieved through a Pooling and Servicing Agreement ("PSA") wherein the Depositor assigns to the newly-created trust all of its right, title, and interest in the mortgage loans, as well as all future proceeds from the loans (whether monthly payments or liquidation). In order to ensure collection of the loan payments and liquidation proceeds, the Sponsor contracts with an entity known as a loan servicer (hereafter "Servicer") to administer the loans and to regularly provide information back to the Trust relating to the status of the loans in the pool. In certain case a master servicer oversees the servicer's actions and activities.

70.     The Depositor and Sponsor then act as the registrant/issuer for new securities, known as "RMBS Certificates," backed by the pool assets of the trust.   During this process, the registrants must satisfy various requirements to legitimize their securitization, including, among other things, representations required by the SEC with regard to various criteria that must be met to make the certificates eligible for Shelf Registration. Such representations are made in a document called the Prospectus Supplement. In many instances, the Prospectus Supplement is accompanied by additional

1    documents, called Free Writing Prospectuses ("FWPs"), which provide in some cases loan-level data for

2    loans to be included in the pool.

3        71.     The RMBS Certificates are then purchased at a discount to the projected sales price by

4    one or more entities known as underwriters ("Underwriters"), which then sell the securities for full

5    market value to investors, including, as here, various Government Investors.

6        72.     The Underwriters also bear responsibility for performing due diligence with respect to the

7    trust transaction (and are included in and share responsibility for confirming the accuracy of the

8    representations made in the issuing documents for the corresponding Trust).

9        **B.**     **Delinquency Reporting Requirements For RMBS Securitization**

10       73.     When investors invest in any RMBS deal, the integrity of the loans that comprise the

11    underlying collateral is critical. This is because investors must be able to assess the likelihood that the

12    borrowers will be able to repay their mortgage debts and thus maintain the investors' ability to profit

13    from the security.

14       74.     While a variety of factors can figure into loan integrity (including, for example, the

15    veracity of the loan origination papers, the creditworthiness of the borrowers, the borrowers' equity

16    stakes, and the degree to which the originators of the loans adhered to the applicable loan underwriting

17    guidelines), one of the most important metrics is both simple and objective: loan payment status. If the

18    borrowers are not paying their debts on time—or at all—the burden and relative weight of the other

19    factors are rendered largely academic.

20       75.     Investors—including Government Programs—are not interested in taking on the

21    significantly increased risk of default that comes with loans that are not being paid on time. Instead they

22    prefer that such delinquent loans be largely absent from any initial RMBS pool. By and large, the SEC

23    has sought to satisfy investor concerns in this respect by requiring specific disclosures related to the

24    payment status of the loans in an asset-backed pool.

25       76.     Thus, a pool of residential mortgages can only be securitized according to a number of

26    strict laws designed to ensure the integrity of the markets for such instruments. One of the core

27    requirements, relevant here, is full and accurate disclosure of the percentage of the aggregate value of

28

1  the pooled loans being placed into the Trust that are delinquent as of the so-called "Cut-Off Date" for

2  creation of the Trust.

3      77.    The "Cut-Off Date" is the date on which the loans are first considered to be a part of the

4  trust pool and the date after which all monies received related to these loans will become property of the

5  trust. This date is highlighted in the Prospectus Supplement for each trust, and is the date for which the

6  delinquency percentages for loans in the trust pool are required to be measured.

7      78.    The paid-to date describing a loan's delinquency status is a measurement that can change

8  for any loan on a month-to-month basis. A loan that might be delinquent for one month may be non-

9  delinquent in a later month if the borrower on that loan has made up for earlier payments that had not

10  previously been sent. Conversely, a loan that is delinquent one month may persist as a delinquent loan

11  (and may even become more delinquent) as subsequent payments are made later and/or not at all. And

12  loans that had never before been delinquent may become delinquent if the borrower fails to make timely

13  payments. While any one-delinquency snapshot cannot predict how loans are going to be viewed month-

14  to-month, that snapshot can indicate potential weakness in the loans within a pool. If borrowers are not

15  making their payments on time, this is a red flag to investors.

16      79.    Asset-Backed Securities, including RMBS, are subject to an SEC-promulgated regulation

17  called "Reg AB" (where "AB" refers to "asset-backed"). *See* 17 CFR Part 229, Subpart 229.1100 *et seq.*

18  The SEC promulgated the final regulations in 2005.[19] With only a few exceptions, Reg AB went into

19  full effect at the beginning of 2006, and the SEC itself has confirmed that Reg AB essentially echoed

20  established standards that had, for the most part, already been in place for many years. While this

21  regulation covers multiple aspects of how asset-backed securities should be securitized, the portions that

22  deal with delinquency disclosures are relevant here.

23      80.    The SEC has long required that asset-backed securities accurately report the underlying

24  asset delinquencies. With regard to delinquencies, the Commission noted that "[s]uch assets may no

25  longer be ... converting into cash within a finite time period, as required by the definition of asset-

26  backed security, given that such assets are not performing in accordance with their terms and

27

28      [19] *See* "Asset-Backed Securities," 70 Fed. Reg. 1506 (January 7, 2005) (effective January 1,
2005, for all asset-backed securities that are the subject of that registered offering).

1   management or other action may be needed to convert them to cash.... We believe the principle that the

2   ABS should be primarily dependent on a pool of assets that self-liquidate instead of on the ability of the

3   entity performing collection services is an important principle that should be retained.   Further, we

4   believe the conditions we are codifying regarding delinquent and non-performing assets … are

5   appropriate in achieving this principle."[20]

6        81.    Reg AB adopted two standards to govern delinquencies in asset-backed securities.[21]

7          a.    For offerings that could be registered on a non-shelf basis, Reg AB required that

8   "delinquent assets may not constitute 50% or more, as measured by dollar volume, of the asset

9   pool as of the measurement date described above."[22]

10          b.    For shelf registration eligibility, the SEC retained "the existing 20% delinquency

11   concentration level in the no-action letter, as proposed."

12        82.    Reg AB defines a pool asset as "delinquent" if any portion of a contractually required

13   payment on the asset is 30 days or more past due from the contractual due date, as determined in

14   accordance with the most restrictive of any of the following:[23]

15          a.    The transaction agreements for the asset-backed securities;

16          b.    The delinquency recognition policies of the sponsor, any affiliate of the sponsor

17   that originated the pool asset or the servicer of the pool asset; or

18          c.    The delinquency recognition policies applicable to such pool asset established by

19   the primary safety and soundness regulator of any entity listed above or the program or

20   regulatory entity that oversees the program under which the pool asset was originated.

21

22

23        [20] *Id.* at 1517.

24        [21] *Id.* at 1518.

25        [22] *Id.* According to the Commission, "concentrations above that threshold begin to raise serious
doubt that the transaction should be characterized as an ''asset backed security' as the payments on the

26   securities in such transactions would appear to depend more on the ability of the entity or entities that
provide collection services for the delinquent assets than on the self-liquidating nature of the underlying

27   assets."

     [23] *Id.* at 1518.

28

83.   In adopting delinquency limits, the SEC adopted policies regarding grace periods, re-aging, restructures, partial payments considered current or other such practices on delinquencies.

84.   Reg AB called for the presentation of historical information and data on delinquencies and loss information.  In providing such information, Sponsors were required to:[24]

a.   Present delinquency experience in 30 or 31-day increments, as applicable, beginning at least with assets that are 30 or 31 days delinquent, as applicable, through the point that assets are written off or charged off as uncollectable.  At a minimum, such information must be presented by number of accounts and dollar amount;

b.   Disclose the total amount of delinquent assets as a percentage of the aggregate asset pool;

c.   Present loss and cumulative loss information, as applicable, regarding charge-offs, charge-off rate, gross losses, recoveries and net losses (with a description of how these terms are defined), the number and amount of assets experiencing a loss and the number and amount of assets with a recovery, the ratio of aggregate net losses to average portfolio balance and the average of net loss on all assets that have experienced a net loss;

d.   Categorize all delinquency and loss information by pool asset type;

e.   In a registration statement under the Securities Act or the Exchange Act or in a prospectus to be filed pursuant to § 230.424, describe how delinquencies, charge-offs and uncollectable accounts are defined or determined, addressing the effect of any grace period, re-aging, restructure, partial payments considered current or other practices on delinquency and loss experience; and

f.   Describe any other material information regarding delinquencies and losses particular to the pool asset type(s), such as repossession information, foreclosure information and real estate owned (REO) or similar information.

85.   Critical to the allegations herein, the SEC also mandated that the delinquency disclosures be made as of "the designated Cut-Off date for the transaction (*i.e.,* the date on and after which

---

[24] 70 Fed. Reg. at 1598.

1   collections on the pool assets accrue for the benefit of asset-backed security holders)."[25] Such date is

2   referred to in this complaint as the "Cut-Off Date" [capitalized] to distinguish it from the cut-off date

3   [not capitalized] used for monthly remittance reports issued during the life of the Trust, which are

4   discussed *infra*.

5       86.     Thus, pursuant to their creation of the Trusts, the Impac Defendants were required, under

6   applicable SEC laws and regulations, to disclose the percentage of underlying pool assets, by aggregate

7   principal balance, that were delinquent as of each Trust's "Cut-Off Date." The disclosed delinquency

8   rates were required to be less than 50% in order to qualify as "asset-backed" securities, and less than

9   20% in order to qualify as "investment quality" securities entitled to Shelf Registration. Of course, the

10  disclosed delinquency rates were also material to the risk rating assigned to the securities and the

11  corresponding market price for the securities.

12      87.     The Cut-Off Date disclosures are generally provided in the Prospectus Supplement,

13  publicly filed with the SEC as part of the securitization process. This Prospectus Supplement disclosure

14  is often worded in terms of the percentage of loans in the pool that were "delinquent" as of the Cut-Off

15  Date (*e.g.*, "delinquent," "30 days or more delinquent," "more than 30 days delinquent," "30-59 days

16  delinquent," etc.).

17      88.     In most instances, the criteria for loans being "delinquent" and/or "30 days delinquent"

18  are specifically defined in the Prospectus Supplement. In the absence of such definitions, they take their

19  ordinary meaning.

20      89.     Whatever the delinquency definitions, however, these particular Prospectus Supplement

21  "delinquency" disclosures are still required to comport with Reg AB, which mandates, among other

22  things, that RMBS Issuers disclose an appropriate method of determining loan delinquency and disclose

23  the amount of total assets (as a percentage of the aggregate pool) that are delinquent as of the transaction

24  Cut-Off Date. *See* Reg AB Items 1100(b), 1105(a) & 1111(c).

25

26

27

28

---

[25] 70 Fed. Reg. at 1601.

1    90. Specifically, Reg AB (and Item 1101(d)) required that delinquency (*i.e.*, whether a

2    payment was late by more than a month from its date due) could be calculated no more expansively than

3    the policies established by the OTS.

4    91. As a preliminary matter, there are two generally utilized methodologies for calculating

5    loan delinquencies for mortgage-backed securities, one articulated by the Mortgage Bankers Association

6    of America (the "MBA method") and one articulated by the OTS[26] (the "OTS method"). Under the more

7    restrictive MBA method (usually reserved for prime loans), a loan is considered "delinquent" as to status

8    at the close of business on the day that a single scheduled payment has been missed, and considered 30

9    days delinquent as to tier on the last day before the next payment is due. The OTS method (usually used

10   for subprime loans) is slightly more forgiving: a loan under the OTS method is not deemed "delinquent"

11   until the next monthly payment has also been missed, at which time it is considered "delinquent" as to

12   status and "30 days delinquent" as to tier.[27] Both methodologies are acceptable under Reg AB, but, as a

13   practical matter, Reg AB effectively prohibits the use of any delinquency methodology less restrictive

14   than that set forth by OTS (*i.e.*, one that would capture and identify even less delinquencies).[28]

15   92. As noted above, under OTS methodology, a loan becomes "delinquent" (and specifically,

16   "30 days delinquent") if its scheduled payment remains unpaid as of the next monthly due date. Hence,

17   OTS methodology is slightly more forgiving than MBA methodology, where a loan becomes

18   

19   [26] Effective July 21, 2011, the OTS merged into the Office of the Comptroller of the Currency ("OCC").

20   

21   [27] *See* 11/16/12 Complaint: *SEC v. JPMorgan et al.* at ¶ 64 ("Under the OTS method, a mortgage
     loan was thirty days delinquent if payment due on a due date in one month was not received by the close
22   of business on the loan's due date in the following month. Under the MBA method, that mortgage loan
     was thirty days delinquent if payment was not received by the close of business on the immediately
23   preceding day. As an example, if a loan had a payment due date of November 1, that loan would be
     thirty days delinquent under the OTS method if the payment was not received by the close of business
24   on December 1. Under the MBA method, however, that loan would be thirty days delinquent if payment
     was not received by the close of business on November 30.").
     (http://www.sec.gov/litigation/complaints/2012/comp-pr2012-233.pdf)
25   
     [28] In most instances, OTS was either the primary safety and soundness regulator for one or more
26   of the entities that were issuing/underwriting the residential mortgage backed securities or the regulatory
     entity overseeing the program under which at least some of the mortgage pool assets were originated.
27   And, even in those rare cases in which it was neither, no other regulatory entities overseeing the
     origination of mortgage loans or the securitization of mortgage pools had ever recognized the acceptable
28   use of any delinquency methodology for subprime loans that was less restrictive than that articulated by
     OTS.

1  "delinquent" the day a payment is missed, and is classified in the "30 days delinquent" tier if its

2  scheduled payment remains unpaid as of the day *before* the next monthly due date.

3      93.      Depending on the day of the month on which delinquency status is determined, there can

4  be significant differences in the number of loans considered "30 days delinquent" at any given time

5  under the two methodologies. However, in the RMBS deals at issue here, delinquency was to be

6  determined "as of" a Cut-Off Date on the first of the month. Therefore, but for the Impac Defendants'

7  fraud, application of either methodology should have yielded the same result.

8      94.      In the present case, the Impac Defendants falsified the Cut-Off Date mortgage loan

9  schedules and designed a non-Reg AB and non-OTS method to mask its manipulation of the underlying

10  data so as to improperly shift the loans to the next most favorable delinquency tier for all monthly

11  remittance reporting. Impac's alterations of paid-to dates in the Cut-Off Date mortgage loan schedule

12  and home-cooked method for monthly reporting were impermissibly more lenient than the OTS method,

13  and therefore violated Regulation AB.

14      **C.**    **Ongoing Distribution Remittance Reporting For RMBS Trusts**

15      95.      Each month, the Issuer publishes a Remittance Report summarizing the payments

16  received on the loans in the Trust pool, thereby providing a vehicle for assessing changes in the pool's

17  delinquency percentage. Remittance Reports historically report the delinquency status of the loans as of

18  the end of the previous month (*e.g.*, a remittance report issued in July reports on loan delinquency status

19  as of the end of June). As noted above, vastly different percentages of loans in a given pool will be

20  reported as "delinquent" depending on whether the MBA or OTS methodology is used, and for subprime

21  securities Issuers always used the more lenient OTS method.

22      96.      By way of example, consider a loan having payments due on the first of each month.

23  Assume that the borrower on that mortgage loan misses the June 1 payment and has not made any

24  payment by close of business on the last day of the month. Under the MBA methodology, that loan

25  would be categorized in the July report as "30 days delinquent." Under the OTS methodology, however,

26  that loan would be considered less than 30 days delinquent. Only if the borrower makes no payment by

27  the end of July would the OTS methodology allow the loan to be reported (in the August report) as "30

28  days delinquent." This is not to say that the loan did not become "30 days delinquent" as of July 1 – it

1 indeed did. But such delinquency would not be assessed or reported until the end of July (and even then
2 only if it is not further deferred by a late payment interposed between July 2 and July 31) for a month
3 end report Cut-Off date.

4      97.    The Impac Defendants constructed a monthly reporting structure for all remittance
5 reporting which violated Reg AB and did not conform to the OTS method. Delinquency was measured
6 and reported as of the last day of the prior month, while the servicer's file was as of the 14th day of the
7 current month for all monthly remittance reporting. The OTS method and Reg AB require the
8 measurement date for delinquency be the monthly files' effective day, the 14th of the month. This home-
9 cooked method covered up original delinquency misrepresentations and prevented investors, including
10 government investors, from detecting the original and ongoing false statements and reporting.

11     **D.**    **The Impac Defendants' Motive And Opportunity To Engage In The Alleged Scheme**

12         *1.*    *2005-2007: Late Payments Begin To Imperil Residential Mortgage Pool Securitization*

13
14     98.    The Impac Defendants had both the motive and the opportunity to undertake the
15 fraudulent scheme alleged herein, which spring from the confluence of two events. First, and as detailed
16 below, the 2006 onset of mandatory compliance with Reg AB for the Cut-Off Date delinquency
17 disclosure was at odds with the Impac Defendants' desires to continue using other methodologies that
18 slightly masked the delinquency rates when publishing subsequent monthly reports during the life of the
19 securities. Second, at the same time the mounting financial crisis was resulting in higher delinquency
20 rates, in response to which investment banks were trying frantically to securitize and off-load their loans
21 to Government Programs so they wouldn't be stuck holding bad loans.

    99.    In the 2005-2007 time period, the private-label RMBS market was moving at full tilt.
22 RMBS Issuers were aggregating mortgage loans and selling pool securities as fast as they possibly
23 could. The pressure to rapidly securitize these billions of dollars of loans, however, was driven not only
24 by profit motive, but also by an ever-growing realization that the mortgage market was unsustainable.
25 Loan turnover was high, underwriting guidelines were becoming ever more lax, and an alarming number
26 of mortgagors were no longer making their payments on time.
27
28

100. With the inexorable advance toward an end-of-days scenario, Issuers like Impac were, in essence, playing a high stakes game of "musical chairs." Before the music stopped, they needed to make these loans someone else's problem as soon as practicable. While they sought to remove as many securitization hurdles as they could, these RMBS Issuers were hobbled by at least two things: a) the Reg AB requirements (or, in 2005, its analogous precursors) that Issuers reveal, *as of the Cut-Off Date*, the 30 day delinquency status of the loans in the mortgage pool to be securitized; and b) their own longstanding practice of providing Closing Date representations and warranties that rely in part on loan payment status.

101. Hence, ignoring the Reg AB requirements when reporting Cut-Off Date delinquencies as well as the Closing Date no-default provision became the strategy for off-loading these toxic securities to investors (including the Government Programs) as quickly as possible.

102. From the Impac Defendants' perspective, the "problem" with RMBS securitization was that the pooled loans were not being packaged and securitized as of the end of the month, but as of the first day of the month. Hence, with the transaction "Cut-Off Date" being the first of the month and with a clear Reg AB requirement to report delinquency status *as of* that Cut-Off Date, proper application of the MBA and OTS methods would yield essentially the same delinquency percentages for all loans due on the first of the month. But for the later Remittance Reports, which often purported to measure delinquencies as of the end of the prior month (yet another violation of Reg AB, as detailed in the previous section), the MBA and OTS methods would still yield different results, and therefore the Issuers wanted to continue using the more lenient OTS method which made the loan pools appear less delinquent on an ongoing basis.

103. On a practical level, to Issuers this meant that (if they reported Cut-Off Date delinquencies in compliance with Reg AB) the OTS "30 day delinquencies" that would normally either remain hidden until the end of the month or be perpetually masked by later catch-up payments would instead be laid bare – providing investors (including Government Programs), and federal regulators like the SEC, insight into the true nature of the underlying mortgage pools and threatening the Issuers' ability to offload these loans at all, much less to command an unwarranted premium for securities based on these loans.

104.   To illustrate the point, consider a loan originated in April 2006, with the first payment due on June 1, and which was pooled into a RMBS trust with a July 1 Cut-Off Date.  Assume that as of the close of business on July 1 the borrower had failed to pay both the June 1 and July 1 payments. Under the MBA method, the loan would be reported in the 30-day delinquent tier from and after June 30th, and hence it would make no difference whether the Trust Cut-Off Date was June 30th or June 1st. In contrast, when using the OTS method, if the Cut-Off Date is June 30th the loan would not be reported in the 30-day delinquency tier, but would be reported in that tier if the Cut-Off Date is July 1.  Hence, following Reg AB and properly applying the OTS method would have revealed the high delinquency rates of bad loans they were trying to securitize and off-load to investors, including the Government Programs.  Compounding the situation was the Impac Defendants' need to continue masking the high delinquency rates during the life of the Certificates by issuing monthly remittance reports measuring delinquency rates "as of" the end of the prior month (even though now also prohibited by Reg AB).

105.   The Impac Defendants' solution was to ignore Reg AB and conceal the fact its Cut-Off Date delinquency rates were based on the status of the loans the day *before* the Cut-Off Date.

106.   In short, the Impac Defendants reported initial Cut-Off Date delinquencies in a manner inconsistent with accepted delinquency recognition methodology, and continued the deception through their end-of-the-month Remittance Report methodology, which not only carried through with the improper methodology, but, in addition, also backdated later payments to hide delinquencies even more.

107.   By ignoring Reg AB when reporting the Cut-Off Date delinquencies, the Impac Defendants hid the instability of the loans in the pools they sought to securitize. Under their methodology, rather than a loan becoming "delinquent" (and specifically, "30 days delinquent") when the second *consecutive* payment is missed, a loan was not considered "30 days delinquent" until the borrower missed the second *subsequent* payment *after* an initial missed payment—*i.e.*, the third missed payment).  In other words, the Impac Defendants deceptively shifted all delinquent loans up to the next more favorable tier.  Although Issuers sometimes varied in the descriptions of their methodology and how they presented the data, the descriptions were false and misleading smokescreens masking the fact the Issuer was actually ignoring Reg AB and the OTS method.

2.  *The Impac Defendants Continue To Represent And Warrant That "No Untrue Statements" Were Or Are Being Made.*

108.  From the outset of these transactions until the present time, the Impac Defendants repeatedly (both falsely and deceptively) misrepresented that they have made "no untrue statements." Set forth below are illustrative examples taken from the Impac 2007-2 Trust. Substantially the same certifications and/or misrepresentations were also made by the Impac Defendants with respect to each of the other 10 Trusts.

109.  *First,* in Exhibit L-1 to the Impac 2007-2 Trust's PSA, filed with the SEC and made available to prospective investors, including the Government Programs, the Impac Defendants falsely and deceptively represented that they would undertake to certify certain material facts, when they had no present intention of making truthful certifications. The certifications the Impac Defendants undertook to make, and later did falsely and fraudulently make, were as follows (underlined emphasis added):

FORM OF CERTIFICATION TO BE

PROVIDED WITH FORM 10-K

Re:   Impac Secured Assets Corp., Mortgage Pass-Through Certificates, Series 2007-1, issued pursuant to the Pooling and Servicing Agreement , dated as of February 1, 2007, among Impac Secured Assets Corporation, as Depositor, Impac Funding Corporation as the Sponsor and Master Servicer, Deutsche National Trust Company, as Trustee.

I, Mario Fegan, certify that:

1.  I have reviewed this report on Form 10-K and all reports on Form 10-D required to be filed in respect of the period covered by this report on Form 10-K of Impac Secured Assets Trust 2007-1 (the "Exchange Act periodic reports");

2. Based on my knowledge, the Exchange Act periodic reports, taken as a whole, <u>do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the last day of the period covered by this Report;</u>

3. Based on my knowledge, all of the distribution, servicing and other information required to be provided under Form 10-D for the period covered by this report is included in the Exchange Act periodic reports;

4. I am responsible for reviewing the activities performed by the servicers and based on my knowledge and the compliance reviews conducted in preparing the servicer compliance statements required in this report under Item 1123 of Regulation AB, and except as disclosed in the Exchange Act periodic reports, the servicers have fulfilled their obligations under the servicing agreements; and Based on my knowledge and the servicer compliance statements required in this report under Item 1123 of Regulation AB, and except as disclosed in the Exchange Act periodic reports the servicers have fulfilled their obligations under the servicing agreements; and

5. All of the reports on assessment of compliance with servicing criteria for asset-backed securities and their related attestation reports on assessment of compliance with servicing criteria for asset-backed securities required to be included in this report in accordance with Item 1122 of Regulation AB and Exchange Act Rules 13a-18 and 15d-18 have been included as an exhibit to this report, except as otherwise disclosed in this report. Any material instances of noncompliance described in such reports have been disclosed in this report on Form 10-K.

In giving the certifications above, I have reasonably relied on information provided to me by the following unaffiliated parties, Countrywide Financial Corporation and Deutsche Bank National Trust Company.

Date: 3/28/08

/S/ Mario Fegan

Mario Fegan

Senior Officer in Charge of the

Servicing Function of the Master Servicer

110. For each of the Trusts, the Impac Defendants filed at least one Form 10-K and/or Form 10-D containing a signed certification in substantially the same form as the foregoing example, which was knowingly false or fraudulent when made.

111. *Second*, in Exhibit L-1 to the Impac 2007-2 Trust's PSA, filed with the SEC and made available to prospective investors, including the Government Programs, the Impac Defendants falsely and fraudulently represented in Section 3.25(b)(iii) of the PSA ("Exchange Act Reporting"),"Form 10-K certification in the form attached hereto as Exhibit L-1 (the "Certification")" would be "signed by the senior officer of the Depositor in charge of securitization." The form was signed by Mario Fegan, Senior Officer in Charge of the Servicing Function of the Master Servicer and not the senior officer of the Depositor in charge of securitization.

112. *Third*, within their 10-K filing for the Impac 2007-2 Trust's PSA, the Impac Defendants falsely and fraudulently allowed the following disclosures to be included within the 10-K filing which they knew were untrue based on the delinquency measurement on a date other than the monthly remittance file data's effective date:

    a.   "KPMG LLP, a registered public accounting firm, has issued an attestation report with respect to the management's assertion of compliance with the Applicable Servicing Criteria as of and for the Period."

    b.   "In our opinion, except for the material noncompliance described in the third paragraph, management's assertion that the Company complied with the aforementioned servicing criteria as of and for the year ended December 31, 2007 for the Platform is fairly stated, in all material respects. /s/ Ernst & Young LLP".

113. For each of the Trusts, the Impac Defendants filed at least one Form 10-K containing a signed certification they made or caused to be made from the Master Servicer, Servicer and Depositor in substantially the same form as the foregoing example, which was knowingly false or fraudulent when made.

114. *Fourth*, the Prospectus Supplement disclosed, "The current and historical delinquency disclosure included in this prospectus supplement regarding the mortgage loans, the representation of the sponsor with respect to the delinquency status of the mortgage loans and the static pool information of the sponsor utilizes the OTS Method except as provided in 'Static Pool Information' in this prospectus supplement. In addition, delinquency information included in reports to certificateholders and delinquencies for purposes of the trigger tests described in this prospectus supplement will use the OTS

31

1   Method. See 'The Mortgage Pool - Methods of Delinquency Calculation' in the prospectus." The Cut-

2   Off Date and monthly remittance reports did not use the OTS method and were in violation of Reg AB.

3       115.   *Fifth*, while Section 4.02(a)(xi) of the PSA discloses delinquencies will be reported as of

4   the end of the calendar month prior to such Distribution Date, it failed to disclose the effective date of

5   the file used for such measurement was the day prior to the Determination Date. The PSA thus failed to

6   disclose this non-compliant Reg AB and non-OTS method for measuring and reporting delinquencies.

7       116.   *Sixth*, the PSA defined "Delinquent" as: "The delinquency method used for calculations

8   with respect to the mortgage loans will be in accordance with the methodology used by lenders regulated

9   by the Office of Thrift Supervision. Under this method, a mortgage loan is considered "30 days or more

10  Delinquent" if the borrower fails to make a scheduled payment prior to the close of business on the

11  mortgage loan's first succeeding due date. A mortgage loan would be considered "60 days or more

12  delinquent" with respect to such scheduled payment if such scheduled payment were not made prior to

13  the close of business on the mortgage loan's second succeeding due date. Similarly for "90 days or more

14  delinquent" and so on. Unless otherwise specified, with respect to any date of determination,

15  determinations of delinquency are made as of the last day of the prior calendar month. Mortgage Loans

16  with Due Dates which are not the first of the month are treated as if the Due Date was the first of the

17  following month." While this definition is OTS and Reg AB compliant, the method utilized for the Cut-

18  Off Date and monthly remittance reporting to investors was in fact not Reg AB compliant and was more

19  lenient than the OTS method.

20          a.     The method utilized for monthly reporting utilized a file from the day prior to the

21      Determination Date and measured the file as if it had been received 14 days prior to that date.

22      This non-compliant method of reporting delinquencies dramatically understated loan-level

23      delinquencies and delinquency severities.

24          b.     The Cut-Off Date delinquency disclosures appear to be based on falsified

25      mortgage loan schedules. Four of the ten trusts which did include a mortgage loan schedule

26      within an SEC filing included false and more favorable paid-to dates as of the Cut-Off Date,

27      which supported the false delinquency disclosures within the Prospectus Supplement.

28

32

117.    *Seventh*, when making monthly Remittance Reports for each of the Trusts from 2006 to the present day, the Impac Defendants made or caused to be made similar signed certifications and/or representations which were knowingly false or fraudulent when made. In fact, each Monthly Statement to Certificateholders for each Trust was knowingly made or caused to be made by the Impac Defendants in contravention of the foregoing representations.

118.    *Eighth*, the 10K filings were not signed by the Registrant for any of the trusts, but rather on their behalf by the Master Servicer, Impac Funding Corporation. The Master Servicer representatives signing the 10-K filings attesting to the compliance with Reg AB were Richard J. Johnson,[29] Executive Vice President and Chief Financial Officer and Mario Fegan,[30] Vice President Impac Funding Corporation. The Master Servicer is the very entity that was not complying with the required Reg AB disclosures as of the Cut-Off Date and monthly remittance reporting. Impac's involvement in certifying their own compliance rather than the Registrant is an inherent conflict of interest. The remittance reporting, 10-D filings, original Cut-Off Date mortgage loan schedule filings, and potentially the delinquency disclosures themselves within the Prospectus Supplement were all false and misleading.

119.    In each of the foregoing instances, by falsely certifying and/or causing others to falsely certify that there were no untrue statements relevant to the Trusts, the Impac Defendants caused investors (including the Government Programs) to purchase Trust Certificates from each Trust, and caused them to remain unaware that those Certificates were worth significantly less than the price paid for the Certificates.

120.    In each of the foregoing instances, by falsely certifying and/or causing others to falsely certify that there were no untrue statements relevant to the Trusts, the Impac Defendants facilitated their initial and ongoing, to the present, avoidance of their obligations to replace or repurchase loans that were in default, which obligation was required to be fulfilled in order to create and maintain Trusts supported by pools of assets that would provide the represented stream of income supporting the purchase price and ongoing market value of the Trust Certificates.

---

[29] Signed Impac 2005-1 Trust and Impac 2005-2 Trust 10-K filings.

[30] Signed all Impac 2006 and 2007 issued Trusts.

33

## VI.  THE IMPAC DEFENDANTS ENGAGED IN SYSTEMATIC FRAUD TO DECEIVE INVESTORS, INCLUDING THE GOVERNMENT PROGRAMS.

121.  As previously alleged herein, the Impac Defendants chose to ignore Reg AB and the Trusts' stated OTS delinquency methodologies, and instead reported loan delinquencies "as of" the day prior to the prior month, rather than on the day prior to the determination date for each trusts' monthly remittance delinquency reporting. Additionally, for those trusts which did file a mortgage loan schedule including the paid-to date as of the Cut-Off Date, evidence has been discovered which illustrates these schedules were false and misleading.

122.  Further, the decision to not publish the first month's loan-level remittance report, coupled with the facts identifying loans in breach of the no default provision monthly after the Closing Date, supports the position that the delinquency disclosures within the Prospectus Supplement were in fact false as well.

123.  The falsified mortgage loan schedules as of the Cut-Off Date resulted in underreporting the Trusts' actual 30-day delinquency percentages at a level that would allow them to securitize unworthy pools and make the associated securities attractive to unwary investors, including Government Programs.

124.  The monthly delinquency reporting was not compliant with the OTS method or Reg AB reporting requirements. In the monthly reporting the Impac Defendants employed two deceptive tactics that we have nicknamed "the drift" and "the float."

125.  In "the drift," the Issuers applied an unarticulated delinquency recognition methodology unsupported by the Prospectus Supplement, and in violation of Reg AB, allowing loan payments to drift unpaid for an additional month before they were even considered late. For example, while they might have stated in the Prospectus Supplement that a loan would count as "30 days delinquent" if it remained unpaid through the *immediately* succeeding month after the missed due date, Impac would actually only count such loan as delinquent if it remained unpaid through the *second* succeeding month (because Impac was required under the OTS method to measure the file as of the effective date of the file, when it was actually measuring as of the last day of the previous month). Employing "the drift," the Issuers redefined and limited the 30+ day delinquent loans to those that had not been paid for the two previous

1  months along with the unpaid payment due on the last day of the prior month, as opposed to simply the

2  previous month. When employed, this sham tactic allowed the Issuers to hide many of the very 30+ day

3  delinquencies by simply defining them away using their non-Reg AB and non-OTS compliant standard.

4        126.  In "the float," which was applied for all monthly distribution remittance reports, the

5  Issuers coupled the drift methodology with an additional backdating of payments received many weeks

6  after the monthly distribution Determination Date (the measurement date and effective date of the loan-

7  level file). Specifically, they applied loan-level payment data from later in the month as opposed to the

8  date on which the data was supposed to be assessed (thus creating a time cushion for subsequent

9  payments received between the monthly distribution Cut-Off Date (the Determination Date) and the

10  "float" date from which they actually obtained their payment status data in order to further hide loans

11  that should otherwise have been reported as delinquent).

12        127.  By using the "drift" and the "float" in direct violation of their own stated methodologies,

13  and in violation of Reg AB and the OTS method, the Impac Defendants improperly hid from investors

14  (including the Government Programs) that many of the loans in their various pools had significant

15  repayment risk. They instead "disclosed" that *none* of the loans were delinquent as of either the initial

16  Cut-Off Date or the monthly Determination Date, all while knowing that the actual percentages were

17  much, much higher. These tactics hid and covered up the original contractual no-default breaches which

18  the Impac Defendants in their role as the sponsor and master servicer made and had actual knowledge

19  of.

20        128.  These deceptive tactics were used to avoid what Impac considered to be the fundamental

21  problem at the heart of many of the RMBS deals packaged on the eve of the mortgage crisis –

22  mandatory Reg AB compliance when reporting Cut-Off Date delinquency rates, since it was at odds

23  with how they wanted to report the delinquency rates from and after the initial securitization Cut-Off

24  Date. This, coupled with falsifying the Cut-Off Date mortgage loan schedules in SEC filings,

25  compounded the Impac Defendants' cover up.

26     **A.**   **The Impac Defendants' Fraudulent Cut-Off Date Delinquency Disclosures**

27        129.  All of the RMBS Trust offerings at issue here used an initial Cut-Off Date at the first of

28  the month. Under Reg AB, the Impac issuing parties were required to disclose the delinquency status of

1 | the loans in the pool as of that Cut-Off Date's end of day reporting, and were effectively limited to the

2 | use of a delinquency calculus no more forgiving than that offered by OTS. Impac had a legal obligation

3 | to disclose loans as "delinquent" that had payments due on the first of the month and that, as of the Cut-

4 | Off Date, had received neither the payment due for the previous month nor the payment due on the Cut-

5 | Off Date under Reg AB, and "30 days delinquent" under accepted OTS methodology.

6 |     130.   As a result, the Impac Defendants misrepresented in the offering documents the then-

7 | current delinquency status of these loans collateralizing the vast bulk of the Trust transactions.

8 | Specifically, the Prospectus Supplements for the Trusts disclosed that none of the loans of each pool's

9 | aggregate principal balance was "more than 30 days delinquent" as of each Trust's Cut-Off Date. While

10 | the falsified mortgage loan schedules within the public filings support these disclosures, the first

11 | available loan-level remittance reports do not. While the Impac 2006-3 Trust publically filed mortgage

12 | loan schedule and Prospectus Supplement disclosure indicated no loans were delinquent, the first

13 | available loan-level remittance data, measured on the files effective, date illustrates *11.39% of all*

14 | *balances were 30 days or more delinquent.*[31]

15 |     131.   Consistently, the Impac Defendants falsely represented in the corresponding Pooling and

16 | Servicing Agreement for Trusts that they were recognizing delinquencies pursuant to the OTS method,

17 | the most permissive methodology permissible under Regulation AB. In accordance with the OTS

18 | method, any loan having missed both the prior month's scheduled payment and the payment due on the

19 | Cut-Off Date was not merely "delinquent" as to status, but "30+ days delinquent" as to OTS

20 | delinquency tier. Impac hid these delinquencies by employing monthly remittance reports which did not

21 | conform to representations Impac made in the PSAs or Reg AB.

22 |     **B.**    **The Impac Defendants' Fraudulent Inclusion of Breaching Loans Were Never**
        **Removed From The Trusts**

23 |

24 |     132.   The Impac Defendants knew of loans in breach of the monetary default and other

25 | provisions of the PSA. Impac knew of at least one loan in breach of underwriting representations, and,

26 | despite two notices to Impac regarding the defects, failed to provide a notice of breach pursuant to its

27 |

28 |     [31] Impac and the Trustee failed to file their loan-level remittance reports for the first three
remittances. The first available loan-level file is January 2007.

1  obligatons set forth in Sections 2.03 and 2.04 of the Pooling and Servicing Agreement and/or cure such

2  breaches via repurchase of the defective loan pursuant to its oblgtaion to maximize recoveries on behalf

3  of the Trust pursuant to Section 3.15.

4    133.   A loan is underwritten with the assumption that the borrower is going to make payments

5  for the term of the loan.[32] In order for this assumption to hold, the originator is required to underwrite a

6  loan to the originator's underwriting standards and guidelines. Deviations from those standards and

7  guidelines increase the risk of default and must be mitigated with compensating factors, reviewed by

8  more senior personal, and appropriately approved in writing. When originators ignore or violate their

9  own underwriting guidelines, the assumption that the borrower is going to make the payments for the

10  term of the loan is no longer valid.

11    134.   The PSAs include representations and warranties stating that loans are originated in

12  conformance with the originator's underwriting standards and guidelines. When these representations

13  are warranties are breached, the first and most advantageous path for recovery is to provide a notice of

14  breach to the Trustee seeking repurchase of a defective loan. While modifications, foreclosures and short

15  sales all are suitable methods of mitigating losses, each of these method generate either an economic

16  loss in the form of reduced interest payments, principal reduction/charge-off or extension of payments.

17  Additionally, a principal loss from each of these methods is customarily incurred.

18    135.   Repurchase, on the other hand, results in a full recovery of principal and payment of all

19  accrued interest due. As a result, the servicer's and master servicer's action to provide notice to a

20  Trustee of a breach of representations and warranties is the best option for maximizing recovery on a

21  defaulted loan. The servicing and/or Pooling and Servicing Agreement agreements provide specific

22  contractual obligations for the sponsor, servicers and/or master servicer to notice breaches for

23  repurchase, which should not be ignored as a method to maximize recovery.

24    136.   One loan in the Impac 2007-2 trust provides an example. There, the originator, who was

25  also the sponsor/seller and master servicer seeking restitution recovery, failed to underwrite the loan in

26  accordance with the underwriting guidelines. Background information on the loan is as follows:

27

28    [32] Jim Malloy, Impac, page 22 line 25 and page 23 lines 1 and 2 of November 16, 2015, 10:00
a.m. U.S. Courthouse Brooklyn, New York, 11-CR-449 (SJ) (RER) Transcript of Restitution Hearing.

     a.     The loan was underwritten as a stated income verified asset loan for a first time buyer.

     b.     The borrower indicated the property was going to be his primary residence.

     c.     He indicated he was single.

     d.     The borrower's stated income as a field advisor for a cast iron company was $114,900, plus net rental income of $13,500 per year.

137.    While his prior rental rate was only $800 a month, this borrower's monthly payment between the first and second mortgage, along with taxes and insurance, was now going to be over $4,200 a month. A payment shock and increase of 425% should have been a red flag to the underwriter. An underwriting review of the original information identified several additional issues:

     a.     The borrower's income failed the reasonableness test for the position. The maximum income for this type of a role appears to be closer to $80,000 per year rather than $114,000 per year based on Indeed's December 2015 comparable positions in Brooklyn NY. The average salary was closer to $65,000. Unless there was a significant increase in the maximum income of approximately 30% and this borrower had the highest paying position available, the borrower's stated income was significantly over stated.

**indeed**
one search. all jobs.

what:
Steel Erection
job title, keywords or company

where:
Brooklyn, NY
city, state, or zip

Steel Erection jobs in Brooklyn, NY

Upload your resume - Let employers find you

Jobs 1 to 10 of 18

My recent searches

Steel Erection SUPERVISOR - Brooklyn, NY

Steel Erection Project Manager

Steel Erection Foreman - Brooklyn, NY

Steel Erection Foreman

Structural Steel Project Manager - BROOKLYN ny

Structural Steel Project Manager

× clear searches

Sort by: relevance - date

Distance:
within 25 miles

Salary Estimate
$55,000+ (16)
$65,000+ (10)
$70,000+ (8)
$75,000+ (7)
$80,000+ (5)

**Project Manager (Structural Steel)**
Liberty Personnel Services        7 reviews - New York, NY
5+ years working as a Project Manager doing both structural erection and miscellaneous steel. Field measure steel stairs, rails, gates, ladders etc....
13 days ago - email
Sponsored

**Tower Top Hand - Charleston, SC**
Atlantic Tower Services        6 reviews - United States
Erection of various tower types. Antenna installation and alignment, TMA's, Diplexers, Coax, Connectors, Jumpers, installation of steel platforms and grounding....
22 days ago - email
Sponsored by TowerClimber

**Project Manager**
Michael Page US - Plainfield, NJ
Experience working for a steel contractor, hopefully with miscellaneous iron exposure. Management experience and scheduling skills required to plan, organize...
15 days ago - email
Sponsored

**Structural Steel Project Manager**
C&A Iron Works - Brooklyn, NY 11215 (Park Slope area)
Review and develop structural miscellaneous steel drawings. Develop cost-effective erection plans and schedules for completion projects....
Easily apply

    b.    While the borrower indicated the property was going to be his principal residence, several of the loan documents indicated his residency would continue to be his prior address for tax notices.[33]

---

[33] 103rd Avenue was the borrower's prior address.

1

2

3

4

5

6

7

8

9

10

11

12

13   and

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### TAX ESCROW ACCOUNT DESIGNATION OF MORTGAGE INVESTING INSTITUTION TO RECEIVE TAX BILLS'

(Real Property Tax Law, Sec. 953)

I DESIGNATE THE BANK OR OTHER MORTGAGE INVESTING INSTITUTION LISTED BELOW, ITS AGENTS, SUCCESSORS AND ASSIGNS TO RECEIVE ALL TAX BILLS FOR MY REAL PROPERTY (DESCRIBED BELOW) FOR SO LONG AS THE REAL PROPERTY TAX ESCROW ACCOUNT NOW BEING ESTABLISHED SHALL REMAIN IN EFFECT.

DATE  JANUARY 31, 2007

(1) ▮▮▮▮▮▮▮▮▮
NAME(S)

(2) ▮▮ CHAUNCEY STREET
ADDRESS OF PROPERTY SUBJECT TO TAX ESCROW ACCOUNT

(3) BROOKLYN          NY 11233          KINGS
CITY/TOWN        (4) STATE & ZIP CODE       (5) COUNTY

(6) SEC 607 BLOCK ▮▮ LOT 76
PROPERTY IDENTIFICATION (AS SHOWN ON TAX BILL OR TAX ROLL)

(7) ▮▮▮▮ 103RD AVENUE, SOUTH RICHMOND HILL , NEW YORK 11419
OWNER'S MAILING ADDRESS (IF DIFFERENT FROM #2, ABOVE)

▮▮▮▮▮▮▮▮▮▮▮▮    01/31/2007
SIGNATURE(S)        (8) DATE

1) IMPAC FUNDING CORPORATION dba  IMPAC LENDING GROUP

### ADDRESS CERTIFICATION

MORTGAGOR: ▮▮▮▮▮▮▮

I hereby certify that the above referenced mortgaged property is located at the address indicated below, and that the correct mailing address of the mortgagor is also indicated below:

The complete PROPERTY street       ▮▮ CHAUNCEY STREET
address is as follows:                (Street)

                                      BROOKLYN
                                      (City)

                                      NEW YORK                    11233
                                      (State)                     (Zip Code)

The complete MAILING address is      ▮▮▮▮ 103RD AVENUE
as follows:                          (Street)

                                      SOUTH RICHMOND HILL
                                      (City)

                                      NEW YORK                    11419
                                      (State)                     (Zip Code)

c.     Both the tax escrow mailing address information and the address certification statements indicated an address other than the underlying property address. This was a further indication that the underwriter knew the loan was not the borrower's primary residency.

d.     The underwriting guidelines also limited the combined loan-to-value (CLTV) to 95% for first time buyers. The actual CLTV for this loan was 100%, and no approval for this exception was presented in the file.

21, First time homebuyer with less than full doc is limited to a max 95% CLTV.

e.     The credit report showed no prior record of mortgage activity, indicating the borrower had not previously purchased a property. Additionally, a search of property records for the borrower shows no additional property owned in his name. The borrower can only have net rental income if they actually own a property. No proof of verification of assets was available in the file for net rental income, such as a lease or proof of ownership of additional property.

| | T R A D E   S U M M A R Y | | | | |
|---|---|---|---|---|---|
| | COUNT | BALANCE | HIGH CREDIT | PAYMENT | PAST DUE |
| MORTGAGE | 0 | 0 | 0 | 0 | 0 |
| AUTO | 0 | 0 | 0 | 0 | 0 |
| EDUCATION | 0 | 0 | 0 | 0 | 0 |
| OTHER INSTALLMENT | 0 | 0 | 0 | 0 | 0 |
| OPEN | 0 | 0 | 0 | 0 | 0 |
| REVOLVING | 8 | 303 | 19000 | 50 | 0 |
| OTHER | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 8 | 303 | 19000 | 50 | 0 |
| SECURED DEBT | 0 | OLDEST TRADELINE | 12/05 | | |
| UNSECURED DEBT | 303 | DEBT/HIGH CREDIT | 2% | | |

138.     Each of these are examples of breaches of representations and warranties at the point of origination by the underwriter of the loan, which was Impac Funding Corporation. Impac Funding Corporation was also the sponsor/seller and master servicer, which required them to provide notice of breaches to the trust.

139.     As time passed, the master servicer reviewed further evidence indicating the original loan was not underwritten to the standards. As part of a short sale evaluation, the borrower provided his 2008

1  and 2009 tax returns to the master servicer. The returns indicated the borrower was married, and not

2  single as indicated on his loan application. The couple's combined 2008 and 2009 income was less than

3  $19,100 each year.

**Filing status**

1  ☐ Single
2  ☒ Married filing jointly (even if only one had income)

21   Subtract line 20 from line 15. This is your adjusted gross income.   ▶ 21   19,085
For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 78.   EEA   Form 1040A (2008)

and

21   Subtract line 20 from line 15. This is your adjusted gross income.   ▶ 21   18,563
For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 87.   EEA   Form 1040A (2009)

14   140.   The borrower's W2 for 2008 indicated he was making closer to $8 an hour and his tax

15  returns showed no net rental income. The borrower's 2010 paystubs indicated an $8 an hour pay rate.

Employee Number:          2092
Department Number:
Social Security Number:   XXX-XX-XXXX
Marital Status:           MARRIED
Number Of Allowances:     01

| Description | Hours | Rate | This Period |
|---|---|---|---|
| REGULAR | 32.00 | 8.0000 | 256.00 |
| O/TIME | | | |
| HOLDAY | 8.00 | 8.0000 | 64.00 |

*Hours and Earnings*

141.    As evidenced above, the master servicer had substantial evidence prior to the short sale that the loan was originated in breach of the underwriting guidelines. Yet Impac Funding Corporation, as the master servicer, provided no notice of breach to the Trustee. This was confirmed by a review of the ABS 15G report filings with the SEC, which indicated no activity for this or any Trust to date.[34] Even if Impac Funding Corporation as the originator ignored obvious underwriting issues at inception, they became apparent again during subsequent loss mitigation efforts.

142.    As the sponsor, the Impac Defendants breached their contractual obligations when they included the defectively underwritten loan in the Trust, failed to correctly state the mortgage loan schedule values which were inherently incorrect due to the false underwriting, and ignored the default provision of the mortgage note in violation of the no monetary default provision.

---

[34] http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001018905&owner=exclude&count=40&hidefilings=0

143.     As the master servicer, Impac Defendants then failed to provide notice of breach to the Trustee requiring repurchase of the loan even when they became aware of the underwriting breach in their capacity as master servicer approving the short sale. This violated their duty under Section 3.15 of the PSA to maximize recovery upon default. In fact, Impac has not provided a single notice of breach for any defective loans in any of their ABS15G reporting, and has only filed two of their required quarterly ABS15G filings with the SEC.

**C.     The Impac Defendants' Fraudulent Inclusion Of Breaching Loans In Default**

144.     As shown in the Table below, the Impac Defendants improperly included at a  minimum in excess of $197 million in loans they knew to be in breach of one or more closing date representations. Additionally, in each case where the Impac Defendants included a mortgage loan schedule within a public filing as of the Cut-Off Date, the first loan-level remittance reports subsequently illustrated the disclosed paid-to dates for certain loans contained in the public filings were false.

145.     For example, the Impac 2006-5 Trust illustrated all loans paid through the Cut-Off Date of November 10, 2006 as follows:

| IMPAC 2006-5 TRUST POOLING AND SERVICING AGREEMENT MORTGAGE LOAN SCHEDULE v061976 | | |
|---|---|---|
| IPTD[35] | Count | Balance |
| 20061110 | 1 | $158,835.21 |
| 20061112 | 1 | $51,973.08 |
| 20061116 | 1 | $76,942.85 |
| 20061201 | 5,191 | $1,695,215,727.63 |
| 20070101 | 93 | $26,389,404.34 |
| **Total** | **5,287** | **$1,721,892,883.11** |

In contrast, the first available loan-level remittance report (from January 2007) indicated at least 150 loans had paid-through dates prior to the schedule above and at least 151 loans were in breach of the no monetary default provision on the Closing Date:

---

[35] IPTD stands for Interest Paid Through Date. Partial payments are not generally accepted as payments in full. In order for the interest payment to be applied the full payment would need to be applied.

| IMPAC 2006-5 TRUST JANUARY 2007 FIRST REMITTANCE REPORT | | | |
|---|---|---|---|
| PaidToDate | Count | End Balance | In Default on Closing Date |
| 10/1/2006 | 26 | $8,685,057 | In Monetary Default on Closing Date |
| 11/1/2006 | 124 | $45,526,885 | In Monetary Default on Closing Date |
| 11/10/2006 | 1 | $158,723 | In Monetary Default on Closing Date |
| 12/1/2006 | 1,897 | $802,877,056 | Undetermined |
| 12/12/2006 | 1 | $51,959 | Undetermined |
| 12/16/2006 | 1 | $76,885 | Undetermined |
| 1/1/2007 | 3,115 | $827,492,520 | Undetermined |
| 2/1/2007 | 112 | $24,238,120 | Undetermined |
| 3/1/2007 | 9 | $2,440,581 | Undetermined |
| 7/1/2007 | 1 | $172,413 | Undetermined |
| Total | 5,287 | $1,711,720,201 | |

146.    This same pattern exists for all four trusts which provided mortgage loan schedules filed with the SEC. The Impac 2006-3, Impac 2006-4, Impac 2006-5 and Impac 2007-1 Trusts all included a mortgage loan schedule within a public filing prior to the first available loan-level remittance. The loan-level remittance reports indicated numerous loans within each trust had paid-to dates prior to those illustrated within in the mortgage loan schedules, indicating these schedules were in fact false. The delinquency disclosures based on false mortgage loan schedules would therefore also be misleading and false. These four altered schedules also provide support that Impac knew the paid-to dates in the unadjusted mortgage loan schedules would be in conflict with their Prospectus Supplement delinquency disclosures and contractual obligations pursuant to the Pooling and Servicing Agreements to exclude from the pool loans which were 30 days delinquent on the Cut-Off Date.

147.    The Impac Defendants' intentional inclusion of non-conforming loans and false statements in the mortgage loan schedules as to the paid-to date of loans violated both Reg AB and Section 17 of the Securities and Exchange Act of 1933, giving rise to an affirmative obligation by the Impac Defendants to: a) replace or repurchase loans in order to ensure investors (including the Government Programs) received the value for which they had paid; and b) disgorge to the SEC the illicit gains they reaped by deceptively including unreported delinquent loans in their Trusts and potentially securitizing the assets in violation of the shelf registration delinquency limits.  The Impac Defendants concealed these obligations from investors and the SEC, and continue to hide these obligations to this

1  day. The minimum notional value of loans in breach of the monetary default provision as of Closing

2  Date, as identified in the first available loan-level remittance reports for each Trust is as follows:

| SUMMARY OF MINIMUM NOTATIONAL MONETARY DEFAULT BREACHES | | | |
|---|---|---|---|
| Trust | Closing Date | Minimum Monetary Default Loans | Amount |
| Impac 2007-3 | 4/30/2007 | Undetermined first loan-level July 2011 | |
| Impac 2007-2 | 3/29/2007 | 55 | $20,793,398 |
| Impac 2007-1 | 2/22/2007 | 64 (measured in Aug. 2007) | $17,066,060 |
| Impac 2006-5 | 12/21/2006 | 151 | $54,370,665 |
| Impac 2006-4 | 11/16/2006 | 85 | $25,432,516 |
| Impac 2006-3 | 9/29/2006 | 44 (measured in Jan. 2007) | $14,258,750 |
| Impac 2006-2 | 6/29/2006 | 9 (measured in Jan. 2007) | $2,965,196 |
| Impac 2006-1 | 3/30/2006 | Undetermined first loan-level Jan. 2009 | |
| Impac 2005-2 | 12/29/2005 | 138 | $27,710,408 |
| Impac 2005-1 | 6/10/2005 | 128 | $35,024,214 |
| Total Minimum Loans in Monetary Default as of Closing Date | | | $197,621,207 |

13      148.    For two Trusts, Impac 2007-3 and Impac 2006-1, no measurement was conducted, as the

14  first available loan-level monthly remittance report was not published for *several years* after the Closing

15  Date. For five of the trusts the first available loan-level remittance report was not made available until

16  several periods after the first remittance report. The trustee would need this loan-level data to generate

17  the monthly remittance report, so the information had to be available. It is a customary practice for the

18  trustee to publish the loan-level data along with the monthly remittance.

19      149.    The decision to not publish the first loan-level remittance information was made to cover

20  up the full scope of loans in breach of the monetary default provision and magnitude of fraudulent

21  misrepresentations of the paid-to dates in the Cut-Off Date mortgage loan schedules filed with the SEC.

22  The trustee has been contacted on two separate occasions in 2015 and 2016 and continues to fail to

23  publish the first loan-level remittance file. These failings at a minimum intentionally conceal monetary

24  default breaches, which are further masked by payments made between the Closing Date and first

25  available monthly loan-level file.

**D.    The Impac Defendants' Ongoing False Delinquency Disclosures In Monthly Remittance Reports Perpetuated And Concealed The Initial Fraud.**

150.    In addition to the materially false information that The Impac Defendants disclosed in the SEC Shelf Registrations, the Impac Defendants have, each month and as to each Trust, made, used, or directed others to make and use similar false statements regarding the purported delinquency rate of the pool assets for the Trusts. Those false statements appear both in Distribution Remittance Reports provided by either the Trustee or Securities Administrator (in accordance with each Trust's PSA) and in 10-D filings submitted to the SEC.

151.    The measurement date for delinquency corresponds with the regulatory definition, "the date on and after which collections on the pool assets accrue for the benefit of asset-backed security holders" and the associated "period." In the case of RMBS trusts, this corresponds with the day prior to the Determination Date of the trust, rather than the Impac Defendants' fraudulent use of the last day of the prior month. The Determination Date is customarily the 15th of the month in which the distribution is paid to certificate holders.

152.    For all ten Trusts, the Impac Defendants directed the Servicers, through the corresponding PSAs, to generate their monthly schedules of loan data as of the day *prior* to the Determination Date (on or between the 14th of the month).  While payments were collected up to and including the day prior to the monthly Determination Date, on the 14th of the month for the associated distribution remittance report, the delinquency measurement was performed as if the file was received on the last day of the prior month, *fourteen days earlier.*

153.    Stated another way, even though the resultant loan payment status fields in these reports ("Next Due," "Paid Through," or similar) reflected all regular and late payments received through the mid-month Determination Date, the Impac Defendants directed the Trustees and/or Securities Administrators to treat the data for these fields improperly as if they reflected the payment status of the loans as of the end of the *previous month.*

154.    This deceptive method did four things.  First, it failed to report loans that were 30 days delinquent as of the associated Measurement Date of the loan file, the day prior to the Determination Date (as required by Reg AB).  Second, it misreported delinquency in each and every distribution

47

1 remittance report by one month of delinquency for the majority of delinquent loans (*i.e.*, 30 day

2 delinquent loans were fraudulently classified as current, 60 day delinquent loans were fraudulently

3 classified as 30 days delinquent, 90 days delinquent loans were fraudulently classified as 60 days

4 delinquent). Third, it allowed payment to be applied to loans up to and including the day prior to the

5 Determination Date, the 14th of the month, while treating the file as if it was received on the last day of

6 the prior month. Fourth, it covered up the original false statements concerning delinquency and paid-to

7 date contained in public filings with the SEC.

8     155.    In all instances, the delinquency status representations, as furnished in the monthly

9 distribution remittance reports and as disclosed on the SEC website, have been and continue to be

10 materially false. These representations are also, as described in detail above, in violation of the OTS

11 methodology.

12     156.    The Office of the Comptroller of the Currency ("OCC") has replaced the OTS and has

13 now conducts oversight of thrifts. On information and belief, it is the OCC's position that the approved

14 OTS method would not be met where, as here, the "as of" date one day prior to the Determination Date

15 for all cash flow distributions and loan-level reporting was a different date than the measurement date

16 for measuring delinquency. Per the OCC, the regulatory and statutory enforcement of the OTS method

17 requires the "measurement date" for delinquency reporting to be the same as the "measurement date" of

18 the file itself.

19     157.    As a result, the Impac Defendants have falsely reported *and continue to falsely report –*

20 and/or caused others to falsely report – lower pool asset delinquencies than actually exist. Specifically,

21 through the improper use of end-of-month reporting and by improperly back-crediting all payments

22 made over the the first two weeks of each month, the Impac Defendants misleadingly and falsely shifted

23 the recognized delinquency tiers down one level for all loans due between the 1st and the 15th which

24 were in fact delinquent (*i.e.*, the actual 90+ day delinquencies were and are being reported as 60+ day

25 delinquencies, the actual 60+ day delinquencies were and are being reported as 30+ day delinquencies,

26 and significant percentages of loans that are actually 30+ day delinquencies are not being reported at all

27 for loans due on the first of the month) for approximately 99 percent or greater of the delinquent loans.[36]

28

---

[36] Less than 1% of loans had payment due dates on days other than the 1st of the month.

E. **Detailed Example From Impac 2006-4 Trust**

158. For example, the false remittance reporting scheme for the Impac 2006-4 Trust covered up discrepancies that would have otherwise led the SEC and the Government Programs to learn that the initial Prospectus Supplement Cut-Off Date delinquency disclosures were fraudulent.

159. In the Impac 2006-4 Trust Prospectus Supplement,, the Impac Defendants materially misrepresented that, "None of the mortgage loans were 30 days or more delinquent as of the Cut-Off Date." The FWP filed with the SEC included the following false information supporting the Prospectus Supplement disclosure:

| IMPAC 2006-4 TRUST FWP MORTGAGE LOAN SCHEDULE D584010 | | |
|---|---|---|
| Paid-to | Loan Count | Current Balance |
| 20061101 | 5,248 | $1,398,109,254 |
| 20061026 | 1 | $47,451 |
| 20061005 | 2 | $304,982 |
| 20061029 | 1 | $750,000 |
| 20061002 | 1 | $475,200 |
| 20061006 | 1 | $314,761 |

160. While the FWP as of November 1, 2006 Cut-Off Date indicated all loans had made their required payment due as of the Cut-Off Date, the first loan-level remittance file, made available 44 days later, indicated this was not the case. The first available loan-level remittance report, illustrated below, gives the lie to the fraudulent disclosure of the paid-to dates in the FWP and false statements regarding the delinquency of loans as of the Cut-Off Date. Eighty-five loans were paid through only 9/1/2006 or 10/1/2006, as well as the minimum number of loans which are in default as of the Closing Date.

| IMPAC 2006-4 TRUST DECEMBER 14, 2006 REMITTANCE SUMMARY | | | |
|---|---|---|---|
| PaidToDt | Current Balance | Count | % |
| 9/1/2006 | 5,569,879.06 | 13 | In Monetary Default |
| 10/1/2006 | 19,862,637.32 | 72 | In Monetary Default |
| 10/5/2006 | 59,886.25 | 1 | Undermined |
| 10/18/2006 | 114,505.04 | 1 | Undermined |
| 10/19/2006 | 99,632.62 | 1 | Undermined |
| 10/26/2006 | 47,451.23 | 1 | Undermined |
| 11/1/2006 | 1,272,892,674.95 | 4,709 | Undermined |

| IMPAC 2006-4 TRUST DECEMBER 14, 2006 REMITTANCE SUMMARY | | | |
|---|---|---|---|
| **PaidToDt** | **Current Balance** | **Count** | **%** |
| 11/6/2006 | 228,000.00 | 1 | Undermined |
| 12/1/2006 | 88,356,016.66 | 466 | Undermined |
| 1/1/2007 | 1,414,166.45 | 6 | Undermined |
| 3/1/2007 | 290,774.20 | 2 | Undermined |
| **Total** | **1,388,935,623.78** | **5,273** | |

161.    This intentional deception illustrated a false sense of more favorable performance for the loan pool on the Cut-Off Date.

162.    This behavior was systemic. This same false sense of security can be illustrated in each of the mortgage loan schedules included within public filings. The mortgage loan schedules include in three additional trust public filings illustrate a pattern of misrepresentation and intent to defraud investors. These trusts include Impac 2006-3, Impac 2006-5, and Impac 2007-1. In each case the mortgage loan schedule filed with the SEC included fraudulent and more favorable paid-to dates than were illustrated within the first available loan-level remittance schedule. These Cut-Off Date mortgage loan schedules stated all payments due prior and as of the Cut-Off Date have been made, which was shown to be false.

163.    The monthly remittance reporting and every 10-D filing also falsely stated a delinquency percentage that was not calculated in compliance with the OTS method and was designed to deceive investors. A comparison of the delinquencies stated in the Impac 2006-4 Trust remittance report compared to the proper calculation of delinquencies using the OTS method uncovers the false statements.

164.    The Impac Defendants improperly used payment status data as of the middle of December, but treated all these loans as if they were reviewing payment data from the end of November. By backdating all payments to a date in the previous month, Impac was able to hide delinquencies. As part of the deception, they represented that they were measuring delinquency as of the last day of the prior month, even though Reg AB requires the measurement date to be on the file "as of" date, or in this case the day prior to the Determination Date as stated in the PSA.

1    165.    The loan-level data for the Impac 2006-4 Trust tells a different story. It reveals that most

2    of the loans in the Trust had received two additional payments between September 2, 2006 and October

3    15, 2006 (the date for which the loan data was generated). These rolling late payments, applied

4    retroactively, deceptively brought most loans down from "30+ day delinquent" status back into "late, but

5    not delinquent" status.    Given the mid-October date on which the data was generated, however, those

6    loans that were actually at the time 30-59 days delinquent as of the monthly Cut-Off Date but received

7    only one subsequent payment would still have been required under the OTS method to be included as

8    assets "30+ days delinquent" as of October 15, 2006. And those loans that were 30-59 days delinquent

9    as of the monthly Cut-Off Date but had not received any subsequent payments would have been required

10   under the OTS method to be included as assets "60+ days delinquent."

11   166.    Thus, by improperly backdating the OTS calculation to the previous month, the Impac

12   Defendants fraudulently shifted those 60+ day delinquencies to 30+ day delinquencies and shifted those

13   30+ day delinquencies out of the reporting scheme altogether.

14   167.    If the true asset delinquencies had been revealed as of the mid-December date on which

15   the loan data was generated for the first remittance report for the Impac 2006-4 Trust, the Government

16   Programs and the SEC would have been alerted to a suspicious one-month jump in 30+ day

17   delinquencies from 0.000% (as falsely reported in the Prospectus Supplement) to 1.43% and even more

18   suspicious 0.40% 60 days delinquent disclosure. Instead only the 0.40% of loans were falsely reported

19   as 30 days delinquent in the December 2006 first remittance report. The loan-level data shows these 13

20   loans were paid to 9/1/2006 as of the December 14, 2006 loan-level remittance. Not only where these

21   loans actually 60 days delinquent as of the first loan-level remittance and falsely reported as 30 days

22   delinquent, these loans were in fact 30 days delinquent on the November 1, 2006 Cut-Off Date,

23   illustrating the Prospectus Supplement disclosure was false as well.

24   168.    Comparing the loan-level data with the remittance reports illustrates the ongoing false

25   reporting which has continued to go on in each trust for each period since inception to cover up the

26   original false disclosures:

27

28

| | | **"As of" Date** | **% 30+ DO** | **% 60+ DO** | **% 90+ DO** | **Summary** |
|---|---|---|---|---|---|---|
| | | | | | | |
| | **IMPAC 2006-4 TRUST** | | | | | |
| | **SEPT 2016 UNDERREPORTING OF ASSET DELINQUENCIES** | | | | | |
| **Sept 2016** | **Monthly Report and Website[37] (Backdated)** | 8/31/2016 | 14.23% | 12.74% | 12.18% | The Impac Defendants falsely reported pool delinquencies as if data from 8/31/2016 were correct "as of" date was 9/14/2016. By backdating the measurement and crediting all payments made through mid-September as having been paid in August, the Impac Defendants under-reported all pool delinquencies by one tier. |
| | **Actual Pool Delinquencies (Proper Date)** | 9/14/2016 | 17.66% | 14.23% | 12.74% | |
| | **Percentage of Assets Underreported Using Improper Backdating and Crediting of Later Payments** | | 3.43% | 1.49% | 0.56% | Further, by applying this improper methodology, the Impac Defendants avoided reporting *any* of the loans that were actually 30 days delinquent as of 9/1/2016 (**an additional 3.43% of the pool).** |

169.    As shown in the table above for September 2016, through their creation and application of a deceptive and improper method for determining pool asset delinquencies, the Impac Defendants avoided reporting the assets that were actually 30-59 days delinquent as of 9/1/2016 and 9/14/2016[38] (an additional 3.43% of the asset pool).

170.    This concealment continues for all Impac trusts for all periods to the present day.

171.    In this way for all the Trusts, the Impac Defendants have been able not only to keep the

---

[37] In this table, the "Monthly Report" numbers listed for the %30+, %60+, %90+ categories are the delinquency percentages as reported on the Morgan Stanley website, percentages that are the same as the false delinquent asset percentages disclosed in the Trust's corresponding distribution remittance reports. For this Trust, the Morgan Stanley numbers for the percentage of assets "30+ days" delinquent combine the percentages as disclosed in the corresponding distribution remittance reports for assets "1 PAYMENT," "2 PAYMENTS," and "3+ PAYMENTS" delinquent. The numbers for "60+ days" combine the percentages disclosed for assets "2 PAYMENTS" and "3+ PAYMENTS" delinquent. The numbers for "90+ days" show the percentages disclosed for assets "3+ PAYMENTS" delinquent. As the distribution remittance reporting for this Trust does not include delinquency categories beyond "3+ PAYMENTS," the "120+ days" delinquent category is not available for comparison (it bears note, however, that the Morgan Stanley website improperly reports assets "120+ days" delinquent as "0.00%" rather than "N/A" or similar).

[38] All remaining loans in the trust were due for payments on the 1st of the month. These loans would be considered 30 days delinquent both on 9/1/2016 and 9/14/2016, with 9/14/2016 being the effective date of the file from the servicer.

1  Government Programs in the dark regarding the true ongoing delinquencies and breaching loans within
2  the Trusts they had created, but also to conceal the fact that they had initially securitized pools of loans
3  that, even at Trust inception, were significantly delinquent and in breach as of their respective Cut-Off
4  Dates and Closing Date.

5      172.    Having employed this deceit from the very first month after securitization, the Impac
6  Defendants have prevented the Government from reasonably ascertaining the false nature of the Impac
7  Defendants' initial Prospectus Supplement delinquency representations, payment status of loans as of
8  the Cut-Off Date, and breaching status as of the Closing Date. This fraudulent subterfuge induced
9  purchases of billions of dollars of certificates in these Trusts. And by continued employment of this
10  scheme, the Impac Defendants are, even now, concealing a pattern of fraud that might otherwise have
11  led the Government to investigate and uncover the Impac Defendants' original fraudulent disclosures
12  and representations and resultant fraudulent securitization.

13      173.    Relator has separately provided disclosure to the Impac Defendants, who are in a position
14  to provide notice to the Trustee, of all fraudulent disclosures within mortgage loan schedules, free
15  writing prospectuses, and PSAs, and contractual breaches for loans in monetary default and
16  misrepresentations of compliance with originator underwriting standards which the
17  originator/sponsor/master servicer Impac Funding Corporate was aware of. To date Impac has failed to
18  provide notice to the trustee of any loans for repurchase.

19  **VII.  FURTHER EVIDENCE OF THE IMPAC DEFENDANTS CONCEALMENT OF THE**
20  **SCHEME**

       **A.    Transactional Concealment Methods – Failure To Publish Loan-Level Data**
21

22      174.    The concealment is intentional, as Relator's analysis has uncovered. The loan-level data
23  for five of the trusts' first remittance reports was and continues to be not disclosed and unavailable to
24  investors. In three of these cases, monetary defaults are eveident even when using the first available
25  loan-level data file from a period *other* than the first remittance report period, even after a period of four
26  months had passed wherein the delinquencies could have been cured.

27

28

**B.    Technological Concealment Methods – Presentation Of Mortgage Loan Schedules In Indecipherable Format**

175.    For the Trusts at issue here, Cut-Off Date mortgage loan schedules were filed with the SEC in FWPs or subsequent SEC 8-K disclosures merely as high-megabyte *text* files nearly indecipherable to Government Programs.  These files thus posed several non-trivial technical challenges to an examiner.

176.    **First**, the files were so large that many conventional PCs in the 2006-2007 time frame were unable to manipulate them. Computers sufficient to open and manipulate such files usually required a minimum of 8GB of RAM along with dual or quad processors. PCs with less than these minimum requirements were often unable even to open the files, much less allow a user to convert them into a form where they could be utilized properly.  Moreover, many of these files were made large by including the same mortgage loan schedule multiple times within a given FWP.

177.    **Second**, once the files were opened, the mortgage loan schedule data needed to be manually reconstructed into database format from the flat text form in which it was provided. A full mortgage loan schedule normally has between 60 and 120 data elements, multiplied by the number of loans in the file. When these mortgage loan schedules were filed with the SEC they were broken into multiple parts with six to twelve data elements per section. As a result, each mortgage loan schedule text file had between six to twenty sections with no telltale characteristics that would guide in the reconstruction of the original data set (a data set having upward of 100,000 discrete data points).

178.    Only after this painstaking technical process had been completed could each of the sections be combined and properly delimited so as to provide a full mortgage loan schedule showing each loan and every corresponding data element corresponding to the loan. Only once the mortgage loan schedule had been fully reconstructed could the then-current current balance, loan count, and payment status be compared to the corresponding Prospectus Supplement disclosure, but only if the paid-to dates had not also been falsely stated.

179.    Finally, all four of the mortgage loan schedules filed with the SEC for four separate Impac trusts were false and included false and misleading paid-to dates, which could only be discovered when reviewing subsequent monthly loan-level data files. Five of the ten trusts failed to publish the first

1  loan-level file, which would have been used to detect false statement in Cut-Off Date mortgage loan
2  schedules.

3     180.     This method of presenting loan data in garbled form allowed the Impac Defendants' to
4  conceal their knowing and material falsification of records or reports, upon which Government
5  Programs and others relied. Determining the true nature of loan delinquencies was thus rendered an
6  exercise of finding the proverbial needle in the haystack.

7     **C.     Impac Defendants' Wire Fraud**

8     181.     Impac filed their public offering documents and PSA agreements with the SEC.
9  Additionally, these documents were provided to investors electronically for their evaluation. The
10 purchase and sale of loans between the trust and the depositor and for the certificates from the trust to
11 certificateholders based on these documents occurred via wire transfer. The Impac Defendants
12 knowingly issued false statement within public filings with the SEC, which were used by investors to
13 purchase securities via wire transfer. The transfer of the securities via wire transfer settlement
14 constitutes wire fraud committed by the Impac Defendants.

15                                COUNT I

16     *(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))[39]*

17     182.     The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
18 of the information involved, or with actual knowledge of the falsity of the information, knowingly
19 presented or caused to be presented, and may still be presenting or causing to be presented, to the United
20 States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C.
21 § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

22     183.     As a result of the Impac Defendants' actions alleged herein, the United States of America
23 has been, and may continue to be, severely damaged.

24

25

26

27

28     [39] To the extent wrongdoing occurred after May 20, 2009, this Complaint should be deemed to
include violations of the Federal False Claims Act's recent amendments.

COUNT II

*(Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))[40]*

184.    Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

185.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

186.    The United States of America, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing false or fraudulent claims.

187.    As a result of the Impac Defendants' actions alleged herein, the United States of America has been, and may continue to be, severely damaged.

COUNT III

*(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))[41]*

188.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

189.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the United States, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of 31 U.S.C. § 3729(a)(1), (a)(2).

190.    As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

---

[40] To the extent wrongdoing occurred after May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

[41] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.,* 31 U.S.C. § 3729(a)(3).

COUNT IV

*(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))[42]*

191.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

192.    As detailed above, Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to 31 U.S.C. § 3729(a)(1)(G).

193.    As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

COUNT V

*(Violation of California False Claims Act)*

194.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

195.    This is a civil action brought by Relator on behalf of the State of California against the Impac Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

196.    In the State of California, the relevant State pension funds include CalPERS, the California State Teachers' Retirement System, the Department of Personnel Administration – State Savings Plus Program, the University of California Retirement Plan, California PERF, California Teachers, San Diego County pension fund, and the pension funds for San Francisco City and State, among others. These funds invested heavily in the Impac Defendants.

197.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

---

[42] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, e.g., 31 U.S.C. § 3729(a)(7).

1   presented or caused to be presented, and may still be presenting or causing to be presented false or

2   fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

3       198.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

4   of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

5   used or caused to be made or used, and may still be making, using or causing to be made or used, false

6   records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code §

7   12651(a)(2).

8       199.   The Impac Defendants conspired with numerous entities to prepare and deliver

9   inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other

10  business entities, in violation of Cal. Gov't Code § 12651(a)(3).

11      200.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

12  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

13  used or caused to be made or used, and may still be making, using or causing to be made or used, false

14  records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of

15  California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

16      201.   The State of California, or its political subdivisions, unaware of the falsity of the claims

17  and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or

18  statements, paid, and may continue to pay, for recipients of pension program benefits funded by the

19  State and/or State subdivision.

20      202.   As a result of the Impac Defendants' actions as set forth above, the State of California,

21  including its political subdivisions, has been, and may continue to be, severely damaged.

22                              COUNT VI

23              *(Violation of Delaware False Claims and Reporting Act)*

24      203.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as

25  though fully set forth herein.

26      204.   This is a civil action brought by Relator on behalf of the Government of the State of

27  Delaware against the Impac Defendants under the Delaware False Claims and Reporting Act, Del. Code

28  Ann. tit. 6, § 1203(b).

205.   In the State of Delaware, the relevant State pension funds include the Delaware  Public Employees' Retirement System, which consists of nine retirement plans  for various public employees, and three commingled pension funds.  These funds  invested heavily in the Impac Defendants.

206.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

207.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

208.   The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of Del. Code tit. 6, § 1201(a)(3).

209.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(7).

210.   The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for pension benefits funded by the State of Delaware.

211.   As a result of the Impac Defendants' actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII

### *(Violation of District of Columbia False Claims Act)*

212.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

213.    This is a civil action brought by Relator, on behalf of the District of Columbia, against the Impac Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

214.    In the District of Columbia, the relevant pension funds include the District of Columbia Police & Fire, and the District of Columbia Teachers pension funds. These funds invested heavily in the Impac Defendants.

215.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

216.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

217.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of D.C. Code § 2-308.14(a)(3).

218.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

219.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the District and/or by its political subdivisions.

220.    As a result of the Impac Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT VIII

*(Violation of Florida False Claims Act)*

221.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

222.    This is a civil action brought by Relator, on behalf of the State of Florida, against the Impac Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

223.    In the State of Florida, the relevant funds are consolidated through the Florida Division of Retirement and the Florida Retirement System. These funds invested heavily in the Impac Defendants.

224.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

225.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

226.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of Fl. Stat. § 68.082(2)(c).

1    227.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

2  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

3  used or caused to be made or used, and may still be making, using or causing to be made or used, false

4  records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State

5  of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

6    228.   The State of Florida, or its agencies, unaware of the falsity of the claims and/or

7  statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or

8  statements, paid, and may continue to pay, for pension plans funded by the State of Florida

9  or its agencies.

10    229.   As a result of the Impac Defendants' actions, as set forth above, the State of Florida

11  and/or its agencies have been, and may continue to be, severely damaged.

12                COUNT IX

13          *(Violation of Hawaii False Claims Act)*

14    230.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as

15  though fully set forth herein.

16    231.   This is a civil action brought by Relator, on behalf of the State of Hawaii, against the

17  Impac Defendants under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

18    232.   In the State of Hawaii, the relevant funds are managed through Hawaii ER. The State of

19  Hawaii's pension fund is projected to be wiped out by the year 2020. In 2021, the fund will require an

20  infusion of $1.7 billion to make its payments to State beneficiaries. The Hawaii retirement system has

21  been ranked fifth in the country of State pension funds most damaged by the changes in the economy.

22  These funds managed through Hawaii ER invested heavily in the Impac Defendants.

23    233.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

24  of the information involved, or with actual knowledge of the falsity of the information, knowingly

25  presented or caused to be presented, and may still be presenting or causing to be presented, to an officer

26  or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment

27  or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

28

234. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

235. The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of Haw. Rev. Stat. § 661-21(a)(3).

236. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

237. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for pension programs funded by the State and/or its political subdivisions.

238. As a result of the Impac Defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT X

*(Violation of Illinois False Claims Act)*

239. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

240. This is a civil action brought by Relator, on behalf of the State of Illinois, against the Impac Defendants under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

241. In the State of Illinois, the relevant pension funds are the State Retirement Systems of Illinois, the State Universities Retirement System of Illinois, the Chicago Teachers fund, the Illinois Municipal employees' fund, Illinois SERS, the Illinois Teachers Retirement Fund, the Illinois Public

1   Employees' Retirement Fund, and the Illinois Universities' fund. These funds invested heavily in the
2   Impac Defendants. Illinois is ranked first in the list of States most damaged by the changes in the
3   economy. The pension funds are expected to run out of money in the year 2018. Illinois will require an
4   infusion of $13.6 billion in 2019 in order to make payments to State fund beneficiaries.

5        242.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
6   of the information involved, or with actual knowledge of the falsity of the information, knowingly
7   presented or caused to be presented, and may still be presenting or causing to be presented, false or
8   fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

9        243.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
10  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,
11  used, or caused to be made or used, and may still be making, using, or causing to be made or used, false
12  records or statements material to get false or fraudulent claims paid or approved by the State of Illinois,
13  or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

14       244.   The Impac Defendants conspired with numerous entities to prepare and deliver
15  inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other
16  business entities in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(C).

17       245.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
18  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,
19  used, or caused to be made or used, and may still be making, using, or causing to be made or used, false
20  records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to
21  the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

22       246.   The State of Illinois, or its political subdivisions, unaware of the falsity of the claims
23  and/or statements made by the Impac Defendants, and in reliance on the accuracy of those claims and/or
24  statements, paid, and may continue to pay, for pension programs funded by the State and/ or by its
25  political subdivisions.

26       247.   As a result of the Impac Defendants' actions, as set forth above, the State of Illinois
27  and/or its political subdivisions have been, and may continue to be, severely damaged.

28

COUNT XI

*(Violation of Indiana False Claims and Whistleblower Protection Act)*

248.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

249.    This is a civil action brought by Relator, on behalf of the State of Indiana, against the Impac Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

250.    In the State of Indiana, the relevant funds include the Indiana Public Employees' Retirement Fund and the Indiana Teachers' Retirement Fund.  Indiana is ranked third in the list of States most damaged by changes in the economy.  Indiana's pension funds are expected to run out of money in the year 2019.  Indiana will require an infusion of $3.6 billion in 2020 in order to make payments to State fund beneficiaries.

251.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

252.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

253.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of Ind. Code § 5-11-5.5-2(b)(7).

254.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be

1  made or used, false records or statements to avoid an obligation to pay or transmit money to the State of

2  Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

3      255.   The State of Indiana, or its political subdivisions, unaware of the falsity of the claims

4  and/or statements made by the Impac Defendants, and in reliance on the accuracy of those claims and/or

5  statements, paid, and may continue to pay, for pension programs funded by the State and/or by its

6  political subdivisions.

7      256.   As a result of the Impac Defendants' actions, as set forth above, the State of Indiana

8  and/or its political subdivisions have been, and may continue to be, severely damaged.

9                                        COUNT XII

10                            *(Violation of Iowa False Claims Act)*

11      257.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as

12  though fully set forth herein.

13      258.   This is a civil action brought by Relator, on behalf of the State of Iowa, against the Impac

14  Defendants under the Iowa False Claims Act, Iowa Code § 685.3(2)(a).

15      259.   In the State of Iowa, the relevant State pension funds include the Iowa Public Employees

16  Retirement System ("IPERS"), which consists of retirement plans for various public employees.  These

17  funds  invested heavily in the Impac Defendants.

18      260.   The Impac Defendants, in reckless disregard or deliberate ignorance for the truth or

19  falsity of the information involved, or with actual knowledge of the falsity of the information,

20  knowingly presented, or caused to be presented, and may still be presenting or causing to be presented,

21  false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

22      261.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

23  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

24  used or caused to be made or used, and may still be making, using or causing to be made or used, false

25  records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

26      262.   The Impac Defendants conspired with numerous entities to prepare and deliver

27  inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other

28  business entities in violation of Iowa Code § 685.2(1)(c).

263.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

264.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or statements, paid for pension programs funded by the State and/or its political subdivisions.

265.    As a result of the Impac Defendants' actions, as set forth above, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XIII

*(Violation of Minnesota False Claims Act)*

266.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

267.    This is a civil action brought by Relator, on behalf of the State of Minnesota, against the Impac Defendants under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

268.    In the State of Minnesota, the relevant funds include the Minnesota Public Employee Retirement Association, the Minnesota Teachers' Retirement Association, the Minneapolis ERF, the Minnesota PERF, the Minnesota State Employees' fund, and the Minnesota Teachers' fund. These funds invested heavily in the Impac Defendants.

269.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

270.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false

67

1 | records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its
2 | political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

3 |     271.   The Impac Defendants conspired with numerous entities to prepare and deliver
4 | inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other
5 | business entities, in violation of Minn. Stat. § 15C.02(a)(3).

6 |     272.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
7 | of the information involved, or with actual knowledge of the falsity of the information, knowingly made,
8 | used, or caused to be made or used, and may still be making, using or causing to be made or used, false
9 | records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State
10 | of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

11 |     273.   The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims
12 | and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or
13 | statements, paid State and State subdivision funds, and/or have failed to receive funds they are entitled
14 | to receive from the Impac Defendants.

15 |     274.   As a result of the Impac Defendants' actions, as set forth above, the State of Minnesota
16 | and/or its political subdivisions have been, and may continue to be, severely damaged.

17 | COUNT XIV
18 | *(Violation of Montana False Claims Act)*

19 |     275.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as
20 | though fully set forth herein.

21 |     276.   This is a civil action brought by Relator, on behalf of the State of Montana against, the
22 | Impac Defendants under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

23 |     277.   In the State of Montana, the relevant State pension funds include the Montana Public
24 | Employee Retirement Administration ("MPERA"), which consists of retirement plans for various
25 | public employees. These funds invested heavily in the Impac Defendants.

26 |     278.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
27 | of the information involved, or with actual knowledge of the falsity of the information, knowingly
28 | presented or caused to be presented, and may still be presenting or causing to be presented, to an officer

1  or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment

2  or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

3       279.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

4  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

5  used or caused to be made or used, and may still be making, using or causing to be made or used, false

6  records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its

7  political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

8       280.   The Impac Defendants conspired with numerous entities to prepare and deliver

9  inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other

10 business entities, in violation of Mont. Code Ann.§ 17-8-403(2)(c).

11      281.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

12 of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

13 used, or caused to be made or used, and may still be making, using or causing to be made or used, false

14 records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State

15 of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

16      282.   The State of Montana, or its political subdivisions, unaware of the falsity of the claims

17 and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or

18 statements, paid, and may continue to pay, for recipients of pension programs funded by the State

19 and/or its political subdivisions.

20      283.   As a result of the Impac Defendants' actions, as set forth above, the State of Montana

21 and/or its political subdivisions have been, and may continue to be, severely damaged.

22                                    COUNT XV

23                        *(Violation of Nevada False Claims Act)*

24      284.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as

25 though fully set forth herein.

26      285.   This is a civil action brought by Relator, on behalf of the State of Nevada, against the

27 Impac Defendants under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

28

286.    In the State of Nevada, relevant funds include the Nevada Public Employees Retirement System, the Nevada Police Officer and Firefighter fund, and the Nevada Regular Employees' fund, among others. These funds invested heavily in the Impac Defendants.

287.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

288.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

289.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of Nev. Rev. Stat. §357.040(1)(c).

290.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

291.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the State and/or its political subdivisions.

292.    As a result of the Impac Defendants' actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVI

*(Violation of New Jersey False Claims Act)*

293.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

294.   This is a civil action brought by Relator, on behalf of the State of New Jersey, against the Impac Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

295.   In the State of New Jersey, the relevant funds include the New Jersey Division of Pensions and Benefits, New Jersey PERS PUC, New Jersey Police and Fire, and the New Jersey Teachers' fund. New Jersey ranks #4 on the list of State pension funds most damaged by changes in the economy. The funds are expected to run out of money in the year 2019. In the year 2020, the State will need an infusion of $14.4 billion into its fund to enable it to continue paying State fund beneficiaries. These funds invested heavily in the Impac Defendants.

296.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

297.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

298.   The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of N.J. Stat. Ann. § 2A:32C-3(c).

299.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

1   used or caused to be made or used, and may still be making, using or causing to be made or used, false

2   records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State

3   of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

4       300.   The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims

5   and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or

6   statements, paid, and may continue to pay, for pensions funded by the State and/or by its political

7   subdivisions.

8       301.   As a result of the Impac Defendants' actions, as set forth above, the State of New Jersey

9   and/or its political subdivisions have been, and may continue to be, severely damaged.

10                              COUNT XVII

11                  *(Violation of New Mexico Fraud Against Taxpayers Act)*

12      302.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as

13  though fully set forth herein.

14      303.   This is a civil action brought by Relator, on behalf of the State of New Mexico, against

15  the Impac Defendants under the New Mexico Fraud Against Taxpayers Act. N.M. Stat. Ann. §§ 44-9-1

16  *et seq.*

17      304.   In the State of New Mexico, the relevant funds include the New Mexico Education

18  Retirement Board, which manages pensions, the Public Employees Retirement Association of New

19  Mexico, and the New Mexico Teachers fund, among others. These funds invested heavily in the Impac

20  Defendants.

21      305.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

22  of the information involved, or with actual knowledge of the falsity of the information, knowingly

23  presented or caused to be presented, and may still be presenting or causing to be presented, false or

24  fraudulent claims for payment or approval, in violation of N.M. Stat. Ann. § 44-9-1(A)(1).

25      306.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

26  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

27  used or caused to be made or used, and may still be making, using or causing to be made or used, false

28

1 records or statements material to false or fraudulent claims, in violation of N.M. Stat. Ann. § 44-9-

2 1(A)(2).

3     307.    The Impac Defendants conspired with numerous entities to prepare and deliver

4 inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other

5 business entities in violation of N.M. Stat. Ann. § 44-9-1(A)(3).

6     308.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

7 of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

8 used, or caused to be made or used, and may still be making, using or causing to be made or used, false

9 records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State

10 of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann. § 44-9-1(A)(4).

11     309.    The State of New Mexico, or its political subdivisions, unaware of the falsity of the

12 claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims

13 and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the State

14 and/or its political subdivisions.

15     310.    As a result of the Impac Defendants' actions, as set forth above, the State of New Mexico

16 and/or its political subdivisions have been, and may continue to be, severely damaged.

17 COUNT XVIII

18 *(Violation of New York False Claims Act)*

19     311.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as

20 though fully set forth herein.

21     312.    This is a civil action brought by Relator, on behalf of the State of New York, against the

22 Impac Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

23     313.    In the State of New York pension funds are managed by the *New York State* Common

24 Retirement *Fund*. The New York State Common Retirement Fund invested heavily in the Impac

25 Defendants.

26     314.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

27 of the information involved, or with actual knowledge of the falsity of the information, knowingly

28

1 | presented or caused to be presented, and may still be presenting or causing to be presented, false or
2 | fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

3 |     315.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
4 | of the information involved, or with actual knowledge of the falsity of the information, knowingly made,
5 | used or caused to be made or used, and may still be making, using or causing to be made or used, false
6 | records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law §
7 | 189(1)(b).

8 |     316.   The Impac Defendants conspired with numerous entities to prepare and deliver
9 | inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other
10 | business entities, in violation of N.Y. Fin. Law § 189(1)(c).

11 |     317.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity
12 | of the information involved, or with actual knowledge of the falsity of the information, knowingly made,
13 | used, or caused to be made or used, and may still be making, using or causing to be made or used, false
14 | records or statements material to an obligation to pay or transmit money to the State of New York, or its
15 | political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

16 |     318.   The State of New York, or its political subdivisions, unaware of the falsity of the claims
17 | and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or
18 | statements, paid, and may continue to pay, for recipients of pension programs funded by the State and/or
19 | its political subdivisions.

20 |     319.   As a result of the Impac Defendants' actions, set forth above, the State of New York
21 | and/or its political subdivisions have been, and may continue to be, severely damaged.

22 | COUNT XIX

23 | *(Violation of North Carolina False Claims Act)*

24 |     320.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as
25 | though fully set forth herein.

26 |     321.   This is a civil action brought by Relator, on behalf of the State of North Carolina, against
27 | the Impac Defendants under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

28 |

322.   In the State of North Carolina, the relevant funds include North Carolina Local Government's pension fund and the North Carolina Teachers and State Employees fund. These funds invested heavily in the Impac Defendants.

323.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

324.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

325.   The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities in violation of N.C. Gen. Stat. § 1-607(a)(3).

326.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

327.   The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the State and/or its political subdivisions.

328.   As a result of the Impac Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XX

### *(Violation of Rhode Island False Claims Act)*

329.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

330.    This is a civil action brought by Relator, on behalf of the State of Rhode Island, against the Impac Defendants pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

331.    In the State of Rhode Island, the relevant funds are managed by the Employees' Retirement System and include Rhode Island Municipal, among other funds. These funds invested heavily in the Impac Defendants.

332.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

333.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

334.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the State, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of R.I. Gen. Laws § 9-1.1-3(a)(3).

335.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

336.   The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for recipients of pension benefits funded by the State and/or its political subdivisions.

337.   As a result of the Impac Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXI

*(Violation of Virginia Fraud Against Taxpayers Act)*

338.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

339.   This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against the Impac Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

340.   In the Commonwealth of Virginia, the State pension funds are managed by the Virginia Retirement System. The System invested heavily in the Impac Defendants.

341.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

342.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

343.   The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the Commonwealth, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of Va. Code § 8.01-216.3(A)(3).

344. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

345. The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for pension programs funded by the Commonwealth and/or its political subdivisions.

346. As a result of the Impac Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged,

COUNT XXII

*(Violation of Chicago Fraud Against Taxpayers Act)*

347. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

348. This is a civil action brought by Relator, on behalf of the City of Chicago, against the Impac Defendants under the City of Chicago False Claims Act, Chicago Mun. Code § 1-22 *et seq.*

349. In the City of Chicago pension funds are managed by the Municipal Employees' Annuity and Benefit Fund of Chicago. The Municipal Employees' Annuity and Benefit Fund of Chicago invested heavily in the Impac Defendants.

350. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the City of Chicago, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of City of Chicago False Claims Act, Chicago Mun. Code § 1-22-020(1).

351. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

1  used, or caused to be made or used, and may still be making, using or causing to be made or used, false

2  records or statements to get false or fraudulent claims paid or approved by the City of Chicago, in

3  violation of City of Chicago False Claims Act, Chicago Mun. Code § 1-22-020(2).

4      352.   The Impac Defendants conspired with numerous entities to prepare and deliver

5  inaccurate reports to the City, including accounting firms, auditors, vendors, lawyers, and other

6  business entities, in violation of City of Chicago False Claims Act, Chicago Mun. Code § 1-22-020(3).

7      353.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

8  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

9  used or caused to be made or used, and may still be making, using or causing to be made or used, false

10  records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the City of

11  Chicago, in violation of City of Chicago False Claims Act, Chicago Mun. Code § 1-22-020(4).

12      354.   The City of Chicago, or its political subdivisions, unaware of the falsity of the claims

13  and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these claims

14  and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the City

15  and/or its political subdivisions.

16      355.   As a result of the Impac Defendants' actions, as set forth above, the City of Chicago

17  and/or its political subdivisions have been, and may continue to be, severely damaged.

18  COUNT XXIII

19  *(Violation of Miami-Dade County Fraud Against Taxpayers Act)*

20      356.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as

21  though fully set forth herein.

22      357.   This is a civil action brought by Relator, on behalf of the City of Miami-Dade County,

23  against the Impac Defendants under the City of Miami False Claims Act, Miami-Dade County False

24  Claims Ordinance Section 21-255 *et seq.*

25      358.   In the City of Miami pension funds are managed by the *City of Miami* General

26  Employees' & Sanitation Employees' ("GESE") *Retirement* Trust, and the City of Miami Fire Fighters'

27  and Police Officers' Retirement Trust. These trusts invested heavily in the Impac Defendants.

28

359. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the City of Miami-Dade County, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of City of Miami False Claims Act, Miami-Dade County False Claims Ordinance Section 21-258(1)(a).

360. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of Miami, in violation of City of Miami-Dade County False Claims Ordinance Section 21-258(1)(b).

361. The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the City, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of City of Miami False Claims Act, Miami-Dade County False Claims Ordinance Section 21-258((1)(c).

362. The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the City of Miami, in violation of City of Miami False Claims Act, Miami-Dade County False Claims Ordinance Section 21-258(1)(d).

363. The City of Miami, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the City and/or its political subdivisions.

364. As a result of the Impac Defendants' actions, as set forth above, the City of Miami and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXIV

*(Violation of the New York City False Claims Act)*

365.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

366.   This is a civil action brought by Relator, on behalf of the City of New York, against the Impac Defendants under the City of New York False Claims Act, NYC Admin. Code §§ 7-803 *et seq.*

367.   New York City governmental entities with investments in the Impac Defendants include the New York City Employee's Retirement System; the Teachers' Retirement System of the City of New York; the New York City Police Pension Fund; the New York City Fire Department Pension Fund; the New York City Board of Education Retirement System; the New York City Police Officers' Variable Supplements Fund; the New York City Police Superior Officers' Variable Supplements Fund; the New York City Firefighters' Variable Supplements Fund; the New York City Fire Officers' Variable Supplements Fund; Teachers' Retirement System of the City of New York Variable Annuity Funds; the City of New York Group Trust; and the New York City Deferred Compensation Plan. These funds invested heavily in the Impac Defendants.

368.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the City of New York, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of City of New York False Claims Act, NYC Admin. Code § 7-803(a)(1).

369.   The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of New York, in violation of City of New York False Claims Act, NYC Admin. Code § 7-803(a)(2).

370.    The Impac Defendants conspired with numerous entities to prepare and deliver inaccurate reports to the City, including accounting firms, auditors, vendors, lawyers, and other business entities, in violation of City of New York False Claims Act, NYC Admin. Code § 7-803(a)(3).

371.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the City of New York, in violation of City of New York False Claims Act, NYC Admin. Code § 7-803(a)(4).

372.    The City of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for recipients of pension programs funded by the City and/or its political subdivisions.

373.    As a result of the Impac Defendants' actions, as set forth above, the City of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXV

*(Violation of the San Francisco City False Claims Act)*

374.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

375.    This is a civil action brought by Relator, on behalf of the City of San Francisco, against the Impac Defendants under the City of San Francisco False Claims Act, San Francisco Admin. Code §§ 7-803 *et seq.*

376.    In the City of San Francisco pension funds are managed by the San Francisco City & County Employees' Retirement System. The San Francisco City & County Employees' Retirement System invested heavily in the Impac Defendants.

377.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the City of San Francisco, or its political subdivisions, false or fraudulent claims for

1  payment or approval, in violation of City of San Francisco False Claims Act, San Francisco Admin.

2  Code §§ 7-803 *et seq.*

3      378.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

4  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

5  used, or caused to be made or used, and may still be making, using or causing to be made or used, false

6  records or statements to get false or fraudulent claims paid or approved by the City of San Francisco, in

7  violation of City of San Francisco False Claims Act, San Francisco Admin. Code §§ 7-803 *et seq.*

8      379.    The Impac Defendants conspired with numerous entities to prepare and deliver

9  inaccurate reports to the City, including accounting firms, auditors, vendors, lawyers, and other

10  business entities, in violation of City of San Francisco False Claims Act, San Francisco Admin. Code §§

11  7-803 *et seq.*

12      380.    The Impac Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

13  of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

14  used or caused to be made or used, and may still be making, using or causing to be made or used, false

15  records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the City of

16  San Francisco, in violation of City of San Francisco False Claims Act, San Francisco Admin. Code §§ 7-

17  803 *et seq.*

18      381.    The City of San Francisco, or its political subdivisions, unaware of the falsity of the

19  claims and/or statements made by the Impac Defendants, and in reliance upon the accuracy of these

20  claims and/or statements, paid, and may continue to pay, for recipients of pension programs funded by

21  the City and/or its political subdivisions.

22      382.    As a result of the Impac Defendants' actions, as set forth above, the City of San Francisco

23  and/or its political subdivisions have been, and may continue to be, severely damaged.

24      **WHEREFORE**, Relator prays for judgment against the Impac Defendants as follows:

25      That the Impac Defendants be ordered to cease and desist from submitting any more false claims,

26  or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Del. Code Ann. tit. 6,

27  §§ 1201 *et seq.*; D.C. Code § 2-308.13 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Haw. Rev. Stat. §§ 661-21 *et

28  seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.5 *et seq.*; Iowa Code §§ 685.1 *et seq.*;

1  Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*;

2  N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.M. Stat. Ann. §§ 44-9-1 *et seq.*; N.Y. State Fin. Law §§ 187 *et*

3  *seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*;

4  Va. Code Ann. §§ 8.01-216.1 *et seq.*; Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7);

5  Miami-Dade County False Claims Ordinance Section 21-255 *et seq*; NYC Admin. Code §§ 7-803 (a)

6  (1)-(a)(4), 7-803 (a)(7); and San Francisco Admin. Code §§ 7-803 *et seq.*

7      A.    That judgment be entered against the Impac Defendants in the amount of each and every

8  false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not

9  less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per

10  claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate

11  the United States of America for losses resulting from the various schemes undertaken by the Impac

12  Defendants, together with penalties for specific claims to be identified at trial after full discovery;

13      B.    That judgment be entered in Relator's favor and against the Impac Defendants in the

14  amount of the damages sustained by the State of California or its political subdivisions multiplied as

15  provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand dollars

16  ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't

17  Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its

18  political subdivisions for losses resulting from the various schemes undertaken by the Impac

19  Defendants, together with penalties for specific claims to be identified at trial after full discovery;

20      C.    That judgment be entered in Relator's favor and against the Impac Defendants in the

21  amount of the damages sustained by the State of Delaware multiplied as provided in Del. Code Ann.

22  tit. 6, § 1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more

23  than eleven thousand dollars ($11,000) for each act in violation of the Delaware False Claims and

24  Reporting Act, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties

25  shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken

26  by the Impac Defendants, together with penalties for specific claims to be identified at trial after full

27  discovery;

28

1      D.     That judgment be entered in Relator's favor and against the Impac Defendants in the

2  amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code

3  § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten

4  thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such

5  penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties

6  shall fairly compensate the District of Columbia for losses resulting from the various schemes

7  undertaken by the Impac Defendants, together with penalties for specific claims to be identified at trial

8  after full discovery;

9      E.     That judgment be entered in Relator's favor and against the Impac Defendants in the

10  amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla.

11  Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or

12  more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann.

13  § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its

14  agencies for losses resulting from the various schemes undertaken by the Impac Defendants, together

15  with penalties for specific claims to be identified at trial after full discovery;

16      F.     That judgment be entered in Relator's favor and against the Impac Defendants in the

17  amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat.

18  § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten

19  thousand dollars ($10,000) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied

20  penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes

21  undertaken by the Impac Defendants, together with penalties for specific claims to be identified at trial

22  after full discovery;

23      G.     That judgment be entered in Relator's favor and against the Impac Defendants in the

24  amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp.

25  Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or

26  more than eleven thousand dollars ($11,000), as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and

27  the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such

28  penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes

1  undertaken by the Impac Defendants, together with penalties for specific claims to be identified at trial

2  after full discovery;

3      H.    That judgment be entered in Relator's favor and against the Impac Defendants in the

4  amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-

5  5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-

6  5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting

7  from the various schemes undertaken by the Impac Defendants, together with penalties for specific

8  claims to be identified at trial after full discovery;

9      I.    That judgment be entered in Relator's favor and against the Impac Defendants in the

10  amount of damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1),

11  plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand

12  dollars ($10,000), as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall

13  fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various

14  schemes undertaken by the Impac Defendants, together with penalties for specific claims to be identified

15  at trial after full discovery;

16      J.    That judgment be entered in Relator's favor and against the Impac Defendants

17  for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits

18  provided as a result of the Impac Defendants' unlawful acts, plus a civil penalty of triple the amount of

19  damages suffered by Minnesota as a result of the Impac Defendants' unlawful conduct, as well as not

20  less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per

21  claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and

22  Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political

23  subdivisions for losses resulting from the various schemes undertaken by the Impac Defendants,

24  together with penalties for specific claims to be identified at trial after full discovery;

25      K.    That judgment be entered in Relator's favor and against the Impac Defendants

26  for restitution to the State of Montana or its political subdivisions for the value of payments or benefits

27  provided, directly or indirectly, as a result of the Impac Defendants' unlawful acts, as provided for in

28  Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil

1  penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for

2  each false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties

3  shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the

4  various schemes undertaken by the Impac Defendants, together with penalties for specific claims to be

5  identified at trial after full discovery;

6        L.    That judgment be entered in Relator's favor and against the Impac Defendants

7  for restitution to the State of Nevada for the value of payments or benefits provided, directly

8  or indirectly, as a result of the Impac Defendants' unlawful acts, as provided for in Nev. Rev. Stat.

9  § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less

10  than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to

11  Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of

12  Nevada for losses resulting from the various schemes undertaken by the Impac Defendants, together

13  with penalties for specific claims to be identified at trial after full discovery;

14        M.    That judgment be entered in Relator's favor and against the Impac Defendants in the

15  amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as

16  provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the

17  civil penalties allowed under the Federal False Claims Act (31 U.S.C. § 3729 *et seq.*) for each false or

18  fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey

19  or its political subdivisions for losses resulting from the various schemes undertaken by the Impac

20  Defendants, together with penalties for specific claims to be identified at trial after full discovery;

21        N.    That judgment be entered in Relator's favor and against the Impac Defendants for

22  restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits

23  provided, directly or indirectly, as a result of the Impac Defendants' unlawful acts, as provided for in

24  N.M. Stat. Ann. §§ 44-9-1(C)(1), multiplied as provided for in N.M. Stat. Ann. §§ 44-9-1(C)(2),

25  multiplied as provided for in N.M. Stat. Ann. §§ 44-9-1(C), plus a civil penalty of not less than six

26  thousand dollars ($5,000) or more than twelve thousand dollars ($10,000) for each false claim, pursuant

27  to N.M. Stat. Ann. §§ 44-9-1(C)(2), to the extent such multiplied penalties shall fairly compensate the

28  State of New Mexico or its political subdivisions for losses resulting from the various schemes

1  undertaken by the Impac Defendants, together with penalties for specific claims to be identified at trial

2  after full discovery;

3      O.    That judgment be entered in Relator's favor and against the Impac Defendants

4  for restitution to the State of New York or its political subdivisions for the value of payments or benefits

5  provided, directly or indirectly, as a result of the Impac Defendants' unlawful acts, as provided for in

6  N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil

7  penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for

8  each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall

9  fairly compensate the State of New York or its political subdivisions for losses resulting from the

10  various schemes undertaken by the Impac Defendants, together with penalties for specific claims to be

11  identified at trial after full discovery;

12      P.    That judgment be entered in Relator's favor and against the Impac Defendants

13  for restitution to the State of North Carolina for the value of payments or benefits provided, directly

14  or indirectly, as a result of the Impac Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-

15  607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five

16  thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by

17  N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of

18  North Carolina for losses resulting from the various schemes undertaken by the Impac Defendants,

19  together with penalties for specific claims to be identified at trial after full discovery;

20      Q.    That judgment be entered in Relator's favor and against the Impac Defendants in the

21  amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as

22  provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand dollars

23  ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by R.I. Gen. Laws § 9-1,1-

24  3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its

25  political subdivisions for losses resulting from the various schemes undertaken by the Impac

26  Defendants, together with penalties for specific claims to be identified at trial after full discovery;

27      R.    That judgment be entered in Relator's favor and against the Impac Defendants in the

28  amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va.

1    Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars

2    ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A),

3    to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses

4    resulting from the various schemes undertaken by the Impac Defendants, together with penalties for

5    specific claims to be identified at trial after full discovery;

6         S.    That judgment be entered in Relator's favor and against the Impac Defendants in the

7    amount of the damages sustained by the City of Chicago, multiplied as provided for in Chicago Mun.

8    Code § 1-22-020, plus a civil penalty of not less than five thousand five hundred dollars ($5,000) or

9    more than eleven thousand dollars ($10,000) as provided by Chicago Mun. Code § 1-22-020, to the

10   extent such multiplied penalties shall fairly compensate the City of Chicago for losses resulting from the

11   various schemes undertaken by the Impac Defendants, together with penalties for specific claims to be

12   identified at trial after full discovery;

13        T.    That judgment be entered in Relator's favor and against the Impac Defendants in the

14   amount of the damages sustained by the City of Miami-Dade County, multiplied as provided for in

15   Miami-Dade County False Claims Ordinance Section 21-258(3), plus a civil penalty of not less than five

16   thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by

17   Miami-Dade County False Claims Ordinance Section 21-257, to the extent such multiplied penalties

18   shall fairly compensate the City of Miami-Dade County for losses resulting from the various schemes

19   undertaken by the Impac Defendants, together with penalties for specific claims to be identified at trial

20   after full discovery;

21        U.    That judgment be entered in Relator's favor and against the Impac Defendants in the

22   amount of the damages sustained by the City of New York, multiplied as provided for in NYC Admin.

23   Code §§ 7-803, plus a civil penalty of not less than five thousand five hundred dollars ($5,000) or more

24   than eleven thousand dollars ($15,000) as provided by  NYC Admin. Code §§ 7-803to the extent such

25   multiplied penalties shall fairly compensate the City of New York for losses resulting from the various

26   schemes undertaken by the Impac Defendants, together with  What abpenalties for specific claims to be

27   identified at trial after full discovery;

28

1    V.    That judgment be entered in Relator's favor and against the Impac Defendants in the

2 amount of the damages sustained by the City of San Francisco, multiplied as provided for in San

3 Francisco Admin. Code §§ 7-803 *et seq*, plus a civil penalty of not less than five thousand five hundred

4 dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by San Francisco Admin.

5 Code §§ 7-803 *et seq*, to the extent such multiplied penalties shall fairly compensate the City of San

6 Francisco for losses resulting from the various schemes undertaken by the Impac Defendants, together

7 with penalties for specific claims to be identified at trial after full discovery.

8    W.    That the Impac Defendants be ordered to disgorge all sums by which they have been

9 enriched unjustly by their wrongful conduct;

10    X.    That judgment be granted for Relator against the Impac Defendants for all costs,

11 including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the

12 prosecution of this suit; and

13    Y.    That Relator be granted such other and further relief as the Court deems just and proper.

14

15                            JURY TRIAL DEMAND

16

17    Relator demands a trial by jury of all issues so triable.

18

19 DATED: November 1, 2016                Respectfully submitted,

20

21                                       HELLMICH LAW GROUP, P.C.

22

23                                       By: s/Christopher Hellmich
24                                       Christopher Hellmich (CA Bar #224169)
25                                       chellmich@hellmichlaw.com
                                         5753-G E. Santa Ana Canyon Road, #512
26                                       Anaheim Hills, California 92807
                                         Tel.: 949.287.5708
27                                       Fax: 714.974.7733

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### TALCOTT FRANKLIN PC

Talcott J. Franklin (*pro hac vice* to be filed)
tal@talcottfranklin.com
Matthew Browne (*pro hac vice* to be filed)
mat@talcottfranklin.com
1521 North Cooper Street, Suite 340
Arlington, TX 76011
Tel: 214.736.8730
Fax: 800.727.0659

***Attorneys for Relator***

"Exhibit D"

http://www.propertyshark.com/.../Report/print.html?propke...



Property Report by PropertyShark.com

Property Report for:

# 113 Chauncey St, Brooklyn, NY 11233

## B. Overview

## B1. Overview

https://www.propertyshark.com/mason/Reports2/print.html?propke...

## Address

| | |
|---|---|
| Primary address | 113 Chauncey St |
| Zip code | 11233 |
| Borough | Brooklyn |
| Block & lot | 01686-0076 |
| Sanborn map | 305 059 |
| Tax map | 30607 |

## Owner

| | |
|---|---|
| Name | 113 Chauncey Street Realty LLC |
| Address | 29 Viola Dr Glen Cove, NY 11542 |
| Purchase date | 04/02/2018 |
| Purchase price | $0 |

## Property Taxes

| | |
|---|---|
| Tax class | 1 |
| Tax assessor's market value | $1,328,000 |
| Projected tax assessor's market value | $1,291,000 |
| Current tax bill | $4,301 |
| Projected tax bill | $4,321 |

## Neighborhood

| | |
|---|---|
| Neighborhood | Bedford-Stuyvesant |
| Community district | 3 |
| Closest Police station | 0.37 Miles |
| Closest Fire station | 0.35 Miles |
| School district number | 16 |
| Census tract | 297 |

## Hazards & Environment

| | |
|---|---|
| Toxic site on this property | No |
| Neighboring toxic sites | 8 |

## Building

| | |
|---|---|
| Building class | Two Family Brick (B1) 🏚 |
| Building sqft | 2,088 |
| Building dimensions | 16.67 ft x 42 ft |
| Roof height | 31 ft |
| Ground elevation | 59 ft |
| Year built | 1899 (estimated) |
| Stories | 2 |
| Proximity | 2-side abutted |
| Style | Brownstone |
| Construction type | Brick |
| Exterior wall | Masonry |
| Exterior condition | Average |
| Basement type | Full |
| Basement sqft | 708 |
| Basement grade | Above grade |

## Use

| | |
|---|---|
| Residential units | 2 |
| Residential sqft | 1,380 |
| Average residential unit size | 690 |
| Certificate(s) of occupancy | Click here 🏚 |

## Lot

| | |
|---|---|
| Lot sqft | 1,667 🏚 |
| Lot type | Inside |
| Lot shape | Regular |
| Lot dimensions | 16.67 ft x 100 ft |
| Corner lot | No |
| Buildings on lot | 1 |

## Zoning

| | |
|---|---|
| Zoning districts | R6B 🏚 |
| Zoning map | 17a |
| Historic district | Bedford Stuyvesant/Expanded Stuyvesant Heights |

## Floor Area Ratio (FAR)

| | |
|---|---|
| Residential FAR | 2 |
| Facility FAR | 2 |
| FAR as built | 1.25 🏚 |
| Allowed usable floor area | 3,334 |
| Usable floor area as built | 2,084 |
| Unused FAR | 1,250 |

## Violations

| | |
|---|---|
| DOB violations | 1 |
| ECB violations | 1 |

## B2. NEW Real Owners & Mortgages

## B3. Photos

**Open Google Street View**

**Upload photos for this property**





Uploaded in April, 2012 by Christopher Bride

## B6. Sale & Property History

| Date | Event | Amount | Details |
|------|-------|--------|---------|
| 8/1/2011 | Deed transfer recorded | $643,000 | |
| 10/22/2010 | Deed transfer recorded | $225,000 | |
| 9/17/2010 | Lis pendens filed | $570,000 | |
| 9/17/2010 | Lis pendens filed | $570,000 | |
| 9/17/2007 | Lis pendens filed | $427,500 | |
| 8/23/2007 | Lis pendens filed | $570,000 | |
| 1/31/2007 | Deed transfer recorded | $600,000 | |

# C. Ownership

## C1. Registered Owner

**113 Chauncey Street Realty LLC**
29 Viola Dr
Glen Cove, NY 11542
Source: Deed
Last recorded: 04/02/2018

🔍 Phone Lookup

👤 Add to Address Book

Ownership data is aggregated from governmental sources like deeds and the assessment roll. If the registered owner is a LLC or other form of company, use our Real Owners service to find the person behind the company.

# F. Sales & Value

## F1. Neighborhood Price History

Median price/sqft                         $505
Neighboring properties                     23

### Recent sales of similar properties

| Address | Sale price | Sale date | Sqft | Price/sqft |
|---|---|---|---|---|
| 302 Herkimer St | $1,900,000 | 11/27/2017 | 2,268 | $837 |
| 779 Putnam Ave | $1,900,000 | 8/15/2017 | 2,400 | $791 |
| 116 Decatur St | $1,899,000 | 8/16/2017 | 2,400 | $791 |
| 357 Decatur St | $1,700,000 | 4/2/2018 | 2,168 | $784 |
| 298 Herkimer St | $1,725,000 | 5/25/2017 | 2,268 | $760 |
| 121 Malcolm X Blvd | $1,715,000 | 1/12/2018 | 2,400 | $714 |
| 380 Herkimer St | $1,531,600 | 3/20/2017 | 2,205 | $694 |
| 333 Stuyvesant Ave | $1,355,000 | 9/22/2017 | 2,025 | $669 |
| 1022 Putnam Ave | $1,500,000 | 3/12/2018 | 2,295 | $653 |
| 314 Decatur St | $1,325,000 | 8/21/2017 | 2,100 | $630 |

Use our Comparable Sales Tool to select your own list of recent sales, or read our Market Reports for an analysis of sale prices across a neighborhood.

# G. Property Tax

Case 1:11-cr-00449-SJ-RER   Document 327   Filed 05/24/18   Page 133 of 171 PageID #: 4658

## G7. Assessment History

| Year | Building class | Market value | Assessed value | Taxable | Tax rate% | Base tax | Property tax |
|------|----------------|--------------|----------------|---------|-----------|----------|--------------|
| 2017/18 | B1 | $1,328,000 | $21,099 | $21,099 | 20.385% | $4,301 | $4,301 |
| 2016/17 | B1 | $984,000 | $19,905 | $19,905 | 19.991% | $3,979 | $3,979 |
| 2015/16 | B1 | $812,000 | $19,830 | $19,830 | 19.554% | $3,878 | $3,878 |
| 2014/15 | B1 | $710,000 | $18,709 | $18,709 | 19.157% | $3,584 | $3,584 |
| 2013/14 | B1 | $649,000 | $17,665 | $16,065 | 19.191% | $3,390 | $3,083 |
| 2012/13 | B1 | $556,000 | $17,583 | $15,913 | 18.569% | $3,265 | $2,955 |
| 2011/12 | B1 | $463,000 | $16,588 | $16,588 | 18.205% | $3,020 | $3,020 |
| 2010/11 | B1 | $505,000 | $16,525 | $16,525 | 17.364% | $2,869 | $2,869 |
| 2009/10 | B1 | $563,000 | $15,591 | $15,591 | 17.088% | $2,664 | $2,664 |
| 2008/09 | B1 | $481,000 | $14,721 | $14,721 | 16.196% | $2,384 | $2,384 |
| 2007/08 | B1 | $490,295 | $14,653 | $14,653 | 15.434% | $2,262 | $2,262 |
| 2006/07 | B1 | $516,100 | $13,824 | $11,264 | 16.118% | $2,228 | $1,816 |
| 2005/06 | B1 | $378,100 | $13,771 | $11,401 | 15.746% | $2,168 | $1,795 |
| 2004/05 | B1 | $365,000 | $12,993 | $10,503 | 15.094% | $1,961 | $1,585 |
| 2003/04 | B1 | $309,000 | $12,268 | $9,658 | 14.55% | $1,785 | $1,405 |

## Disclaimer

Copyright 2003-2018 by Property Research Partners LLC

All data comes from government sources. No attempt has been made to validate it. No attempt has been made to validate the accuracy of the programming of this web site. Do not rely on this report to support investment decisions. The only authoritative source for the information in this report is the government agencies from which the data was acquired.

5/7/18 8:57 PM

"Exhibit E"

To Be Argued By:
MARGARET GANDY

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 14-2182(L), 14-2282(CON)

UNITED STATES OF AMERICA,

Appellee,

-against-

BIBI OMAR, also known as ZAMEENA OMAR, KIM RAMLOCHAN,
also known as KIM CUPELES, also known as KIM YOHAY,
SHANE BROWNE,

Defendants,

CASSANDRA CEAN,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S OPPOSITION TO CEAN'S MOTION
TO RECALL THE MANDATE AND APPENDIX

RICHARD P. DONOGHUE,
United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

JO ANN M. NAVICKAS,
MARGARET GANDY,
Assistant United States Attorneys,
    (Of Counsel).

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.............................................ii

PRELIMINARY STATEMENT............................................1

STATEMENT OF FACTS..............................................4

I.   Offense Conduct..........................................4

II.  Conviction at Trial......................................4

III. Sentencing..............................................5

IV.  Direct Appeal...........................................7

V.   Remand to District Court.................................8

VI.  Motion to Recall Mandate................................11

ARGUMENT – THE MOTION TO RECALL THE MANDATE
        SHOULD BE DENIED...................................13

I.   Cean Cannot Demonstrate Entitlement
     to the Recall Remedy.....................................13

II.  Cean's Specific Claim Has No Merit......................15

     A.   Loss and Restitution May Be Different.............. 15

     B.   Cean Never Challenged the District
          Court's Failure to Conduct a *Fatico*
          Hearing........................................... 17

CONCLUSION.....................................................22

ii

## TABLE OF AUTHORITIES

Page

### CASES

Bottone v. United States,
  350 F.3d 59 (2d Cir. 2003) ................................. 13

Calderon v. Thompson,
  523 U.S. 538 (1998) ...................................... 13

Jiminian v. Nash,
  245 F.3d 144 (2d Cir. 2001) .............................. 14

Sargent v. Columbia Forest Products, Inc.,
  75 F.3d 86 (2d Cir. 1996) ............................. 13, 14

United States v. Confredo,
  458 F. App'x 69 (2d Cir. 2012) ........................... 19

United States v. Confredo,
  528 F.3d 143 (2d Cir. 2008) .............................. 19

United States v. Eisen,
  974 F.2d 246 (2d Cir. 1992) .............................. 19

United States v. Germosen,
  139 F.3d 120 (2d Cir. 1998) ........................... 16, 18

United States v. Innarelli,
  524 F.3d 286 (1st Cir. 2008) ............................. 16

United States v. Lacey,
  699 F.3d 710 (2d Cir. 2012) ........................... 16, 20

United States v. Prescott,
  920 F.2d 139 (2d Cir. 1990) .............................. 19

United States v. Rutigliano,
  et al., 694 F. App'x 19 (2d Cir. 2017) ................... 20

United States v. Slevin,
  106 F.3d 1086 (2d Cir. 1996) ............................. 19

iii

## STATUTES

18 U.S.C. § 3663A............................................. 16

28 U.S.C. § 2255................................. 14, 15 & n.8

## RULES

U.S.S.G. § 2B1.1........................................ 16, 20

U.S.S.G. § 2B1.1(b)(1)................................. 15, 17

U.S.S.G. § 2B1.1........................................ 16, 20

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 14-2182(L), 14-2282(CON)

UNITED STATES OF AMERICA,

Appellee,

-against-

BIBI OMAR, also known as ZAMEENA OMAR, KIM RAMLOCHAN,
also known as KIM CUPELES, also known as KIM YOHAY,
SHANE BROWNE,

Defendants,

CASSANDRA CEAN,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S OPPOSITION TO CEAN'S
MOTION TO RECALL THE MANDATE

PRELIMINARY STATEMENT

Cassandra Cean was convicted in the Eastern District of
New York after a jury trial before The Honorable Sterling Johnson,
Jr., of conspiracy to commit wire fraud, in violation of 18 U.S.C.
§§ 1343 and 1349, and four counts of wire fraud, in violation of

Case 1:11-cr-00449-SJ-RER  Document 327  Filed 05/24/18  Page 141 of 171 PageID #: 4666
Case 14-2282, Document 243, 03/16/2018, 2259148, Page6 of 84

2

18 U.S.C. § 1343.  Cean was sentenced, principally, to 87 months'
imprisonment, three years' supervised release and restitution of
$1,205,355.00.  This Court affirmed her conviction and sentence on
direct appeal, but remanded for the limited purpose of entering a
revised restitution order.  See United States v. Browne (Cean),
No. 14-2282(CON), 621 F. App'x 44 (2d Cir. 2015), cert. denied,
136 S. Ct. 863 (2016).  This Court issued its mandate on September
24, 2015.

Upon remand, Judge Johnson referred the matter to
Magistrate Judge Ramon E. Reyes, Jr., who held a two-day hearing
on the issue of restitution.  After the hearing was completed, but
before Judge Reyes had recommended any findings, Cean filed the
instant Motion to Recall the Mandate on September 16, 2016.  On
December 2, 2016, Judge Reyes issued a Report and Recommendation
("R&R") recommending that the defendants be ordered to pay
$243,148.51 in restitution to Impac Funding Corp.  On January 16,
2018, Judge Johnson filed an Order adopting Judge Reyes's R&R in
its entirety.

When Cean filed the instant motion, the grounds upon
which she premised her argument were anticipatory – namely, that
a sentencing error would be revealed if, as she expected, the
revised restitution order deviated from the loss amount adopted by
the district court under the United States Sentencing Guidelines

3

("U.S.S.G." or "Guidelines") at sentencing.   While the revised restitution amount is significantly lower than the loss amount adopted at sentencing, for the reasons set forth below, Cean is not entitled to the relief she seeks and her motion should be denied.

STATEMENT OF FACTS[1]

I.    Offense Conduct

Beginning in 2005, Shane Browne, Cean and others engaged in a mortgage fraud scheme by assisting unqualified straw buyers with good credit scores to obtain loans to purchase homes. Browne orchestrated these fraudulent transactions by recruiting the straw buyers and, in some instances, acquiring the properties used in the fraudulent transactions by paying a modest fee to distressed homeowners who were facing foreclosure. Once a straw buyer had been recruited, a loan processor would complete a loan application using falsified information about the straw buyer's financial profile and intention to live in the house. Cean, an attorney, served as the closing agent for the fraudulent transactions, received the fraudulently obtained loan proceeds from the lender, and then distributed the money among the co-conspirators at Browne's direction.

II.   Conviction at Trial

On September 4, 2012, a grand jury sitting in the Eastern District of New York returned a six-count superseding indictment charging Browne, Cean, Bibi Omar and Kim Ramlochan with conspiracy

_____

[1]   A more complete description of the facts of this case is contained in the government's brief on direct appeal at pp. 4-49. See USA v. Browne, et al., Dkt. Nos. 14-2182(L), 14-2282(CON), "COA Dkt." No. 134 (Brief)).

Case 1:11-cr-00449-SJ-RER   Document 327   Filed 05/24/18   Page 144 of 171 PageID #: 4669
Case 14-2282, Document 243, 03/16/2018, 2259148, Page9 of 84

5

to commit wire fraud, and Browne, Cean and Ramlochan with five substantive counts of wire fraud. (USA v. Browne, et al., 11-cr-449(SJ), "EDNY Dkt." No. 56). On October 9, 2013, the jury convicted Cean on the conspiracy count and four substantive counts; she was acquitted on an additional substantive count. (EDNY Dkt. No. 155).

III. Sentencing

The presentence investigation report prepared by the United States Probation Department for Cean ("CPSR") included a Guidelines sentencing range of 70 to 87 months. (CPSR ¶¶ 60, 94).[2] This was arrived at by employing a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), which was enhanced by 16 levels under U.S.S.G. § 2B1.1(b)(1)(I) for losses of more than $1,000,000, two levels under U.S.S.G. § 3B1.3 for Cean's abuse of her position as an attorney to further the offense, and two levels under U.S.S.G. § 3C1.1 for obstruction of justice based on Cean's false trial testimony. (CPSR ¶¶ 38, 41-42). The CPSR also calculated restitution at $1,205,355, claiming losses of $345,000, $851,355, and $9,000 for Impac, Funding Corp. and WMC Mortgage, respectively. (CPSR ¶¶ 23, 106).

---

[2] A copy of Cean's presentence investigation report was filed under seal in connection with Cean's direct appeal.

6

Cean was sentenced on May 9, 2014.  (EDNY Dkt. No. 204).
During the proceeding, and in her written submission, Cean objected
to the loss amount set forth in the CPSR and posited that the
losses were actually $504,000.  (CA 80).[3]  Cean also requested a
Fatico hearing to compel the government to provide more accurate
fair market values for the relevant properties.  (CA 85-86).

The district court declined to hold a Fatico hearing and
adopted an intended loss approach in determining the total loss
under the Guidelines, stating:

> There's a dispute over whether the amount of
> money involved was 500 some thousand dollars
> or over a million dollars.  [U.S.S.G. §] 2B1.1
> addresses that issue.  2B1.1 says that in
> instances such as this, the amount to be
> determined will be the actual amount or the
> intended amount, whichever is greater.  I find
> specifically that the government has proven
> that the intended amount is over one million
> dollars, so I think 16 points is proper in
> this case.

(CA 100).

The district court then imposed a sentence of 87 months'
imprisonment, three years' supervised release, $1,205,355 in
restitution, a $500 special assessment and forfeiture of

---

[3]    "CA" refers to Cean's appendix filed in connection with
her direct appeal; "MCA" refers to the appendix Cean filed in
connection with her Declaration in Support of her Motion to Recall
the Mandate ("Dec."); "MGA" refers to the government's appendix
filed in connection with its response to Cean's Motion to Recall
the Mandate.

7

$43,700.57.  (CA 101-02).  In doing so, the court stated that it had "examined the submissions, listened to the arguments of counsel and . . . I think that a sentence that is sufficient but not greater than necessary is the one I'm going to pronounce." (CA 101).

IV.  Direct Appeal

On direct appeal, Cean argued that (1) the government's proof at trial resulted in a constructive amendment of the indictment; (2) evidence of the co-conspirators' efforts to conceal criminal conduct was improperly admitted and unduly prejudicial; (3) the government's cross-examination of Cean improperly included purported Federal Rule of Evidence 404(b) material that was supported by inadmissible hearsay; (4) the district court should have granted Cean's motion for a new trial or held an evidentiary hearing based on juror misconduct; and (5) the sentence imposed was both procedurally and substantively unreasonable.  (See COA Dkt. No. 62 (Brief at 92-99)).[4]

More specifically, with respect to her claim that the sentence was procedurally unreasonable, Cean argued that the district court failed to properly consider certain mitigating

---

[4]    On direct appeal, Cean did not object to the restitution order in her initial brief, but later sought by letter to join in co-defendant Shane Browne's challenge to the order of restitution. (See COA Dkt. No. 161).

Case 1:11-cr-00449-SJ-RER  Document 327  Filed 05/24/18  Page 147 of 171 PageID #: 4672
Case 14-2282, Document 243, 03/16/2018, 2259148, Page12 of 84

8

factors, failed to consider sentencing disparities among co-defendants, and improperly applied an obstruction of justice enhancement. (COA Dkt. No. 62 (Brief at 92-99)). Notably, Cean did not challenge the loss calculation adopted by the district court, or the court's failure to hold a <u>Fatico</u> hearing.

This Court heard oral argument on August 18, 2015, and, on August 24, 2015, affirmed Cean's conviction and sentence, but remanded to the district court to correct errors related to the restitution order. (<u>See</u> COA Dkt. Nos. 165, 168; MGA 14-19). On September 24, 2015, the judgment mandate was issued. (<u>See</u> COA Dkt. No. 176; MCA 1-6).

Thereafter, on November 23, 2015, Cean filed a petition for a writ of certiorari. (COA Dkt. No. 180). On January 11, 2016, Cean's petition was denied. (COA Dkt. No. 181).

V.  Remand to District Court

Upon remand by this Court, the district court referred the matter to Magistrate Judge Reyes, who presided over a two-day hearing on the issue of restitution on November 16, 2015 and December 8, 2015. (EDNY Dkt., dated entries for November 16, 2015 and December 8, 2015).

In a written submission prior to the hearing, the government noted that only one of the entities on whose behalf the government was seeking restitution – Impac Funding Corp. – was

among the original lenders of the fraudulently obtained mortgages upon which the conviction was based; the other lenders were third-party entities that held successor interest in the loans. (EDNY Dkt. No. 247; MGA 25-26).

In a post-hearing submission, Cean argued that no restitution was warranted as the government had failed to prove "the identity of each alleged victim, the precise amount of restitution due them, and how any loss suffered . . . was caused by misrepresentations." (See EDNY Dkt. No. 268; MCA 112 (emphasis in original)).

The government argued that restitution was due to the following victims in the following amounts: (a) at least $243,148.51 to Impac Secured Asset Series 2007-2 Trust (payable to master servicer); (b) at least $100,515.22 to the Pennymac Trust (payable to servicer); and (c) at least $72,726.89 to Santander (payable to servicer). The government also noted that additional entities that might have had viable claims for restitution had declined to seek restitution, at least in part to avoid revealing proprietary information. (See EDNY Dkt. No. 267; MCA 248-77).

On December 2, 2016, Magistrate Judge Reyes issued an R&R recommending that the district court order Cean and her two co-defendants to pay restitution totaling $243,148.51 to Impac Secured Asset Series 2007-2 Trust, along with prejudgment interest

based on prevailing interest rates (payable to Impac Funding
Corp.). Magistrate Judge Reyes recommended that neither Santander
Bank N.A. nor Pennymac Loan Trust be afforded restitution because
the government had not proven that Santander Bank N.A. suffered a
loss (although Judge Reyes did recognize the entity as a victim),[5]
and because Pennymac Loan Trust was neither a victim nor had it
suffered any identifiable loss. (EDNY Dkt. No. 295; MCA 34-49).

On December 14, 2016, PennyMac Loan Services, LLC, as
servicer for PennyMac Loan Trust 2011-NPL-1, filed an objection to
the R&R as a non-party victim. (EDNY Dkt. No. 297; MGA 30-40).
On December 15, 2016, Cean filed an objection to the R&R insofar
as it awarded restitution to Impac Funding Corp. and found that
Santander Bank was a victim. (EDNY Dkt. No. 299; MGA 41-47).

The district court adopted the R&R in its entirety by
Order dated January 16, 2018, thereby dismissing the objections.
(EDNY Dkt. No. 318; MGA 50-55).

On January 22, 2018, Cean filed a notice of appeal with
respect to the district court's adoption of the R&R. (EDNY Dkt.
No. 320).

---

[5]    Of note, shortly before Magistrate Judge Reyes issued
his R&R, Santander Bank N.A. withdrew its request for restitution
after Judge Reyes made clear his intention to publish the purchase
prices paid for the relevant loans by any entity seeking
restitution. (EDNY Dkt. No. 294).

Case 1:11-cr-00449-SJ-RER  Document 327  Filed 05/24/18  Page 150 of 171 PageID #: 4675

Case 14-2282, Document 243, 03/16/2018, 2259148, Page15 of 84

11

VI. <u>Motion to Recall Mandate</u>

On September 16, 2016, Cean's counsel filed the instant Motion to Recall the Mandate ("Mtn."), contending that Cean expected the restitution amount to change significantly in the district court and arguing that such a change would demonstrate significant errors in the district court's initial loss calculations. (<u>See</u> COA Dkt. No. 193). On October 3, 2016, this Court granted the government an extension of time to respond to that motion. (<u>See</u> COA Dkt. No. 199). Specifically, the Court granted the government's request that it be permitted to file its response within 30 days of the district court's filing of any revised restitution order. (<u>See</u> COA Dkt. Nos. 195, 199). On December 5, 2017, Cean supplemented her counsel's motion with a Declaration in Support of Motion to Recall Mandate ("Dec."), which expanded on arguments raised in the initial motion. (<u>See</u> COA Dkt. Nos. 204, 205).[6]

On January 11, 2018, the government filed a letter informing the Court that Magistrate Judge Reyes had filed the R&R on December 2, 2016, and that the district court had yet to adopt the R&R or otherwise rule on the matter. (<u>See</u> COA Dkt. No. 225). By order dated January 19, 2018, this Court denied Cean's motion

---

[6]    A second copy of Cean's materials was filed on December 28, 2017.  (COA Dkt. No. 223).

to recall the mandate, without prejudice to reinstatement if the district court did not act on the pending R&R by March 2, 2018. (COA Dkt. No. 299; MGA 41-47).

The district court adopted the R&R in its entirety on January 16, 2018. (EDNY Dkt. No. 318; MGA 50-55). By letter dated January 27, 2018, Cean sought clarification of the status of her motion and confirmation of the date by which the government was to respond. (COA Dkt. No. 231). By letter dated February 14, 2018, the government likewise sought clarification and an extension of time within which to file its response. (COA Dkt. No. 233). On March 12, 2018, the Court granted the government's motion for an extension of time and clarified that the government's response should address Cean's September 16, 2016 motion only. (COA Dkt. No. 242).

ARGUMENT

THE MOTION TO RECALL THE MANDATE SHOULD BE DENIED

I.    Cean Cannot Demonstrate Entitlement to the Recall Remedy

While the Court has inherent power to recall its mandate, it exercises that authority sparingly.  The Supreme Court has described recalling the mandate as a remedy "of last resort, to be held in reserve against grave, unforeseen contingencies." Calderon v. Thompson, 523 U.S. 538, 550 (1998).  The sparing exercise of the power protects "the profound interests in repose attaching to the mandate of a court of appeals." Id. (internal quotation marks and citation omitted).  Accordingly, this Court has held that it will recall its mandate only in "'extraordinary circumstances.'" Bottone v. United States, 350 F.3d 59, 62 (2d Cir. 2003) (quoting Calderon, 523 U.S. at 550).  "The reason for parsimony in the exercise of our power to recall a mandate is the need to preserve finality in judicial proceedings." Sargent v. Columbia Forest Products, Inc., 75 F.3d 86, 89 (2d Cir. 1996).

Despite the proscriptions against a court's exercise of the power to recall a mandate, Cean nevertheless seeks that relief based on what she claims are errors in the manner in which the district court calculated loss for Guidelines purposes, and argues that she is entitled to the relief sought under each of the four factors considered by the Court in Sargent.  (Mtn. at 4-5).  Cean's

14

reliance on the factors test in Sargent is misplaced, however, as it applies only when the motion to recall a mandate is premised on "a supervening change in governing law that calls into serious question the correctness of the court's judgment." Sargent, 75 F.3d at 90 (internal quotation marks, alterations and citations omitted). Such is not the case here. Indeed, the grounds on which Cean seeks to recall the mandate were not even raised by Cean on appeal,[7] and therefore no serious question about the correctness of the Court's judgment can be said to exist based on any supervening change in the law or otherwise. See, e.g., Sargent, 75 F.3d at 91 (rejecting argument that recalling mandate was warranted based on a change in governing state law in part because the issue arguably impacted by new legal precedent was not raised on appeal).

What Cean's motion to recall the mandate seeks to do, in actuality, is to challenge the validity of her sentence, which is not a permissible use of the motion. The appropriate vehicle by which to raise such a challenge now is a habeas corpus motion under 28 U.S.C. § 2255. See Jiminian v. Nash, 245 F.3d 144, 146-47 (2d Cir. 2001) ("§ 2255 is generally the proper vehicle for a federal

---

[7]     While Cean did challenge her sentence as procedurally and substantively unreasonable on appeal, she did not specifically argue that the district court erred in its calculation of loss, or that its failure to hold a Fatico hearing on the issue of loss was in error.

15

prisoner's challenge to his conviction and sentence[.]"). Moreover, Cean has implicitly acknowledged as much contending, as she does, that a recall of the mandate would allow her to challenge her sentence before this Court more quickly than would a § 2255 motion. (See, e.g., Dec. at 4, 13-14).[8]

II.  Cean's Specific Claim Has No Merit

In any event, Cean's claim has no merit.

A.  Loss and Restitution May Be Different

Cean's principal argument in support of her motion to recall the mandate, namely, that disparity between loss amounts adopted at sentencing and restitution ordered on remand elucidates procedural errors in sentencing (Mtn. at 2),[9] is unavailing because loss and restitution amounts may permissibly differ.

Pursuant to U.S.S.G. § 2B1.1(b)(1), the offense level for a fraud conviction is based on the amount of loss attributable

---

[8]  In her Declaration, Cean argues that she was precluded from filing a § 2255 petition because the district court had not yet rendered a final determination of the matter on remand (see Dec. at 14); that argument is now moot.

[9]  The R&R had not yet been issued when Cean filed the instant motion, and her arguments, therefore, were anticipatory in nature, e.g., "[s]hould Judge's Reyes' restitution determination differ substantially from the determination by Judge Johnson at sentence, which we believe it will . . . [s]uch a discrepancy would elucidate the errors made by Judge Johnson." (Mtn. at 2). Because the discrepancy that Cean anticipated is now borne out, the government responds to Cean's arguments as if they were affirmatively made.

to the scheme.  The Application Notes to § 2B1.1 direct that "loss" be assessed as the "greater of actual loss or intended loss" (App. Note 3(A)), and define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense" (App. Note 3(A)(i)) and "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict" (App. Note 3(A)(ii)).  In determining the applicable loss amount, "the [c]ourt need only make a reasonable estimate of the loss." (App. Note 3(C)).  By contrast, in ordering restitution, a sentencing court is constrained by the actual loss amount incurred by the victim.  See 18 U.S.C. 3663A; see also United States v. Lacey, 699 F.3d 710, 721 (2d Cir. 2012) (noting that "restitution is designed to make the victim whole, see [United States v. Innarelli, 524 F.3d 286, 293-94 (1st Cir. 2008)], and must therefore be based only on the actual loss caused by the scheme" (citations omitted)).  Given the varied scope of loss and restitution determinations, then, a disparity between them does not, in and of itself, constitute proof of a sentencing error.  See United States v. Germosen, 139 F.3d 120, 130 (2d Cir. 1998) ("Of course, an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution").

B.   Cean Never Challenged the District
     Court's Failure to Conduct a *Fatico* Hearing

While Cean also argues, more generally, that "the district court's denial of a Fatico hearing and adoption of the Government's intended loss amount based on recent tax assessment values with no further inquiry" was erroneous (Mtn. at 4), Cean never challenged this specific purported failure on direct appeal. Nonetheless, the district court's failure to hold a Fatico hearing to address the fair market value of the properties at issue does not constitute procedural error.

Indeed, the government addressed the appropriateness of the use of recent tax assessments as a proxy for fair market value in its sentencing submission:

> [T]he Guidelines clearly state that in cases
> such as the one at bar – a fraud involving a
> mortgage loan where the property has not been
> disposed of by the time of sentencing – "there
> is a rebuttable presumption that the most
> recent tax assessment value of the collateral
> is a reasonable estimate of the fair market
> value." [U.S.S.G. § 2B1.1(b)(1) App. Note
> 3(E)(iii).][10]

(EDNY Dkt. No. 198; MGA 4).   Cean, in turn, persisted in her objection to the court's reliance on the tax assessments as the marker for property value, arguing:

---

[10]   Cean fairly points out that the government mistakenly cited Application Note 3(C) instead of 3(E) as the source of the quoted language in its sentencing submission.   (Mtn. at 3).

> Now, as the Court knows from its own
> experience, both as a citizen and as a jurist,
> a tax assessment may not be up to date, it may
> not be accurate, it may be much lower than the
> actual fair market value of the property is
> and by using a tax assessment, my client is
> prejudiced.

(CA 84). Cean also noted that none of the victims identified in

the PSR had responded to requests for affidavits of loss. (Id.).

The district court, presumably finding that Cean's

argument did not sufficiently rebut the presumption in favor of

tax assessment value, did not order a Fatico hearing to address

Cean's specific objection to the use of the tax assessments.

Instead, tracking the actual loss estimate of $1,205,355 set forth

in the PSR, the district court sua sponte found that Cean intended

a loss of more than one million dollars:

> There's a dispute over whether the amount of
> money involved was 500 some thousand dollars
> or over a million dollars. 2B1.1 addresses
> that issue. 2B1.1 says that in instances such
> as this, the amount to be determined will be
> the actual amount or the intended amount,
> whichever is greater. I find specifically
> that the government has proven that the
> intended amount is over one million dollars,
> so I think 16 points is proper in this case.

(CA 100).[11] While Cean is critical of the district court's failure

to "conduct any analysis of whether the most recent tax assessment

_____

[11] Cean mischaracterizes the government's position at
sentencing with respect to loss by stating, "[i]n the Government's
sentencing submission, it calculated the intended loss amount for
guideline purposes using the Probation Department's provision of
recent tax assessment values for the properties at issue." (Mtn.

19

value was indeed a reasonable estimate of the fair market value of the properties" (Mtn. at 3), a sentencing court is not "required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes." United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996). Rather, "the District Court has broad discretion to determine the procedure by which it will resolve disputed issues at sentencing, so long as it affords the defendant some opportunity to rebut the Government's allegations." United States v. Eisen, 974 F.2d 246, 269 (2d Cir. 1992) (citing United States v. Prescott, 920 F.2d 139, 143-44 (2d Cir. 1990)).

Moreover, even in an instance in which this Court has remanded a case to provide a defendant with an opportunity "to persuade the sentencing judge that the loss he intended was less than the face amount of the loans," United States v. Confredo, 528 F.3d 143, 152 (2d Cir. 2008), the Court later upheld the district court's finding that the defendant had "failed to carry his burden to show an intended loss . . . less than the face value of the loan applications," United States v. Confredo, 458 F. App'x 69, 72 (2d Cir. 2012). Similarly, here, the district court's

---

at 3 (emphasis added)). While the government did ask the district court to adopt the loss calculations set forth in the PSR, it did not argue that it was the amount of loss intended, but rather a fair estimation of the actual losses incurred by the named lenders given the information available at the time.

determination that Cean intended a loss of over a million dollars
was a reasonable estimate of the loss based on the information set
forth in the PSR, a determination that is entitled to great
deference.   See U.S.S.G. § 2B1.1 Application Note 3(C) ("[t]he
sentencing judge is in a unique position to assess the evidence
and estimate the loss based upon that evidence.").   Indeed, while
in Confredo, the sentencing court characterized the intended loss
amount as the full amount of the fraudulently acquired (unsecured)
loans, here the intended loss amount was reduced by the tax-
assessed value of the relevant properties (CPSR ¶¶ 22-23), a
benefit not necessarily required under the circumstances:   "a
sentencing court need not apply the fair market value as an offset
in calculations of intended loss; it need only offset the loss
amount by however much it finds the defendant did not intend loss."
Lacey, 699 F.3d at 720.

Finally, the fact that the district court more recently
found that certain entities identified as victims in the PSR were
not victims for purposes of restitution (and reduced the
restitution order accordingly) does not demonstrate that Cean's
sentence was illegal, as she contends. (Dec. at 2-3). See, e.g.,
United States v. Rutigliano, et al., 694 F. App'x 19, 25 (2d Cir.
2017) (summary order) (upholding district court's denial of § 2255
petition for resentencing based on finding that victim's post-

21

trial reinstatement of voided pensions did not impact the intended-loss figures, and noting that same would be true even if actual loss to victim were impacted).

Accordingly, because the recalling of a mandate is an extraordinary remedy that Cean has failed to demonstrate entitlement to, Cean's motion to recall the mandate should be denied.

<u>CONCLUSION</u>

     For the reasons stated above, Cean's motion to recall the mandate should be denied.

Dated:    Brooklyn, New York
          March 16, 2018

                          Respectfully submitted,

                          RICHARD P. DONOGHUE,
                          <u>United States Attorney</u>,
                          <u>Eastern District of New York</u>.

          By:               /s/
                          MARGARET GANDY
                          Assistant U.S. Attorney

JO ANN M. NAVICKAS,
MARGARET GANDY,
MARIA CRUZ MELENDEZ,
<u>Assistant United States Attorneys</u>,
    <u>(Of Counsel)</u>.

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

     1.   1.   This response complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because the response contains 4,206 words, excluding the parts of the response exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

     2.   This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated:  Brooklyn, New York
       March 16, 2018

                           /s/
                  JO ANN M. NAVICKAS
                  Assistant U.S. Attorney

"Exhibit F"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,        )  Criminal
                                 )  No. 11-449 (SJ)
                Government,       )
                                 )  STATUS CONFERENCE
    vs.                          )
                                 )  Brooklyn, New York
    (2) CASSANDRA CEAN,          )  Date:  April 26, 2017
                                 )  Time:  11:00 a.m.
                Defendant.       )

_____

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE
THE HONORABLE JUDGE STERLING JOHNSON, JR.
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For the Government:        Maria E. Cruz Melendez, AUSA
                           US Attorney's Office
                           271 Cadman Plaza East
                           Eastern District of New York
                           Brooklyn, New York  11201
                           718-254-6408

For the Defendant:         Edward Irizarry, Esq.
                           260 Madison Avenue, 8th Floor
                           New York, New York  10016
                           646-216-2127

(Appearances continued on next page...)


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

A.720

2

1    APPEARANCES: (Cont'd)

2

3        For Interested Party    Ashley S. Miller, Esq.
         PennyMac Loan            Akerman LLP
4        Services, LLC:           666 Fifth Avenue, 20th Floor
                                  New York, New York  10103
5                                 212-880-3800

6

7

8    ALSO PRESENT:

9    Cassandra Cean, via telephonic communications

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A.721

3

1          (WHEREUPON, commencing at 11:32 a.m., the following

2    proceedings were had in open court, to wit:)

3          THE COURTROOM DEPUTY:  *US v. Cassandra Cean.*

4          THE COURT:  Note your appearances.

5          MS. CRUZ MELENDEZ:  Good morning, Your Honor.  Maria

6    Cruz Melendez for the United States.

7          MR. IRIZARRY:  Good morning.  Edward Irizarry for

8    the defendant Cean.  Good morning, Your Honor.

9          MS. MILLER:  Interested party PennyMac.  I am here

10   because I spoke with the AUSA and understood that maybe this

11   proceeding might have something to do with my client so I

12   appeared.

13         MS. CRUZ MELENDEZ:  We weren't sure what the

14   proceeding would cover and so attorneys for PennyMac asked

15   whether or not it made sense for them to sit in because the

16   prosecution was not sure as to what we would be covering.  I

17   said it probably wouldn't hurt and Your Honor would probably

18   not have a problem with it.

19         THE COURT:  Now, the case has been resolved; is that

20   correct?

21         MS. CRUZ MELENDEZ:  With regard to restitution -- so

22   the defendant, specifically Cassandra Cean, she's been

23   sentenced.  The issue of restitution was sent back on behalf

24   of the government to the district court for a hearing.  Judge

25   Reyes held a hearing and provided a recommendation for

4

1    Your Honor with regard to restitution.  The government's

2    understanding, and I believe defense counsel's understanding

3    as well, is that Your Honor is reviewing that report and

4    recommendation to issue an order with regard to restitution.

5              THE COURT:  Okay.

6              MS. CRUZ MELENDEZ:  It's also my understanding that

7    Your Honor wished to speak to Ms. Cean, particularly

8    because --

9              THE COURT:  I don't wish to speak to her, she wishes

10   to speak to me.

11             MS. CRUZ MELENDEZ:  Okay.

12             THE COURTROOM DEPUTY:  Ms. Cean, are you on the

13   phone?

14             THE DEFENDANT:  Yes, I am.

15             THE COURT:  Go ahead.

16             THE DEFENDANT:  I can't hear what's going on in the

17   background, though.  It sounds muffled.

18             THE COURT:  Will the parties speak into the mikes.

19             MR. IRIZARRY:  Just note my appearance, Edward

20   Irizarry, for the record.

21             THE COURT:  Go ahead.

22             MS. CRUZ MELENDEZ:  So as I was saying, Ms. Cean, I

23   am not sure if you heard the beginning of what I was saying.

24   To summarize, in the event that you did not hear me, the

25   government's understanding is that Ms. Cean requested or sent

A. 123

5

1    communications to Your Honor, and so Your Honor requested the

2    appearance today in order to resolve certain issues with

3    regard to certain communications.   The government has not seen

4    the communications so I am unsure as to what specifically

5    Ms. Cean is requesting.   But with regard to restitution, and

6    the presence of counsel for PennyMac, it may be unnecessary

7    that they're here, but they were told that in the event that

8    some discussion of restitution happened, and as the victim, if

9    they preferred to be present, that it would be fine if they

10   were present.

11            THE COURT:   Mr. Irizarry, who do you represent?

12            MR. IRIZARRY:   Ms. Cean.

13            THE COURT:   Ms. Cean, what is it that you wanted?

14   Hello?

15            THE DEFENDANT:   Yes.   Hello?

16            THE COURT:   What is it you wanted?

17            THE DEFENDANT:   I just wanted clarification,

18   Your Honor.

19            THE COURT:   What do you mean, clarification?

20            THE DEFENDANT:   As to the status.   Because I was

21   told that there was a status conference, and if there was a

22   status conference, I wanted to make sure that the Court did

23   not require my appearance.

24            THE COURT:   No, we didn't.

25            THE DEFENDANT:   Okay.

6

1          THE COURT:  Thanks for your concern.

2          MS. CRUZ MELENDEZ:  Just so that Ms. Cean is aware,

3    I think because Ms. Ramlochan's case was subsequent to your

4    own case and Mr. Browne's case, Ms. Ramlochan was eventually

5    added on to the restitution issue after the hearing occurred.

6    And so the status conference -- the two recent status

7    conferences that occurred were relevant to Ms. Ramlochan case,

8    and that was the reason that counsel for you with regard to

9    the restitution did not appear.

10          THE DEFENDANT:  My apologies, but I really can't

11    hear what was just said.

12          MS. CRUZ MELENDEZ:  This is Maria Cruz Melendez, for

13    the government.

14          THE DEFENDANT:  How are you?

15          MS. CRUZ MELENDEZ:  Can you hear me now?

16          THE DEFENDANT:  Yes, I can.  Thank you.

17          MS. CRUZ MELENDEZ:  Okay.  So what I was explaining

18    to the Court and to you, is that with regard to the last two

19    status conferences, if you might recall, your codefendant,

20    Ms. Ramlochan, her appeal happened subsequent to your own

21    appeal, and so the --

22          THE DEFENDANT:  Correct.

23          MS. CRUZ MELENDEZ:  -- restitution issue with regard

24    to her was technically separate and then it was added on to

25    your case.

A.725

7

1              With regard to the last two status conferences that

2    occurred, they were specific to her, because it had to do with

3    sort of her separate standing with regard to the restitution,

4    and that's why your counsel and your appearance was not

5    necessary, because it was technically dealing with and

6    relevant to Ms. Ramlochan.

7              As you know, the restitution report and

8    recommendation involves all defendants.  The Court is

9    considering the report and recommendation, and once an order

10   is issued and a restitution is imposed, or not imposed, if

11   restitution ends up being zero, then it is the government's

12   intention to writ you over to the Eastern District so that you

13   can appear for this.  And so once we hear from Your Honor that

14   a report -- a recommendation has either been adopted or

15   amended or some other order has been put into place, it is

16   definitely our intention to make sure that you are here and

17   present for any imposition of restitution.

18             THE DEFENDANT:  Okay.  Thank you.  Thank you for the

19   clarification.

20             Just two things.  So is it -- currently, there is no

21   oral argument to be made?

22             THE COURT:  No.

23             THE DEFENDANT:  Okay.  So we're just waiting.

24             And then lastly, Your Honor, if possible, I am at a

25   camp, and they do allow legal furloughs.  So if the Court can

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

A.726

1    consider a legal furlough, I would appreciate it, when that

2    time comes for re-sentencing.

3            THE COURT:  That is something you have to take up

4    with the Bureau of Prisons, okay?  Thank you very much.

5            THE DEFENDANT:  I'm sorry, Your Honor, what did you

6    say?

7            THE COURT:  That's something you must take up with

8    the Bureau of Prisons.

9            THE DEFENDANT:  Okay.  Will do.

10           THE COURT:  All right.

11           MR. IKIZARRY:  Thank you very much, Your Honor.

12           MS. CRUZ MELENDEZ:  Thank you.

13           THE COURTROOM DEPUTY:  We are hanging up?

14           THE COURT:  Okay.

15           (WHEREUPON, at 11:38 a.m., the proceedings were

16   concluded.)

17

18                       * * * *

19

20              REPORTER'S CERTIFICATE

21           I, ANNETTE M. MONTALVO, do hereby certify that the
     above and foregoing constitutes a true and accurate transcript
22   of my stenographic notes and is a full, true and complete
     transcript of the proceedings to the best of my ability.

23           Dated this 19th day of May, 2017.

24   /s/Annette M. Montalvo
     Annette M. Montalvo, CSR, RDR, CRR
25   Official Court Reporter